60,547-11

WRIT NUMBER: WR-60-547-13

IN THE

COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

RECEIVED IN
COURT OF CRIMINAL APPEALS

FEB 23 2015

Abel Acosta, Clerk

EX PARTE

DANIEL JAMES SIXTA

APPLICANT.

MOTION DENIED
DATE: 2-25-15
BY: P.C.

APPLICANT'S SUGGESTION FOR
RECONSIDERATION ON THE COURT'S
OWN INITATIVE. TRAP 79.2(D).

Trial Court Cause Number: 923949, from the
351st District Court of Harris County, Texas

Daniel James Sixta
Applicant- pro se
TDCJ #:1143232
H.H. Coffield Unit
2661 F.M. 2054
Tennessee Colony, TX 75884

ORAL ARGUMENT REQUESTED.

WRIT NUMBER: WR-60-547-13

IN THE

COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

EX PARTE

DANIEL JAMES SIXTA

APPLICANT.

APPLICANT'S SUGGESTION FOR
RECONSIDERATION ON THE COURT'S
OWN INITATIVE. TRAP 79.2(D).

Trial Court Cause Number:923949, from the
351st District Court of Harris County, Texas

Daniel James Sixta
Applicant- pro se
TDCJ #:1143232
H.H. Coffield Unit
2661 F.M. 2054
Tennessee Colony,TX 75884

ORAL ARGUMENT REQUESTED.

WRIT NUMBER: WR-60-547-13

EX PARTE

DANIEL JAMES SIXTA

APPLICANT

TO THE HONORABLE JUSTICES OF THE COURT OF CRIMINAL APPEALS:

Applicant suggests to the Court it should on its own motion or its own initative, pursuant to Texas Rules of Appellate Procedure 79.2(d), reconsider the denial of his application for a writ of habeas corpus.

## A. INTRODUCTION

The Applicant is Daniel James Sixta; the respondent is the State of Texas by and through the Harris County District Attorney.

Applicant suggests , on its own initative, the Court reconsider the denial of Applicant's application for a writ of habeas corpus.

## B. FACTS

On December 12, 2002, Applicant was convicted of the offense

of Intoxication Manslaughter and sentenced to 20 years confinement in the Texas Department of Criminal Justice, with a 5,000 dollar fine.

Applicant entered a Plea of NOT-Gulity. His trial was before a jury for the guilt-innocence and the punishment. Applicant testified only at the punishment phase of the trial.

Applicant's conviction was affirmed by the First Court of Appeals on December 18, 2003., The Appellate cause number is: 01-02-01316-CR. Applicant filed a Petition for Discretionary Review (NO. 032804) which was denied in 2004.

Applicant's first application for a writ of habeas corpus under art. 11.07 was denied on July 26, 2006. His second application seeking relief from the final judgment was dismissed for non-compliance on May 23, 2012.

Importantly, before the filing of his third application for writ of habeas corpus, the legislative enactment of Article 11.073, went into effect. Applicant alleged in his third writ application that this new law, and new scientific evidence, unavailable prior to October 1, 2013, entitled him to pass through the gate-keeping provision of Section 4 of art. 11.07. This court denied his third application on:

## C. ARGUMENT & AUTHORITIES

### a. Texas Rules of Appellate procedure, 79.2(d)

Texas Rules of Appellate procedure, Rule 79.2 provides "A motion for rehearing on order that denies habeas corpus relief

under Code of Criminal Procedure, articles 11.07..., may not be filed. The Court may on its own initative reconsider the Case." Tex.R.App. Proc. Ann. 79.2(d) (Vernon's 2013). See, <u>Ex parte Moussazadeh</u>, (Tex.Crim.App. 2012, 2012 WL 468518) (Moussazadeh's suggestion that the Court reconsider the denial of his previous application for writ of habeas corpus, on its own motion.)

**b. Texas Code of Criminal Procedure, art. 11.073.**

This past legislative session, Senate Bill 344 was passed and was codified as Article 11.073 of the Code of Criminal Procedure to create an avenue for relief for people who were wrongfuly convicted as a result of unavailable or erroneous scientific evidence. This statute, which took effect on September 1, 2013, allows for a writ of successive writ of habeas corpus to be brought concerning relevant scientific evidence that: "(1) was not available to be offered in evidence by a convicted person at the convicted person's trial; or (2) contradicts scientific evidence relied on by the State at trial." <u>Act of June 14, 2013, 83rd Leg., R.S., Ch. 412 2013, Tex.Sess.Law Serv. 1197 (West 2013) (codified at Tex.Code Crim. Proc. Ann. art. 11.073).</u> Additionally, in order to consider new advances in science, the statute directs the trial court to make a finding to [c]on- whether the scientific knowledge or method on which the relevant scientific evidence is based has changed since "the trial date or the date that the original or previously-considered applic-

ion for writ of habeas corpus was filed." Id.

Prior to the passage of this bill, under the strict limitations of the Code of Criminal Procedure, the convicted were only allowed to advance one writ of habeas corpus, absent strict procedural hurdles.(See Tex.Code.Crim.Proc. Art. 11.07 §4.) The result was that when scientific principles were undermined by advancing science, those convictions could not be challenged. The rationale in the passage of this statute was most likely the procedurally-complex case of Neal Hampton Robbins.

In Ex parte Robbins, 360 S.W. 3d 446, 448 (Tex.Crim.App. 2011), Mr. Robbins sought relief from his 1999 Montgomery County capital murder conviction, which had been based largely upon testimony of the medical examiner. The medical examiner testified that the death of the complainant child was the result of asphyxia from compression. Id. at 460. Years after her testimony, the medical examiner stated that she could no longer stand by her prior testimony that the death was a homicide. Id. at 499. The Examiner claimed she "[c]ould no longer testify within a reasonable of medical certainty that the complainant's death in this case was the result of compression asphyxia" or "[t]hat the [manner] of death in this case was homicide." Id. at 460. After hearing from numerous experts and witnesses, the Trial court recommended that Mr. Robbins be granted a new trial "[b]cause his due process and due course of law rights were violated, as was his right to an impartial jury." Id. at 457.

Despite the typical deference given to Trial court's findings, the Court of Criminal Appeals denied relief, determining that at the time the medical examiner gave her testimony it was not "false." Id at 463. The rationale was based largely on the fact that Robbins had not unquestionably established his innocence. In dissent, Judge Cochran expressed the difficulties with the case as follows:

> When scientific experts honestly and sincerely thought "X" was true at the time they testified, but the science has changed or the experts' understanding of of the science has changed and their opinions have changed, what cognizance of the change should the the criminal justice system take long after a person has been convicted? Id. 469 (Cochran, J., dissenting).

To put Robbins in context, a review of Ex parte Henderson 384 S.W. 833 (Tex.Crim.App. 2012) is helpful. In Henderson, a child's death was again the offense, but the crucial issue was whether the short-distance fall that resulted in the death 'could' have been an accident. The single contested issue in the 1995 capital-murder trial was whether applicant intended to kill [the complainant] or whether she recklessly, negligently, or accidentally caused his death." Id. at 838. At the original trial, the medical examiner "[t]estified that it was 'impossible' for the [complainant's] extensive brain injuries to have occurred in the way that applicant stated. He testified that her story was false and incredible.'" Ex parte Henderson, 246 S.W. 3d 690, 691 (Tex.Crim.App. 2007). The medical examiner opined it was an "intentional murder," and further declared, "[I] would

say the baby was caught up with the hands by the arms along the body and then swung and slammed very hard against a flat surface." Id at 691.

However, the science of biomechanics had advanced rapidly between Henderson's trial and 2007, when she sought a stay of execution. At that time, and after considering the new scientific reports, the medical examiner stated:

> Since 1995, when I testified..., the medical profession has gained a greater understanding of pediatric head trauma and the extent of injuries that can occur in ...relatively short distance falls, based in part on the applicantion of principles of phyiscs and bio-mechanics.... If this new scientific information had been available to me in 1995, I would have taken it into account before attemption to formulate an opinion about the circumstances leading to the injury. Henderson, 383 S.W.3d at 839

While the Henderson Court in a per curiam, one-page opinion, did "[n]ot accept the trial court's conclusions concerning actual innocence," but accepted "[t]he court's recommendation to grant relief and remand for a new trial." id at 834. And while opinion did not distinguish Robbins, Judge Cochran concurred in the granting of the new trial, but noted that "[t]his case raises the same novel and difficult issue for the criminal-justice system that this court faced, and , I maintain, fumbled in Ex parte Robbins." Id. at 837 (Cochran, J. Concurring) In trying to explain the distinction between the two cases, Judge Alcala wrote in a concurring opinion that "[t]his trial court finds that new scientific evidence is the basis for ordering a new trial." Id. at 851(Alcala, J. concurring).

A distinction without a difference could best describe the disparate results between the two cases. Robbins has now filed an original application for habeas corpus relief under Article 11.073,° and it has been filed and set for consideration. This case will probably be the seminal decision addressing the statute, and may well be applicable to this applicant's conviction.

c. **Applicant's claims were cognizable under 11.073.**

Applicant's claim is cognizable pursuant to Article 11.073, (a)(1) and (2). There is little doubt that some convictions result from testimony or other evidence that is based upon dubious scientific principles. Article 11.073 gives those convicted under scientific principles that are no longer valid a proper vehicle to obtain post conviction relief, and the Legislature has passed this new law to authorize judicial review of convictions based on faulty scientific principles.

On November 27, 2013, this Court, entered the following order: The parties shall brief the the following issues: (1) whether Article 11.073 is a new legal or factual basis under Article 11.07, :4(a); (2) whether an "original application or a previously considered application," as set out in Article 11.073(c),(d)(2), means an application filed on or after September 1, 2013, (3) whether " the scientific knowledge or method on which the relevant scientific evidence is based," as set out in article 11.073(d), applies to an individual expert's knowledge and method; (4) whether relevant scientific evidence is "currently available and was not available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of due diligence," as set out in Article 11.073(b)(1)-(A), if an experts witness for the State no longer stands by his opinion testimony at trial andand the jury heard testimony (from the defense that is consistent with the State's expert's new, post-trial opinion; (5) whether "changed," as set out in Article 11.073(d), applies to cases in which an expert witness changes his opinion after trial; and (6) whether Applicant is entitled to relief under Article 11.073 (b). The parties shall brief these issues. The parties may also brief any other issue they deem relevant to the construction of Article 11.03. Ex parte Robbins, No. WR-7384-02, 2013 WL 6212218 ,at *1 (Tex.Crim.App. Nov 27, 2013, order) (not designated for publication).

In Applicant's C-Writ, on page four (4) of the application where he is required to provide "the reason that the current claims were not presented and could not have been presented on [his] previous application." He makes clear the C-Writ is being brought under the provisions of the new law: Art.11.073. [Texas Code of Criminal Procedure].

That Applicant explained in his First Ground offered for for review that he was actually innocent, and that based on on the newly dicovered evidence which should have been considered under Art. 11.073 that:

> There was a collision between applicant's vehicle and another vehicle, the passenger in the other vehicle [was] killed. it was vital to the State's case to prove the collision was applicant's fault. It was also vital for 'indigent' applicant, charged with intoxication manslaughter, to prove the driver of the other vehicle (Alford) was at fault. He was assured by counsel he'd have an expert to combat the State's version of the of the collision. The court and counsel agreed that applicant needed to opinion of an expert to reconstruct the collision. The court allowed court-appointed counsel $750 for that purpose, yet failed to obtain the defense witness, a witness crucial to Applicant's defense. The money was not used for that purpose, and counsel made no attempt to get additional funds. Applicant was left without his defense.
>
> After Applicant filed his first pro se application his counsel was ordered to submit his affidavit explaining his actions. He stated in his affidavit that the money allowed was not enough to hire an expert, and

"that a defense witness would not have testified differently as to the evidence presented by the state." (exhibit four [in the C-Writ]) Later, after Applicant had filed his first pro se application the defense evidence was "newly discovered" by Applicant himself, he being unable to secure it sooner. He was denied his defense at trial and left to discover it for himself after trial. he didn't have funds, counsel or training to "discover" the vital evidence any sooner. Finally, a family member provided funds in 2007 (exhibit seven [in the C-Writ]) after Applicant had done all he could to secure the evidence. (exhibit eight[in the C-Writ] the newly discovered evidence (the Cope Report) which could have, and should have, been presented for applicant at trial would have included the following "findings and opinions" of the expert: the driver of the other vehicle "failed to yield right of way" and "failed to keep a proper lookout." The State's investigator "failed to address the evasive action" taken by Applicant and failed to include the fact that he [Applicant] "braked" prior to impact. The weather and road conditions should have been considered. The report also states, "It is also my opinion that a jury trial without an accident reconstruction professional is highly unfair and would be almost impossible for an accused driver to receive a fair trial," and that the "State would have provided funds for accident reconstruction professional."

He also stated: "this expert has worked for the plaintiff, defense and procutors [sic]in various cases, and has the opinion that a reconstruction is important as well as confident legal representation in any case involving accidents." Exhibit nine[in the C-Writ]).

This claim and evidence presented (the Cope Report) was

sufficient to bring Applicant's C-Writ within the pale of the newly enacted provision of Art. 11.073, Tex.Code Crim. Proc.

**d. The trial court failed in its duty to applicant**

On 2 May, 2014, the State filed its proposed findings of fact, conclusions of law and order. The Trial court adopted these findings of fact, and conclusions of law on 1 July 2014.

Stating:

> The Court has considered the application for writ of habeas corpus, the State's answer, and official court records in the above-captioned cause. The court finds that the applicant has failed to include sufficient specific facts establishing that the current claims could not have been presented previously because the factual or legal basis for the claim was unavailable; or that by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt. Tex.Code Crim.Proc.Ann. art. 11.07 §4(a)(West 2013).

Importantly, the court failed to determine if the C-Writ contained specific facts indicating that:

> (A) relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial; and
> (B) the scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of the application;....

Applicant's newly discovered "scientific evidence," consisted of the true details, analysis and reconstruction of the motor vehicle collision between the vehicle Applicant was driving and another vehicle, the collision resulting in the death of the passenger in the other vehicle. The record supports that the scientific evidence was unavailable to the Applicant before the date Applicant filed his first Application.

The new scientific evidence was derived using "Engineering Dynamics Corporation (EDC) software, with the aid of an on-staff engineer, which included, HVE, EDCRASH, EDSMAC and SIMON. The new 3-D, 5.0 version was developed as a sophisiticated, 3- dimensional user environment for setting up and executing simulations involving humans and vehicles interacting with their environment. This scientific evidence determined, among other things, that the Applicant was traveling between 45-53 mph before braking, that he braked before the collision, that the police investigation was incomplete, that the driver of the other vehicle failed to yield right of way, and failed to keep a proper lookout. (See 6.0- findings and opinions included in the C-Writ appendix "Cope Report".)

## C.   CONCLUSION

The Applicant filed his C-writ, including new scientific evidence which calls into question the evidence used by the State in convicting him of the offense of Intoxication manslaughter. That the new scientific evidence was not ascertainable

through the exercise of reasonable diligence on or before he filed his first writ application. And that the new scientific evidence and method on which it was ascertained changed since the date of Applicant's trial.

## D. PRAYER

For all of these reasons, Applicant prays that the court on its own initative reconsider his C-Writ application.

Respectfully submitted,

X ~~Daniel James Sixta~~
Daniel James Sixta
Applicant-pro se
TDCJ # 1143232
2661 F.M. 2054
Tennessee Colony, Tx 75884

APPENDIX-APPENDIX-APPENDIX-APPENDIX

**Case No. _____**
(The Clerk of the convicting court will fill this line in.)

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### APPLICATION FOR A WRIT OF HABEAS CORPUS
### SEEKING RELIEF FROM FINAL FELONY CONVICTION
### UNDER CODE OF CRIMINAL PROCEDURE, ARTICLE 11.07

NAME:  __DANIEL JAMES SIXTA__

DATE OF BIRTH:  __SEPT. 9, 1960__

PLACE OF CONFINEMENT:  __COFFIELD UNIT, TENNESSEE COLONY, TX__

TDCJ-CID NUMBER: __1143232__          SID NUMBER: _____

(1)     This application concerns (check all that apply):

    ☒    a conviction                ☐ parole

    ☐    a sentence                ☐ mandatory supervision

    ☐    time credit               ☐ out-of-time appeal or petition for discretionary review

(2)     **What district court entered the judgment of the conviction you want relief from?**
(Include the court number and county.)

_____ 351ˢᵀ   DISTRICT COURT OF HARRIS COUNTY, TX_____

(3)     **What was the case number in the trial court?**

_____ 923949 _____

(4)     **What was the name of the trial judge?**

_____ MARK KENT ELLIS _____

(5) Were you represented by counsel?   If yes, provide the attorney's name:

_____YES, MICHAEL BARROW_____

(6) What was the date that the judgment was entered?

_____DEC. 12, 2002_____

(7) For what offense were you convicted and what was the sentence?

___INTOXICATION MANSLAUGHTER:   20 YRS. TDCJ-ID & 5000 FINE___

(8) If you were sentenced on more than one count of an indictment in the same court at the same time, what counts were you convicted of and what was the sentence in each count?

_____

_____

(9) What was the plea you entered? (Check one.)

☐ guilty-open plea          ☐ guilty-plea bargain
☒ not guilty                     ☐ *nolo contendere*/no contest

If you entered different pleas to counts in a multi-count indictment, please explain:

_____

_____

(10) What kind of trial did you have?

☐ no jury          ☒ jury for guilt and punishment
                              ☐ jury for guilt, judge for punishment

2

(11) Did you testify at trial? If yes, at what phase of the trial did you testify?

_____ YES: PUNISHMENT _____

(12) Did you appeal from the judgment of conviction?

☒ yes                 ☐ no

If you did appeal, answer the following questions:

(A) What court of appeals did you appeal to?    FIRST DIST. OF TX., HOUSTON

(B) What was the case number?    01-02-01316-CR

(C) Were you represented by counsel on appeal? If yes, provide the attorney's name:

_____ YES, LEORA KAHN _____

(D) What was the decision and the date of the decision?    AFFIRMED: 12-18-03

(13) Did you file a petition for discretionary review in the Court of Criminal Appeals?

☒ yes                 ☐ no

If you did file a petition for discretionary review, answer the following questions:

(A) What was the case number?    0328-04

(B) What was the decision and the date of the decision?    DENIED: 2004

(14) Have you previously filed an application for a writ of habeas corpus under Article 11.07 of the Texas Code of Criminal Procedure challenging *this conviction*?

☒ yes                 ☐ no

If you answered yes, answer the following questions:

(A) What was the Court of Criminal Appeals' writ number?    WR-60-547-03
                                                                WR-60-547-09

(B) What was the decision and the date of the decision?    <u>DENIED: JULY 26, 2006</u>
<u>DISMISSED:   MAY 23, 2012</u>

(C)  Please identify the reason that the current claims were not presented and could not have been presented on your previous application.

(1) *Actual Innocence - Newly Discovered Evidence*:  Defense evidence re. true cause of collision denied to innocent  Applicant although discoverable by counsel. Was not until after he was in TDCJ-ID and filed his 1st *pro se* application that he was able to get his own expert's report, evidence newly discovered by him but not heard by his jury. (2) *Actual Innocence-Constitutional Error*:   Deprived of defense—due process.  Also, no help with writ-law.  (3) *New Law: Art. 11.073*, re. *scientific evidence*, unavailable until 9-1-13 appears to elevate status of *new evidence* claim.  Also, *Padilla v. Kentucky*, S. Ct. (3-31-2010) shows *collateral consequences* of conviction are inside scope of counsel's representation, not available when 1st application filed.  (Habeas action should be included as "collateral consequence of conviction".)

(15)  Do you currently have any petition or appeal pending in any other state or federal court?

☐ yes                          ☒ no

If you answered yes, please provide the name of the court and the case number:

_____

(16)  If you are presenting a claim for time credit, have you exhausted your administrative remedies by presenting your claim to the time credit resolution system of the Texas Department of Criminal Justice? (This requirement applies to any final felony conviction, including state jail felonies)

yes                                    no

If you answered yes, answer the following questions:

(A)  What date did you present the claim?      _____

(B)  Did you receive a decision and, if yes, what was the date of the decision?

_____

If you answered no, please explain why you have not submitted your claim:

4



(17)   Beginning on page 6, state *concisely* every legal ground for your claim that you are being unlawfully restrained, and then briefly summarize the facts supporting each ground. You must present each ground on the form application and a brief summary of the facts. *If your grounds and brief summary of the facts have not been presented on the form application, the Court will not consider your grounds.*
If you have more than four grounds, use pages 14 and 15 of the form, which you may copy as many times as needed to give you a separate page for each ground, with each ground numbered in sequence. The recitation of the facts supporting each ground must be no longer than the two pages provided for the ground in the form.

You may include with the form a memorandum of law if you want to present legal authorities, but the Court will *not* consider grounds for relief set out in a memorandum of law that were not raised on the form. The citations and argument must be in a memorandum that complies with Texas Rule of Appellate Procedure 73 and does not exceed 15,000 words if computer-generated or 50 pages if not. If you are challenging the validity of your conviction, please include a summary of the facts pertaining to your offense and trial in your memorandum.

**GROUND ONE:**

<u>ACTUAL INNOCENCE</u>

<u>(NEWLY DISCOVERED EVIDENCE)</u>

FACTS SUPPORTING GROUND ONE:

THERE WAS A COLLISION BETWEEN APPLICANT'S VEHICLE AND ANOTHER VEHICLE, THE PASSENGER IN THE OTHER VEHICLE KILLED. IT WAS VITAL TO THE STATE'S CASE TO PROVE THE COLLISION WAS APPLICANT'S FAULT. IT WAS ALSO VITAL FOR "INDIGENT" APPLICANT, CHARGED WITH INTOXICATION MANSLAUGHTER, TO PROVE THE DRIVER OF THE OTHER VEHICLE (ALFORD) WAS AT FAULT. HE WAS ASSURED BY COUNSEL HE'D HAVE AN EXPERT TO COMBAT THE STATE'S VERSION OF THE COLLISION. THE COURT AND COUNSEL AGREED THAT APPLICANT NEEDED THE OPINION OF AN EXPERT TO RECONSTRUCT THE COLLISION. THE COURT ALLOWED COURT-APPOINTED COUNSEL $750 FOR THAT PURPOSE, YET COUNSEL FAILED TO OBTAIN THE DEFENSE WITNESS, A WITNESS CRUCIAL TO APPLICANT'S DEFENSE. THE MONEY WAS NOT USED FOR THAT PURPOSE, AND COUNSEL MADE NO ATTEMPT TO GET ADDITIONAL FUNDS. APPLICANT WAS LEFT WITHOUT HIS DEFENSE.

AFTER APPLICANT FILED HIS FIRST *PRO SE* APPLICATION HIS COUNSEL WAS ORDERED TO SUBMIT HIS AFFIDAVIT EXPLAINING HIS ACTIONS. HE STATED IN HIS AFFIDAVIT THAT THE MONEY ALLOWED WAS NOT ENOUGH TO HIRE AN EXPERT, AND "THAT A DEFENSE WITNESS WOULD NOT HAVE TESTIFIED DIFFERENTLY AS TO THE EVIDENCE PRESENTED BY THE STATE." (EXHIBIT FOUR) LATER, AFTER APPLICANT HAD FILED HIS FIRST *PRO SE*

6

APPLICATION THE DEFENSE EVIDENCE WAS "NEWLY DISCOVERED" BY APPLICANT HIMSELF, HE BEING UNABLE TO SECURE IT SOONER. HE WAS DENIED HIS DEFENSE AT TRIAL AND LEFT TO DISCOVER IT FOR HIMSELF AFTER TRIAL. HE DIDN'T HAVE FUNDS, COUNSEL OR TRAINING TO "DISCOVER" THE VITAL EVIDENCE ANY SOONER. FINALLY, A FAMILY MEMBER PROVIDED FUNDS IN 2007 (EXHIBIT SEVEN) AFTER APPLICANT HAD DONE ALL HE COULD TO SECURE THE EVIDENCE. (EXHIBIT EIGHT) THE NEWLY DISCOVERED EVIDENCE (THE COPE REPORT) WHICH COULD HAVE, AND SHOULD HAVE, BEEN PRESENTED FOR APPLICANT AT TRIAL WOULD HAVE INCLUDED THE FOLLOWING "FINDINGS AND OPINIONS" OF THE EXPERT: THE DRIVER OF THE OTHER VEHICLE "FAILED TO YIELD RIGHT OF WAY" AND "FAILED TO KEEP A PROPER LOOKOUT." THE STATE'S INVESTIGATOR "FAILED TO ADDRESS THE EVASIVE ACTION" TAKEN BY APPLICANT, AND FAILED TO INCLUDE THE FACT THAT HE "BRAKED" PRIOR TO IMPACT. THE WEATHER AND ROAD CONDITIONS SHOULD HAVE BEEN CONSIDERED. THE REPORT ALSO STATES, "IT IS ALSO MY OPINION THAT A JURY TRIAL WITHOUT AN ACCIDENT RECONSTRUCTION PROFESSIONAL IS HIGHLY UNFAIR AND WOULD BE ALMOST IMPOSSIBLE FOR AN ACCUSED DRIVER TO RECEIVE A FAIR TRIAL," AND THAT THE "STATE SHOULD HAVE PROVIDED FUNDS FOR ACCIDENT RECONSTRUCTION PROFESSIONAL."

HE ALSO STATED: "THIS EXPERT HAS WORKED FOR THE PLAINTIFF, DEFENSE AND PROCUTORS IN VARIOUS CASES, AND HAS THE OPINION THAT A RECONSTRUCTION IS IMPORTANT AS WELL AS CONFIDENT LEGAL REPRESENTATION IN ANY CASE INVOLVING ACCIDENTS." (EXHIBIT NINE)

7

**GROUND TWO:**

ACTUAL INNOCENSE

("INTERTWINED" WITH CONSTITUTIONAL ERROR)

FACTS SUPPORTING GROUND TWO:

THE RECORD, ESPECIALLY THE *COURT-ORDERED AFFIDAVIT* OF HIS TRIAL ATTORNEY, CONFIRMS THE FACT THAT APPLICANT WAS DENIED DUE PROCESS OF LAW, DENIED THE OPINION OF HIS OWN EXPERT. EVEN THE STATE'S RESPONSE IN ITS "RESPONDENT'S ORIGINAL ANSWER" TO APPLICANT'S FIRST "11.07" LENDS CREDIBILITY TO APPLICANT'S CLAIM THAT HIS TRIAL COUNSEL DID NOT ADEQUATELY INVESTIGATE THE CAUSE OF THE COLLISION, WHEN THE STATE ASSERTS THAT IN ORDER TO OBTAIN HABEAS RELIEF THE APPLICANT "MUST SHOW WHAT A MORE IN-DEPTH INVESTIGATION WOULD HAVE REVEALED." (EXHIBIT SIX) APPLICANT'S *NEWLY DISCOVERED EVIDENCE* (THE COPE REPORT) SHOWS WHAT "A MORE IN-DEPTH INVESTIGATION" WOULD HAVE REVEALED AT TRIAL.

THE OUTCOME OF THE CASE DEPENDED UPON THE ANSWER TO THIS QUESTION: WHICH DRIVER CAUSED THE COLLISION WHICH RESULTED IN THE DEATH? IN ORDER TO GET A CONVICTION THE STATE HAD TO PROVE THAT APPLICANT WAS AT FAULT. TO BE ACQUITTED APPLICANT HAD TO SHOW OTHERWISE.

THE STATE'S KEY WITNESS, ALFORD, WAS THE DRIVER OF THE VEHICLE IN WHICH HER SISTER WAS RIDING AS A PASSENGER. HER SISTER DIED AS A RESULT OF INJURIES RECEIVED IN THE COLLISION. THE RECORD SHOWS THE FOLLOWING: (1) THE SISTERS WERE IN A *RENTED* CAR AND IT

8

WAS *ALFORD* WHO UNDERTOOK TO DRIVE THE CAR, FOR THE *FIRST TIME*; (PAGE 15 OF EXHIBIT TEN); (2) ALFORD WAS FAMILIAR WITH THE AREA WHERE THE COLLISION OCCURRED: (PAGE 16 OF EXHIBIT TEN); (3) IT WAS A BUSY INTERSECTION ON THAT NIGHT: (PAGE 19 OF EXHIBIT TEN); (4) IT WAS ALFORD'S *SISTER* WHO WAS WATCHING OUT: "MY SISTER SCREAMED OUT, "WATCH OUT." AND I LOOKED AT HER AND SAID "WHAT?" (PAGE 21, LINE 7 OF EXHIBIT TEN); (5) ALFORD HAD NOT EVEN LOOKED IN THE DIRECTION OF APPLICANT'S VEHICLE UNTIL AFTER HER VEHICLE WAS STRUCK. (PAGE 21, LINE 21 OF EXHIBIT TEN) CLEARLY, ALFORD *FAILED TO KEEP A PROPER LOOKOUT.*

HAD APPLICANT BEEN PROVIDED WITH HIS OWN ACCIDENT RECONSTRUCTION EXPERT, ESPECIALLY WHEN COUPLED WITH THE ABOVE EVIDENCE, THE OUTCOME OF THE TRIAL WOULD HAVE BEEN DIFFERENT. NO REASONABLE OR RATIONAL JUROR WOULD HAVE FOUND APPLICANT GUILTY BEYOND A REASONABLE DOUBT.

9

GROUND THREE:

## INEFFECTIVE ASSISTANCE OF COUNSEL

## (FAILURE TO ADEQUATELY INVESTIGATE FACTS OF THE CASE)

FACTS SUPPORTING GROUND THREE:

A VERY CLEAR FACT IS THAT THE CAUSE OF THE COLLISION WHICH RESULTED IN THE DEATH OF THE PASSENGER IN THE OTHER VEHICLE WAS A VITAL PART OF THE STATE'S CASE. LIKEWISE, THIS ISSUE WAS IMPORTANT TO APPLICANT'S DEFENSE. YET, APPLICANT'S COUNSEL FAILED TO ADEQUATELY INVESTIGATE THIS CRUCIAL ASPECT OF THE CASE; HE FAILED TO BE READY TO COMBAT THE STATE'S VERSION OF THE CAUSE OF THE COLLISION.

THE TRIAL COURT, OBVIOUSLY CONCERNED AFTER APPLICANT HAD FILED HIS FIRST *PRO SE* APPLICATION, ORDERED COUNSEL TO FILE AN AFFIDAVIT STATING, AMONG OTHER THINGS, WHETHER HE HAD "INVESTIGATED POTENTIAL WITNESSES WHO COULD HAVE REBUTTED THE STATE'S PHYSICAL EVIDENCE." COUNSEL'S AFFIDAVIT REVEALS HOW LAME HIS EFFORTS WERE, CONSISTING ONLY OF TALKING TO OTHER ATTORNEYS AND REVIEWING THE "FACTS, FIGURES, AND COMPUTATIONS" OF HIS *OWN* WITNESS, AND THEN CONCLUDING, "THAT A DEFENSE WITNESS COULD NOT HAVE TESTIFIED DIFFERENTLY AS TO THE EVIDENCE PRESENTED BY THE STATE." (EXHIBIT FOUR)

COUNSEL FAILED TO USE THE MONEY (ONLY $750) TO SECURE A DEFENSE TO THE STATE'S VERSION OF THE CAUSE OF THE COLLISION, AND FAILED TO ASK THE COURT FOR MORE FUNDS. HE DID NOT SEEK OUT AND

10

INTERVIEW POTENTIAL WITNESSES, FAILING TO MAKE AN INDEPENDENT INVESTIGATION OF THE FACTS OF THE CASE. IT WAS A MATTER OF NEGLIGENCE AND MONEY, NOT A MATTER OF STRATEGY.

A PROPER INVESTIGATION OF THE FACTS BY COUNSEL WOULD HAVE RESULTED IN A DEFENSE AT LEAST AKIN TO THE DEFENSE APPLICANT WAS LEFT TO DISCOVER FOR HIMSELF. (COPE REPORT-EXHIBIT NINE)

APPLICANT WAS HARMED BY COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE THE FACTS OF THE CASE, AS SHOWN BY THE GUILTY VERDICT AND MAXIMUM TIME ASSESSED BY THE JURY: BUT FOR THIS FAILURE OF DUTY, THE OUTCOME OF THE TRIAL WOULD HAVE BEEN DIFFERENT, AS NO REASONABLE OR RATIONAL JUROR WOULD HAVE CONVICTED APPLICANT.

FURTHER, APPLICANT'S ATTORNEY FAILED TO ASK FOR ANY KIND OF HEARING TO EVALUATE THE TESTIMONY OF THE SHERIFF'S DEPARTMENT EMPLOYEE WHO WAS TO GIVE HIS OPINIONS REGARDING THE COLLISION. THE TRIAL JUDGE DID NOT REVIEW THE OPINIONS OF THE WITNESS BEFORE THEY WERE ADMITTED INTO EVIDENCE. THERE WAS NO TEST OF THE SOUNDNESS, BASIS, OR VALIDITY OF THE SO-CALLED "SCIENTIFIC" OR "EXPERT" TESTIMONY TO BE PROFFERED BY THE STATE.

11

**GROUND FOUR:**

## INEFFECTIVE ASSISTANCE OF CONSEL

## (FAILURE TO ASSERT AN AVAILABLE DEFENSE)

**FACTS SUPPORTING GROUND FOUR:**

APPLICANT'S COUNSEL FAILED TO ASSERT AN AVAILABLE DEFENSE. A DEFENSE WAS OUT THERE, WAITING, DISCOVERABLE BY COUNSEL HAD HE DECIDED TO OBTAIN IT FOR APPLICANT'S DEFENSE. COUNSEL WAS ILL-PREPARED FOR CROSS EXAMINATION OR FOR ADVANCING A DEFENSE. THE RECORD SHOWS IT WAS A MATTER OF NEGLIGENCE AND MONEY, NOT A MATTER OF STRATEGY.

APPLICANT'S COUNSEL HAD BEEN ALLOWED FUNDS TO SECURE AN EXPERT TO ANALYZE AND RECONSTRUCT THE MOTOR VEHICLE COLLISION IN ORDER TO COMBAT THE STATE'S VERSION OF THE COLLISION. FIRST, HE WHOLLY FAILED TO USE THE FUNDS FOR THAT PURPOSE. SECONDLY, HE WHOLLY FAILED TO TRY TO OBTAIN MORE FUNDS FOR THAT PURPOSE. THE NET RESULT OF THESE FAILINGS WAS THAT APPLICANT WAS DENIED HIS DEFENSE, A DEFENSE WHICH WOULD HAVE SHOWN THAT THE DRIVER OF THE OTHER VEHICLE WAS AT FAULT, THEREBY CAUSING THE DEATH OF HER PASSENGER, SUCH EVIDENCE ESSENTIALLY NEGATING THE STATE'S VERSION OF THE CAUSE OF THE COLLISION. APPLICANT HAS SHOWN THAT A DEFENSE TO THE STATE'S VERSION OF THE COLLISION WAS AVAILABLE, DISCOVERABLE BY COUNSEL, YET HE FAILED, WITHOUT SUFFICIENT CAUSE, TO PRESENT IT FOR APPLICANT. NO REASONABLE OR RATIONAL JUROR WOULD HAVE CONVICTED APPLICANT HAD THE DEFENSE BEEN PRESENTED.

**GROUND FIVE:**

**INEFFECTIVE ASSISTANCE OF COUNSEL**

**(FAILURE IN PERFORMANCE)**

**FACTS SUPPORTING GROUND FIVE:**

*COUNSEL PRESSED APPLICANT TO TESTIFY AT PUNISHMENT PHASE OF TRIAL, DISREGARDING HIS PHYSICAL AND MENTAL CONDITION.* SHORTLY BEFORE THE PUNISHMENT PHASE OF HIS TRIAL APPLICANT HAD TRIED TO KILL HIMSELF, FAILING ONLY BECAUSE OF A BED CHECK THAT NIGHT. OVER 100 STITCHES TAKEN IN HIS ARM. A FEW HOURS LATER HE WAS TAKEN BACK TO THE COURTROOM FOR THE PUNISHMENT PHASE OF HIS TRIAL. HE DIDN'T WANT TO GO THROUGH THE PAINFUL PROCESS OF CHANGING BACK INTO HIS SUIT, BUT THE JUDGE SENT A DEPUTY TO FORCIBLY MAKE HIM CHANGE FROM THE JAIL SUIT INTO HIS SUIT. YET, THE BLOOD ON HIS SLEEVES COULD BE SEEN, AS THE BANDAGES WENT FROM HIS KNUCKLES TO HIS ELBOWS. (HE HAD CUT THE VEINS ON HIS HANDS BECAUSE HE WANTED TO "BLEED OUT" AS FAST AS POSSIBLE.)

APPLICANT'S PHYSICAL AND MENTAL CAPACITIES WERE CLEARLY DIMINISHED, YET NEITHER HIS COUNSEL NOR THE COURT MADE ANY ALLOWANCE FOR HIS CONDITION. HE WAS COMPELLED TO CONTINUE.

THE JUDGE ADMONISHED HIM NOT TO MENTION THE SUICIDE ATTEMPT. HE WAS DENIED A RIGHT TO EXPLAIN HIS CONDITION OR THE QUALITY OF HIS TESTIMONY TO THE JURY. THE JUDGE APPARENTLY FELT APPLICANT WAS LUCKY TO BE ALIVE: HE SAID, "MR. SIXTA, I'M

14

NOT—WHATEVER HAPPENED LAST NIGHT, OBVIOUSLY, *I'M GLAD YOU'RE ALIVE AND ALL THAT STUFF*, BUT THAT'S NOT RELEVANT TO THIS HEARING. SO, YOU'RE NOT TO TALK ABOUT IT." (EXHIBIT ELEVEN) IT WAS NOT UNTIL A FEW DAYS LATER THAT APPLICANT, BY READING A NEWSPAPER ACCOUNT, REALIZED WHAT ALL HAD HAPPENED .

THE NET RESULTS OF APPLICANT'S CONDITION, AND THE RESPONSE OF COUNSEL AND THE COURT TO IT, WAS THAT APPLICANT RECIEVED THE MAXIMUM TIME OF TWENTY YEARS.

IN COUNSEL'S AFFIDAVIT HE WAS TOLD TO "STATE WHETHER COUNSEL BELIEVED THAT APPLICANT HAD SUFFICIENT PRESENT ABILITY TO CONSULT WITH COUNSEL WITH A REASONABLE DEGREE OF RATIONAL UNDERSTANDING AND HAD A RATIONAL AND FACTUAL UNDERSTANDING OF THE PROCEEDINGS AGAINST HIM ON THE DATE OF THE TRIAL." COUNSEL GAVE APPLICANT A GLOWING REPORT, FAILING TO MENTION APPLICANT'S CONDITION. (PAGES " 82" & "83", EXHIBIT FOUR)

FORCING APPLICANT TO TESTIFY IN HIS CONDITION DEPRIVED HIM OF THAT FAIR TRIAL AND THAT DUE PROCESS OF LAW TO WHICH HE WAS ENTITLED. NO REASONABLE OR RATIONAL JUROR WOULD HAVE ASSESSED THE MAXIMUM TIME OF 20 YEARS HAD APPLICANT NOT BEEN PHYICALLY AND MENTALLY IMPAIRED AT THE PUNISHMENT PHASE OF HIS TRIAL, YET MADE TO TESTIFY WITHOUT EVEN THE BENEFIT OF MITIGATING EVIDENCE.

15

**GROUND SIX:**

**INEFFECTIVE ASSISTANCE OF COUNSEL**

**(FAILURE IN PERFORMANCE)**

**FACTS SUPPORTING GROUND SIX:**

*COUNSEL FAILED TO PRESENT MITIGATING EVIDENCE AT THE PUNISHMENT PHASE OF THE TRIAL.*

HE COULD HAVE SHOWN APPLICANT'S POSITIVE ACCOMPLISHMENTS, SUCH AS HIS MILITARY EXPERIENCE, HIS EDUCATION, HIS POSITIVE CAREER ACCOMPLISHMENTS, AND POSITIVE ASPECTS OF APPLICANT'S NATURE AND CHARACTER, AND ALL OTHER MITIGATING EVIDENCE ALLOWED BY LAW. THE DENIAL OF THE MITIGATING EVIDENCE RESULTED IN APPLICANT'S RECEIVING THE MAXIMUM TWENTY YEAR SENTENCE. SOME EXAMPLES OF THE MITIGATING EVIDENCE WHICH COULD HAVE BEEN SHOWN ARE:

*EDUCATION*: HIGH SCHOOL; CITY OF HOUSTON ELECTRICAL APPRENTICE PROGRAM; UNIVERSITY OF HOUSTON STATIONARY ENGINEERING PROGRAM; ADAMS SCHOOL OF ENGINEERING; STATIONARY ENGINEERING PROGRAM; *MILITARY SERVICE*: RANK E4 CORPORAL; HONORABLE DISCHARGE; MOS MILITARY POLICE; THREE MERITORIOUS PROMOTIONS; TWO MERITORIOUS MASS; *DECORATIONS*: MERITORIOUS UNIT COMMENDATION; OVERSEAS COMMENDATION; GOOD CONDUCT COMMENDATION; RIFLE MARKSMAN; PISTOL MARKSMAN. *MILITARY PERSONAL HIGHLIGHTS*: CHOSEN IN 1980 TO COMPETE IN COMPETITION CALLED "SUPER SQUAD" CONSIDERED TO BE ONLY FOR THE BEST OF THE BEST OF THE ENTIRE MARINE CORP. EVENTUALLY FINISHED 4TH PLACE,

16

RECEIVING A MERITORIOUS PROMOTION, E4 IN UNDER TWO YEARS. *CAREER PROGRESSION*: 1981 -1983: OB GILBERT ELECTRIC - ELECTRICIAN. A HIGHLY QUALIFIED DEDICATED TECHNICALLY SKILLED ELECTRICIAN. 1983 – 1986: HINE INTEREST – LICENSED STATIONARY ENGINEER, SERVICING WATER CHILLERS, BOILERS, GENERATORS, COOLING TOWERS, WATER TREATMENT, ENERGY MANAGEMENT SYSTEMS. 1986 – 1990: SIXTA GATE (DBA) OWNER – INSTALLING AND SERVICING ALL TYPES OF ACCESS CONTROL EQUIPMENT. PROVIDED COMPLETE SCOPE OF INFORMATION FROM SCHEMATICS, BLUE PRINTS, ON-SITE TRAINING FOR PERSONNEL. 1990 -2002: G.F.A.C., INC, CEO – FOUNDED RESEARCH AND DEVELOPED A COMPANY TO CREATE THE STATE OF THE ART ACCESS CONTROL COMPANY SPECIALIZING IN THE SERVICE AND INSTALLATION OF ALL TYPES OF ACCESS CONTROL EQUIPMENT, VIDEO CAMERAS, TELEPHONE SYSTEMS, INTERCOMS, UPS, GATE OPERATORS & SECURITY SYSTEM, KEY PADS, RETINA SCANNERS, PRINT SCANNERS. WAS LICENSED DISTRIBUTOR FOR NINE MANUFACTURING COMPANIES. *TEXAS STATE LICENSES*: 3RD GRADE STATIONARY ENGINEERING; BOILER OPERATOR; ELECTRICIAN; *VOLUNTEER HISTORY*: 6 YEARS BRIGHT HORIZON DAY CARE PARENT ADVISORY BOARD; 3 YEARS LITTLE LEAGUE COACH; 3 YEARS LITTLE LEAGUE TEAM SUPPORTER; 5 YEARS PTO HAIR GROVE ELEMENTARY; 4 YEARS HABITAT FOR HUMANITY; 9 YEARS SAN JACINTO CORVETTE CLUB; *CHURCH*: 11 YEARS MEMBER OF THE BREAD OF LIFE CHURCH.

NO REASONABLE OR RATIONAL JUROR WOULD HAVE ASSESSED SUCH A SEVERE PUNISHMENT HAD THEY HEARD MITIGATING EVIDENCE.

17

**GROUND SEVEN:**

INEFFECTIVE ASSISTANCE OF COUNSEL

(FAILURE IN PERFORMANCE)

FACTS SUPPORTING GROUND SEVEN:

*COUNSEL FAILED TO PRESERVE ERROR RE. EXHIBIT NO. 54 (A TAPE).* THE DRIVER (ALFORD) OF THE OTHER VEHICLE TESTIFIED AS TO HER ACCOUNT OF THE COLLISION WHICH RESULTED IN THE DEATH OF HER SISTER. ALSO, AT THE PUNISHMENT PHASE, THE STATE INTRODUCED A TAPE RECORDING (EXHIBIT NO. 54) OF HER ACCOUNT OF THE COLLISION. APPLICANT ASSERTS THAT THE TAPE REVEALS THAT THIS WITNESS WAS LYING. HIS CONCERN AND OBJECTION TO THIS TESTIMONY WAS MADE CLEAR BY HIM TO HIS TRIAL COUNSEL. APPLICANT WAS CONVINCED THAT THE WITNESS SHOULD BE CROSS-EXAMINED ON THIS ISSUE—I.E., THAT ALFORD WAS CHANGING HER ACCOUNT OF THE COLLISION. HIS COUNSEL WAVED HIM OFF, MAKING NO EFFORT TO ATTACK THE CREDIBILITY OF THIS WITNESS. THIS WITNESS'S TESTIMONY, WITH WHAT APPLICANT BELIEVES TO BE ITS CONTRADICTIONS, WAS LEFT UNSCATHED, AND APPLICANT BELIEVES THE TAPE WOULD HELP PROVE HIS ACTUAL INNOCENCE.

APPLICANT'S PERSONAL EFFORTS TO GAIN ACCESS TO THE TAPE WERE EXERCISES IN FUTILITY. HOWEVER, THE HARRIS COUNTY OFFICIALS HAVE TREATED APPLICANT'S UNDERSIGNED ATTORNEY WITH COURTESY, BUT APPARENTLY WOULD NEED A COURT ORDER DIRECTED TO THE HARRIS COUNTY DISTRICT CLERK TO PRODUCE THE TAPE. BY THIS APPLICATION,

18

**APPLICANT NOW HAS AN ACTION BEFORE THE TRIAL COURT. ACCORDINGLY, HE NOW ASKS THE TRIAL COURT AND THE TEXAS COURT OF CRIMINAL APPEALS TO ORDER THE PRODUCTION OF THE EXHIBIT (EXHIBIT NO. 54, A TAPE IN CAUSE NO. 923949) AS A PART OF APPLICANT'S HABEAS ACTION.**

**GROUND EIGHT:**

<u>DENIAL OF DUE PROCESS OF LAW</u>

<u>(FAILURE OF COUNSEL & COURT TO GIVE NOTICE RE. HABEAS RIGHTS)</u>

FACTS SUPPORTING GROUND EIGHT:

<u>APPLICANT RECEIVED NO NOTICE OR ADVICE OF ANY KIND FROM HIS COUNSEL OR THE TRIAL COURT REGARDING HIS HABEAS CORPUS RIGHTS. ALTHOUGH HE WAS HONORABLY DISCHARGED FROM THE UNITED STATES MARINE CORPS HE'S HAD NO LEGAL TRAINING IN THE LAW. AFTER HIS CONVICTION AND FIRST TIER EFFORTS TO OVERTURN HIS CONVICTION, HE WAS ILL-EQUIPPED TO DEAL WITH HABEAS LAW. HAVING RECEIVED NO ASSISTANCE OF ANY KIND FROM HIS COUNSEL OR THE JUDGE, HE WAS LEFT TO FEND FOR HIMSELF IN TRYING TO PREPARE HIS PREVIOUS APPLICATIONS. HE HAD TO COPE WITH VERY LIMITED ACCESS TO HIS UNIT'S LIBRARY, HAD TO DEAL WITH OUTDATED MATERIALS, AND HAD NO ACCESS TO MODERN TECHNOLOGY. AFTER HE HAD WORKED TEN HOURS A DAY, FIVE DAYS A WEEK, THERE WAS LITTLE TIME OR ENERGY LEFT TO DEAL WITH WRIT-LAW. HE WAS SURROUNDED BY "PRETEND LAWYERS", OTHERS WHO WERE INCARCERATED, OFFERING TO HELP FOR SOME KIND OF "FEE."</u>

<u>APPLICANT'S ATTEMPTS TO DEAL WITH PREPARATION OF HIS APPLICATIONS HAVE BEEN INSUFFICIENT, ESPECIALLY WITH REGARD TO HIS SECOND ATTEMPT WHICH WAS DISMISSED FOR NON-COMPLIANCE, THE MERITS OF HIS CASE NOT HAVING BEEN CONSIDERED.</u>

<u>APPLICANT'S SECOND APPLICATION SPEAKS FOR ITSELF ON THIS ISSUE, AS IT CLEARLY DEMONSTRATES THAT HE WAS UNABLE EVEN TO</u>

20

NEGOTIATE THE REQUIREMENTS OF THE WRIT FORM, UNABLE TO FULLY COMPREHEND THE INSTRUCTIONS, YET DOING THE BEST HE COULD WITH HIS MEMORANDUM OF LAW.

FACT IS, THE ONLY WRIT "TOOLS" AVAILABLE TO HIM AT HIS UNIT WERE OUTDATED AND INCOMPLETE, BUT EVEN IF PERFECT, WOULD NOT BE ADEQUATELY UNDERSTOOD AND IMPLEMENTED BY APPLICANT.

HAD APPLICANT BEEN GIVEN SOME KIND OF NOTICE OR "HEADS UP" BY HIS COUNSEL OR TRIAL COURT REGARDING THE NATURE, OR EVEN THE AVAILABILITY OF THE HABEAS LAW, HE COULD HAVE STARTED MUCH EARLIER TRYING TO PREPARE FOR THAT JOURNEY, INCLUDING TRYING TO SECURE FINANCES, AND THE PROBABILITY IS THAT HE WOULD HAVE BEEN SUCCESSFUL AND WOULD NOT PRESENTLY BE INCARCERATED. IT IS A FACT, OF WHICH THIS COURT HAS JUDICIAL KNOWLEDGE, THAT AN APPLICANT HAS A BETTER CHANCE OF SUCCESS, ESPECIALLY WITH HIS FIRST APPLICATION, WHEN HE'S HAD THE BENEFIT OF ADVICE, OR ASSISTANCE OF SOME KIND, FROM A TRUE LEGAL COUNSEL.

APPLICANT WAS ILL-EQUIPPED TO NEGOTIATE THIS PROCESS WITHOUT SOME KIND OF GUIDANCE OR ADVICE FROM HIS COUNSEL OR THE COURT. (THE COURT'S STATISTICS – EXHIBIT 13-SUPPORT THIS)

21

**GROUND NINE:**

OUR WRIT OF HABEAS CORPUS LAW IS UNCONSTITUTIONAL

(SECTION 4 (a)-(c), ARTICLE 11.07, TEX. CODE CRIM. PROC.)

**FACTS SUPPORTING GROUND NINE:**

THE TEXAS LAW REGARDING SUBSEQUENT WRIT APPLICATIONS WAS TOO STRINGENT, DIFFICULT, AND COMPLEX FOR APPLICANT TO SUCCESSFULLY NEGOTIATE WITHOUT TRUE LEGAL COUNSEL. APPLICANT PERSONALLY WANTED THE BENEFITS OF THIS LAW, AND HE STILL DOES. HE HAS BEEN DENIED HIS RIGHT TO SEEK REDRESS VIA "THE GREAT WRIT OF LIBERTY." (*BLACKSTONE*). SECTION 4 (a)-(c), THOUGH WELL-INTENDED, IS PROHIBITIVE.

APPLICANT KNOWS THAT MOST APPLICANTS "FLUNK" THIS LAW. HE KNOWS THAT ARTICLE 11.07 HAS MANY PARTS, ALL SPEAKING LAWYER'S LANGUAGE. HE PERSONALLY KNOWS THAT THE INSTITUTIONAL DIVISION OF THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE IS ILL-EQUIPPED WITH THE "TOOLS" NEEDED BY "INMATES" TO FULLY COMPREHEND, AND THEN IMPLEMENT THIS LAW. THE "SUBSEQUENT-APPLICATION" RULE (THE "ABUSE OF WRIT DOCTRINE") IS THE ESPECIALLY EGREGIOUS PART OF TEXAS WRIT LAW. FURTHER, APPLICANT PERSONALLY KNOWS THAT IT IS MORE UNLIKELY THAN LIKELY THAT AN INCARCERATED PERSON WILL BE SUCCESSFUL IN OBTAINING HIS LIBERTY BY WAY OF THIS LAW. APPLICANT PERSONALLY FEELS, BECAUSE THE LAW ITSELF IMPELS HIM TO FEEL, THAT HE IS IN FACT *ENTITLED* TO THE BENEFITS OF THIS LAW, AND THAT THIS IS NOT MERELY WISHFUL THINKING. THE LAW, ITSELF, HAS CREATED THIS

22

*EXPECTATION* OF APPLICANT'S ENTITLEMENT TO THIS LAW.

APPLICANT IS ABLE TO SEE THAT THIS LAW REQUIRES ENUMERATED PEOPLE TO DO ENUMERATED THINGS IN A CERTAIN WAY, NOT JUST LEAVING THE PLAYERS TO USE THEIR PERSONAL JUDGMENTS. IN FILING HIS *PRO SE* APPLICATIONS HE NEVER REALLY UNDERSTOOD WHAT ALL HE WAS SUPPOSED TO DO. HE DIDN'T EVEN GET HIS FACTS IN THE CORRECT PLACE IN HIS SECOND *PRO SE* APPLICATION; IT WAS DISMISSED FOR "NON-COMPLIANCE." THIS PART OF OUR HABEAS LAW IS BEYOND REACH OF THE AVERAGE "INMATE" WHO HAS NO TRUE LEGAL COUNSEL, AND IS ALMOST BEYOND THE REACH OF TRUE LEGAL COUNSEL.

WHEN APPLICANT FINALLY FOUND OUT ABOUT THE LEGAL AVENUE HE WOULD ATTEMPT TO USE (THE WRIT OF HABEAS CORPUS) IT PROVED TO BE BEYOND HIS PERSONAL CAPACITY TO PROPERLY UTILIZE. HE IS INNOCENT OF THE OFFENSE CHARGED, AND HAS MAINTAINED HIS INNOCENCE FROM THE BEGINNING OF HIS CASE. HIS FREEDOM IS AT STAKE. HE HAS BEEN HARMED BECAUSE THE PROCESS PROVIDED TO HIM IS SO COMPLEX, SO DIFFICULT, FOR THE AVERAGE "INMATE" TO UNDERSTAND AND IMPLEMENT. IT PROVED TO BE BEYOND HIS PERSONAL CAPABILITIES, PUTTING HIM IN THE VAST MAJORITY OF *PRO SE* WRIT-APPLICANTS. (THE COURT'S STATISTICS – EXHIBIT 13-SUPPORT THIS.)

ACCORDINGLY, HIS PREVIOUS APPLICATIONS SHOULD NOT BLOCK HIS WAY INTO CONSIDERATION OF HIS PRESENT APPLICATION. HE SHOULD BE ALLOWED TO "SIDE-STEP" THE "ABUSE OF WRIT DOCTRINE."

23

**WHEREFORE, APPLICANT PRAYS THAT THE COURT GRANT APPLICANT RELIEF TO WHICH HE MAY BE ENTITLED IN THIS PROCEEDING.**

## VERIFICATION

This application must be verified or it will be dismissed for non-compliance. For verification purposes, an applicant is a person filing the application on his or her own behalf. A petitioner is a person filing the application on behalf of an applicant, for example, an applicant's attorney. An inmate is a person who is in custody.

The inmate applicant must sign either the Oath Before a Notary Public before a notary public or the Inmate's Declaration without a notary public. If the inmate is represented by a licensed attorney, the attorney may sign the Oath Before a Notary Public as petitioner and then complete Petitioner's Information. A non-inmate applicant must sign the Oath Before a Notary Public before a notary public unless he is represented by a licensed attorney, in which case the attorney may sign the verification as petitioner.

A non-inmate non-attorney petitioner must sign the Oath Before a Notary Public before a notary public and must also complete Petitioner's Information. An inmate petitioner must sign either the Oath Before a Notary Public before a notary public or the AInmate's Declaration without a notary public and must also complete the appropriate Petitioner's Information.

### OATH BEFORE A NOTARY PUBLIC

STATE OF TEXAS

COUNTY OF ANDERSON

DANIEL JAMES SIXTA, being duly sworn, under oath says: I am the (applicant) / petitioner (circle one) in this action and know the contents of the above application for a writ of habeas corpus and, according to my belief, the facts stated in the application are true.

Signature of (Applicant) / Petitioner (circle one)

SUBSCRIBED AND SWORN TO BEFORE ME THIS 21 DAY OF March, 2014.

Signature of Notary Public

Shauna L. Vestal
Notary Public. State of Texas
My Commission Expires
02 01 2017
Notary Without Bond

24

**PETITIONER'S INFORMATION**

Petitioner's printed name: **ARDON MOORE**

State bar number, if applicable: **14390000**

Address: **P.O. Box 133183**

**Tyler, TX   75713-1383**

Telephone: **903-593-1116**

Fax:   **903-590-1752**

**INMATE'S DECLARATION**

I, _____, am the applicant / petitioner (circle one) and

being presently incarcerated in _____, declare under penalty of

perjury that, according to my belief, the facts stated in the above application are true and correct.

Signed on _____, 2014.

_____
Signature of Applicant / Petitioner (circle one)

**PETITIONER'S INFORMATION**

Petitioner's printed name: _____

Address: _____

_____

_____

Telephone: _____

Fax: _____


Signed on _____, 2014.


_____
Signature of Petitioner

26

# IN THE

## COURT OF CRIMINAL APPEALS

## OF TEXAS

**WRIT NO: WR-60-547-03 (1st application)**

**WRIT NO: WR-60-547-09 (2nd application)**

**NEW WRIT NO:** _____

**EX PARTE**

**DANIEL JAMES SIXTA**

**TDCJ-ID 1143232**

**CAUSE NO. 923949-B**

**HARRIS COUNTY, TEXAS**

## MEMORANDUM OF LAW
## IN SUPPORT OF APPLICATION
## FOR WRIT OF HABEAS CORPUS

# Ardon Moore
*Attorney and Counselor at Law*
P.O. Box 133183
Tyler, TX 75713
903-593-1116

**Attorney for Applicant**

## CERTIFICATE OF COMPLIANCE

In compliance with TRAP 73.1(f) this is to certify that according to the word count of the computer program used to prepare this document the number of words in this document is 5528, not including appendices, exhibits, cover page, table of contents, table of authorities, and certificate of compliance.

_____
**Ardon Moore**
**Petitioner-Attorney for Applicant,**
**Daniel James Sixta**

## IN THE

## COURT OF CRIMINAL APPEALS

## OF TEXAS

WRIT NO: WR-60-547-03 (1st application)

WRIT NO:  WR-60-547-09 (2nd application)

NEW WRIT NO: _____

EX PARTE

DANIEL JAMES SIXTA

TDCJ-ID 1143232

CAUSE NO.  923949-B

HARRIS COUNTY, TEXAS

## INDEX

List of Authorities ...................................................................................................... Page  i-iv

Exhibits ....................................................................................................................... Page v-vi

Memo of Law:

Subjects ...................................................................................................................... Page  1

    *Custody* ............................................................................................................... Page  1

    *Summary Of Facts Pertaining To Offense And Trial*.............................................. Page  1

    *Why Applicant Should Be Allowed "Another Bite Out Of The Apple"*....................... Page  2

    GROUND ONE:  ACTUAL INNOCENCE-NEWLY DISCOVERED
    EVIDENCE...................................................................................................... Page 3
    (The NDE:  The True Cause of the Motor Vehicle Collision)

## INDEX (CON'T)

GROUND TWO:  ACTUAL INNOCENCE................................................ Page 6
("Intertwined" With Constitutional Error)

GROUND THREE:  INEFFECTIVE ASSISTANCE OF COUNSEL................... Page  7
(Failure To Adequately Investigate Facts Of The Case)

GROUND FOUR:  INEFFECTIVE ASSISTANCE OF COUNSEL..................... Page 9
(Failure To Assert An Available Defense)

GROUND FIVE:  INEFFECTIVE ASSISTANCE OF COUNSEL..................... Page 9
(Failure In Performance)

GROUND SIX:  INEFFECTIVE ASSISTANCE OF COUNSEL
(Failure in Performance) .............................................................Page 10

GROUND SEVEN:  INEFFECTIVE ASSISTANCE OF COUNSEL
(Failure in Performance)...............................................................Page 11

GROUND EIGHT:  DENIAL OF DUE PROCESS OF LAW...............................Page 13
(Denied Due Process By Failure Of Counsel And Court To Give Him
Any Notice Or Advice Regarding His Habeas Rights)

GROUND NINE:  OUR WRIT OF HABEAS CORPUS LAW IS
UNCONSTITUTIONAL.......................................................................... Page 16
(Sec. 4(a)-(c), Art. 11.07 Tex. Code Crim. Proc.)

ENCAPSULATION OF APPLICANT'S CASE............................................. Page 19

CERTIFICATE OF COMPLIANCE......................................................... Page 21

# IN THE

## COURT OF CRIMINAL APPEALS

## OF TEXAS

WRIT NO: WR-60-547-03 (1st application)

WRIT NO: WR-60-547-09 (2nd application)

NEW WRIT NO: _____

EX PARTE

DANIEL JAMES SIXTA

TDCJ-ID 1143232

CAUSE NO. 923949-B

HARRIS COUNTY, TEXAS

## LIST OF AUTHORITIES

### Cases

*Bounds v. Smith*, 430 U.S. 817, 821 (1977)............................................................. Pg. 15

*Burdine v. Johnson*, 266 F. 3rd (5th Cir. 2001)....................................................Pg. 15

*Butler v. State*, 716 S.W. 2d 48, 54 (Tex. Crim. App. 1986)................................... Pg. 8

*Coble v. State*, 330 S. W. 3d 253, (Tex. Crim. App. 2010) .....................................Pg. 9

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Crt. 2786................... Pg. 8, 9

*Ex parte Biggins*, 635 S.W. 2d 743 (Tex. Crim. App. 1982)................................... Pg. 15

*Ex parte Brown*, 158 S.W. 3d 449 (Tex. Crim. App. 2005).....................................Pg. 16

*Ex parte Duffy*, 607 S.W. 2d 507, 514-15 (Tex. Crim. App. 1980) ...........................Pg. 7, 13

*Ex parte Elizondo*, 947 S.W. 2d 202, 205 (Tex. Crim. App. 1996) ......................... Pg. 3, 6

*Ex parte Franklin*, 72 S.W. 3rd 678 (Tex. Crim. App. 2002)................................. Pg. 5

i

## Cases (Con't)

*Ex parte Graves*, 70 S.W. 3d 103 (Tex. Crim. App. 2002)..................................... Pg. 15

*Ex parte Hernandez*, 988 S.W. 2d 770 (Tex. Crim. App. 1999)............................... Pg. 13

*Ex parte Henderson*, 384 S.W. 3d 833, (Tex. Crim. App. 2012)............................ Pg. 5

*Ex parte Kerr*, 64 S.W. 3d 414, 418 (Tex. Crim. App. 2002)................................Pg. 17

*Ex parte Lemke*, 13 S.W. 3rd 791 (Tex. Crim. App. 2000) ..................................... Pg. 3

*Ex parte Menchaca*, 864 S.W. 2d 128, 132 (Tex. Crim. App. 1993).......................Pg. 12

*Ex parte Miles*, (Tex. Crim. App. 2012) .............................................................Pg. 4

*Ex parte Milner*, 394 S.W.3d 502, 505-06 (Tex. Crim. App. 2013)........................ Pgs. 2, 7

*Ex parte Montgomery* , 894 S.W. 324, (Tx. Crim. App. 1995)............................... Pg. 17

*Ex parte Nailor*, 149 S.W. 3d 125 (Tex. Crim. App. 2004)..................................Pg. 12

*Ex parte Parra*, No. AP-76-871 (Tex. Crim. App. Sept. 18, 2013)...........................Pg. 7

*Ex parte Sanders*, 588 S.W. 2d 383 (Tex. Crim. App. 1979.................................. Pg. 15

*Ex parte Scott*, 190 S.W. 3d 672 (Tex. Crim. App. 2006)..................................... Pg. 13

*Ex parte Sledge*, 391 S.W. 3d 104 (Tex. Crim. App. 2013)................................... Pg. 6

*Ex parte Torres*, 943 S.W. 2d 469 (Tex. Crim. App. 1997)...................................Pg. 12

*Ex parte Wilborn*, 785 S.W. 2d 391, 393 (Tex. Crim. App. 1999) ........................Pg. 8

*Hernandez v. State*, 726 S.W. 2d 53, 57 (Tex. Crim. App. 1986) ........................... Pgs. 7, 12

*Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853 (1993).................................... Pgs. 2, 3, 6

*Jackson v. State* 877 S.W. 2d 768, 77-771 (Tex. Crim. App. 1994) ........................ Pg. 12

*Kelly v. State*, 824 S.W. 2d 568 (Tex. Crim. App.) ...............................................Pg. 9

*Kentucky Department Of Corrections v. Dumschat*, 452 U.S. 458, 101 S. Ct. 2460....... Pg. 17

*Kentucky Department Of Corrections v. Thompson*, 490 U.S. at 462........................Pg. 17

*Mempa v. Rhay*, 389 U.S. 128 (1967)......................................................... Pg. 13

## Cases (Con't)

*Miles v. State*, 359 S.W. 3d 647 (Tex. Crim. App. 2012)........................... Pg. 7

*Miller v. Dreke* 420 F. 3d356 (5th Cir. 2005)........................................ Pg. 11

*Murray v. Carrier*, 477 U.S. 478, 496 (1986) ...................................... Pg. 12

*Padilla v. Kentucky*, 130 S. Ct. 1473; 176 L. Ed. 2d 284 (2010)..................... Pgs. 3, 14

*Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851 (1995)........................... Pgs. 2, 6

*Sparkman v. State*, 580 S.W. 2d 358, 360 (Tex. Crim. App. 1979)................... Pg. 11

*Strickland v. Washington*, 466 U.S. 668, (1984) ..............................Pgs. 7, 12, 13, 14

*Thaddeus – X v. Blatter*, 15 F.3[rd] 378, 391 (6th Cir. 1999)..................... Pg. 15

*United States v. Cronic*, 466 U.S. 648 (1984)........................................ Pg. 7

## Statutes

Article 11.07, Tex. Code Crim. Proc.................................................... Pgs. 12, 13, 17,19

Article 11.07, Sec. I Tex. Code Crim. Proc............................................ Pg. 17

Article 11.07, Sec. 4... Tex. Code Crim. Proc........................................ Pgs. 2, 6

Article 11.07, Sec. 4(a) Tex. Code Crim. Proc ...................................... Pg. 17

Article 11.07, Sec. 4(a)-(c) Tex. Code Crim. Proc..................................... Pg. 16 19

Article 11.07, Sec. 4(a)(1) Tex. Code Crim. Proc...................................... Pgs. 2, 3, 6, 7

Article 11.07, Sec. 4(a)(2) Tex. Code Crim. Proc ................................... Pgs. 2, 7

Article 11.073, Tex. Code Crim. Proc.................................................. Pgs. 3, 5

Art. 37.02, Sec. 3, Tex. Code Crim. Proc............................................. Pg. 11

Rule 702, 26 TEX. R. Evid. ........................................................... Pgs. 8, 9

28 U.S.C. Sec. 2254.................................................................. Pg. 13

Tex. CONST., Article I, Sec. 10 .....................................................Pgs. 5, 7, 17

Tex. CONST., Article I, Sec. 19...................................................... Pg. 7

## Statutes (Con't)

Tex. Rules App. Proc. 25.2.................................................................... Pg. 14

Tex. Rules App. Proc. 48.4.................................................................... Pg. 14

U.S. CONST., amends. V VI, XIV.......................................................Pgs. 13, 15

U.S. CONST., amends. V, XIV.............................................................. Pg. 17

U.S. CONST., amend VI....................................................................... Pg. 7, 12

U.S. CONST., amends. VI, XIV............................................................. Pg. 5

U.S. CONST., amends XIV.................................................................... Pg. 7

# IN THE

## COURT OF CRIMINAL APPEALS

## OF TEXAS

WRIT NO: WR-60-547-03 (1st application)

WRIT NO: WR-60-547-09 (2nd application)

NEW WRIT NO: _____

EX PARTE

DANIEL JAMES SIXTA

TDCJ-ID 1143232

CAUSE NO. 923949-B

HARRIS COUNTY, TEXAS

## EXHIBITS ATTACHED

*The Indictment* ................................................................ EXHIBIT ONE

*Clerk's Index (Judgment/Sentence 12-13-02)* ........................... EXHIBIT TWO

*Notice of Denial of First Application* ................................... EXHIBIT THREE

*Notice of Dismissal of Second Application* ............................ EXHIBIT THREE

*Counsel's Court Ordered Affidavit* ..................................... EXHIBIT FOUR

*State's Opening Statement* ............................................... EXHIBIT FIVE

*State's Answer to First Application* .................................... EXHIBIT SIX

*Affidavit of Applicant's Sister* ......................................... EXHIBIT SEVEN

*Affidavit of Applicant, Daniel Sixta* ................................... EXHIBIT EIGHT

*The Cope Report* ......................................................... EXHIBIT NINE

*Testimony of Alford Regarding the Collision* .......................... EXHIBIT TEN

*Judge's Comments re. Applicant's Suicide Attempt* ..................... EXHIBIT ELEVEN

*Record Showing Failure to Present Mitigating Evidence* ............... EXHIBIT TWELVE

*The Court's Habeas Statistics* .......................................... EXHIBIT THIRTEEN

v

# IN THE

## COURT OF CRIMINAL APPEALS

## OF TEXAS

WRIT NO: WR-60-547-03 (1st application)

WRIT NO: WR-60-547-09 (2nd application)

NEW WRIT NO: _____


EX PARTE

DANIEL JAMES SIXTA

TDCJ-ID 1143232

CAUSE NO. 923949-B

HARRIS COUNTY, TEXAS


## MEMORANDUM OF LAW
## IN SUPPORT OF APPLICATION FOR WRIT OF HABEAS CORPUS


### *Custody*

Applicant is illegally restrained of his liberty in the Texas Department Of Criminal Justice, Institutional Division, presently incarcerated at Coffield Unit, Tennessee Colony, Texas, by virtue of a judgment of the 351st Judicial District Court of Harris County, Texas.

### *Summary Of Facts Pertaining To Offense And Trial*

On an indictment returned in 2002 (Intoxication Manslaughter in Cause No. 923949, 351st Judicial District Court of Harris County, Texas) Applicant was jury tried and found guilty. Sentence: 20 yrs., $5000 fine. His appeal in 2003 and his PDR in 2004 failed as did his federal activity. His first Application (*pro se*), was denied in 2006 without written order. His second application, filed in 2011, again *pro se*, was *dismissed* without written order in 2012 for *non-compliance*. (Facts not put on prescribed form.)

1

## *Why Applicant Should Be Allowed "Another Bite Out Of The Apple"*

### (1)

This, Applicant's subsequent application (his first having been denied without written order and his second dismissed for noncompliance) contains sufficient specific facts establishing that the current claims and issues have not been and could not have been presented previously in an original application or in a previously considered application filed under this article because the factual or legal basis for the claim was unavailable on the date the applicant filed his previous application. (Article 11.07, Section 4(a)(1) Tex. Code Crim. Proc.) Further, by preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found Applicant guilty beyond a reasonable doubt. (Art. 11.07, Sec. 4(a)(2) Tex. Code Crim. Proc.) The remedies provided by Sec. 4 are not mutually exclusive. In *Ex parte Milner*, 394 S.W. 3rd 502 (Tex. Crim. App. 2013) this court held:

> "This Court has recognized that, even if an application does not
>
> meet the requirements of Section 4(a)(1), a subsequent application
>
> for writ of habeas corpus may overcome the procedural bar of art.
>
> 11.07, Sec. 4, if an applicant can show a constitutional violation that
>
> fulfills the requirements of Sec. 4 (a)(2)."

Applicant's *actual innocence* is based on his claim of *newly discovered evidence*. *Herrera v. Collins*, 506 U.S. 390 (1993). His actual innocence is also a procedural claim tied to a showing of constitutional error at trial. *Schlup v. Delo*, 513 U.S. 298, 314 (1995). He was denied due process of law.

2

Further, Applicant shows some *new law* which was unavailable to him when he filed his first Application. *Article 11.073*, Tex. Code Crim. Proc., pertaining to "relevant scientific evidence" was not effective until September 1, 2013. This law appears to elevate the status of scientific evidence in the habeas law, as it was enacted to specify that evidence used to contradict evidence presented at trial is a claim or issue that can affect court consideration of an application for a writ of habeas corpus.

Also, Tex. Code Crim. Proc. Art. 11.07, Sec. 4 (a) (1) is satisfied in that *Padilla v. Kentucky*, 130 S. Ct. 1473; 176 L. Ed. 2d 284 (2010) was *unavailable* to Applicant on the date he filed his previous application. *Padilla* shows that the *collateral consequences* of a conviction are *inside* the scope of the representation by trial counsel, and Applicant submits that the substance of that case involves more than a trial counsel's failure to give the accused a heads-up regarding deportation, and, that Applicant is entitled to the benefits of *Padilla* without regard to whether the case is retroactive. (This will be more fully developed in this memorandum of law.)

## GROUND ONE: ACTUAL INNOCENCE—NEWLY DISCOVERED EVIDENCE
### (The NDE: The True Cause Of The Motor Vehicle Collision)

Applicant is *actually innocent* of the crime of which he was convicted. A claim of actual innocence is cognizable in a post-conviction habeas corpus proceeding. *Ex parte Elizondo* 947 S.W. 2d 202 (Tex. Crim. App. 1996); *Ex parte Lemke*, 13 S. W. 3rd 791 (Tex. Crim. App. 2000).

Applicant's claim of *actual innocence* is based upon *newly discovered evidence* that was neither introduced at trial nor available to Applicant to introduce at trial. *Herrera v.*

3

*Collins*, 506 U.S. 390, 113 S. Ct. 853 (1993). The newly discovered evidence (evidence discovered by Applicant) consisted of the true details, analysis, and reconstruction of the motor vehicle collision between the vehicle Applicant was driving and another vehicle, the collision resulting in the death of the passenger in the other vehicle.

The record supports that the factual basis for this claim was unavailable to Applicant and not ascertainable by him through the exercise of reasonable diligence on or before the date Applicant filed his first Application. *Ex parte Miles*, (Tex. Crim. App. 2012).

Applicant urges the courts to review the *credentials* of Applicant's expert, as well as the *report* itself, each attached as exhibits, with particular attention to the fifth, sixth and seventh pages of the report: They show, among other things, that Applicant was traveling between 45 – 53 mph before braking, that he definitely braked before the collision, that the police investigation was incomplete, that the driver of the other vehicle failed to yield right of way, and failed to keep a proper lookout. The report makes clear that, in the opinion of the expert, the jury trial in this case "without an Accident Reconstruction professional is highly unfair and would be almost impossible for any accused driver to receive a fair trial."

No reasonable juror would have found Applicant guilty as charged if his counsel had secured a proper collision expert for his defense, had Applicant been able to present to the jury the testimony of the expert his family member was finally able to obtain for him.

This begs the question: Does our law defeat the accused who is indigent, who is financially unable to secure a proper defense, while it rewards the defendant who is financially better off?

4

Applicant submits that the evidence here presented is clear and convincing that no reasonable juror would have convicted him of Intoxication Manslaughter in light of this newly discovered evidence. *Ex parte Henderson*, 384 S.W. 3d 833, (Tex. Crim. App. 2012)

Applicant's right to a fair trial, as guaranteed by the *Sixth* and *Fourteenth Amendments* to the *United States Constitution* and Art. I, Sec. 10 of the *Texas Constitution*, was violated because his conviction was based only on the State's version of the collision, Applicant having been deprived of his own expert evidence. His conviction was thereby assured.

Senate Bill 344 out of the 83rd Texas Legislature (now Art. 11.073, Tex. Code Crim. Proc.) speaks to the right of courts to grant relief via writ-applications if the relevant scientific evidence is currently available but was not available at the time of the conviction because the evidence was not ascertainable through reasonable diligence at the time of trial.

In Applicant's case scientific evidence needed to combat the State's version of the cause of the collision was out there, discoverable by Applicant's counsel had he made the effort to obtain it.

Applicant was denied his vital defensive evidence, thus denied his constitutional right to a fair trial and to due process of law. No reasonable juror would have convicted Applicant had they heard his newly discovered evidence.

Applicant has shown, through clear and convincing evidence, that the newly discovered and newly available evidence, especially when superimposed over the failure of his counsel to provide him with the defense needed, creates a doubt in the efficacy of the jury's verdict *and would probably change the verdict on retrial.* See *Ex parte Franklin*, 72 S.W. 3rd 678 (Tex. Crim. App. 2002)

5

In *Ex parte Elizondo*, 947 S.W. 2d 202 (Tex. Crim. App. 1996) the Court said its job was "to decide whether the newly discovered evidence would have convinced the jury of applicant's innocence." Applicant submits that his newly discovered evidence would have accomplished this.

In *Ex parte Sledge*, 391 S.W. 3d 104 (Tex. Crim. App. 2013) a good review was given of the ways to try to escape the "abuse of writ doctrine." However, Art. 11.07, Sec. 4 and case law should be expanded to hold as follows: "New Law; New Facts; Innocence; Having Been Denied Your Defense; Having Been Denied Your Mitigating Evidence; And Not Being Provided With Any True Legal Assistance Regarding Your Personal Efforts To File An Acceptable First Application."

To admonish an attorney at law that if he or she doesn't get it right the first time, he or she is essentially finished, is one thing—but to tell that to the typical untrained "inmate" is a travesty, besmirching the opinion of the great Sir William Blackstone who referred to the habeas process as *"The Great Writ Of Liberty."*

## GROUND TWO: ACTUAL INNOCENSE
### ("Intertwined" With Constitutional Error)

A claim of actual innocence is cognizable in a post-conviction habeas corpus proceeding. *Ex parte Elizondo*, 947 S.W. 2d 202, 205 (Tex. Crim. App. 1996). Applicant is not confined to only one vehicle which can be connected to his cognizable ground of actual innocence, as addressed by Applicant, *supra.* The two types of actual innocence claims that may be raised in a collateral attack on a conviction are shown in: *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851 (1995) and *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853 (1993).

As stated in the first ground, the Court has recognized that even if an application does not meet the requirements of Sec. 4 (a) (1), a subsequent application may overcome

6

the procedural bar of Art. 11.07, Sec. 4 if the applicant can show a constitutional violation that fulfills the requirements of Sec. 4 (a) (2). The constitutional violation claim must be accompanied by a *prima facie* claim of actual innocence. *Ex parte Milner*, 394 S.W.3d 502, 505-06 (Tex. Crim. App. 2013) These two species of actual innocence claims, as addressed in *Miles v. State*, 359 S.W. 3d 647 (Tex. Crim. App. 2012) are not held to be mutually exclusive, and are not required to be urged one at a time in separate applications.

Applicant was denied his vital defense, thus denied his constitutional right to due process of law.

## GROUND THREE: INEFFECTIVE ASSISTANCE OF COUNSEL
### (Failure To Adequately Investigate Facts Of The Case)

An essential element of a fair trial is effective assistance of counsel. *United States v. Cronic*, 466 U.S. 648 (1984). The right of an accused to the effective assistance of counsel comes from four sources: The Sixth Amendment, the Due Process Clause of the Fourteenth Amendment, the "right to be heard" provision of Art. I, Sec. 10 of the Texas Constitution, and the Due Course of Law provision of Art. I, Sec. 19 of the Texas Constitution. *Ex parte Duffy*, 607 S.W. 2d 507, 514-15 (Tex. Crim. App. 1980).

Always there is the Supreme Court's 2-part test for determining whether counsel is ineffective: (1) Counsel committed an error or omission not justifiable as reasonable trial strategy; and (2) the error prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, (1984); *Hernandez v. State*, 726 S.W. 2d 53, 57 (Tex. Crim. App. 1986) As required by *Strickland* Applicant has shown by a preponderance of the evidence that the harm resulting from counsel's deficiency undermines the confidence in the trial's outcome. *Ex parte Parra*, No. AP-76,871 (Tex. Crim. App. Sept. 18, 2013)

The charge of Intoxication Manslaughter involved a motor vehicle collision between

7

the vehicle Applicant was driving and a vehicle in which the passenger was killed. The manner, the method, the details of the collision were at the very core of the State's case. This cannot be disputed by the State, as the record clearly shows that both the court and counsel deemed it essential to have the testimony of an expert for Applicant's defense.

The affidavit required of the trial counsel reveals the truth of Applicant's claims. The attorney did nothing of any significance to investigate the facts regarding the true nature of the collision. He did hot seek out and interview witnesses. The fact of the absence of defense witnesses at Applicant's trial should help prove this cognizable ground.

It is the responsibility of defense counsel to promptly investigate the circumstances of the case. He should make an independent investigation of the facts of the case, not relying simple on his client's version of the facts. *Butler v. State*, 716 S.W. 2d 48, 54 (Tex. Crim. App. 1986). The duty includes the responsibility to seek out and interview potential witnesses. *Ex parte Wilborn*, 785 S.W. 2d 391, 393 (Tex. Crim. App. 1999)

The purpose of this constitutional mandate to investigate the facts of the case is to determine whether a defense is available to the accused. *Butler v. State*, 716 S.W. 2d 48, 54, (Tex. Crim. App. 1986)

Further, Applicant's attorney failed to use *Rule 702*, 26 TEX. R. Evid.: He made no request for *Daubert/Kelly* hearing. *Rule 702* reads:

> "If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education may testify thereto in the form
> of an opinion or otherwise."

See *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Crt. 2786 and *Kelly v. State*, 824 S.W. 2d 568 (Tex. Crim. App.). As shown by *Coble v. State*, 330 S. W. 3d

8

253, (Tex. Crim. App. 2010) the trial judges must act as a true "gatekeeper" when addressing the reliability and relevance of expert testimony, and this "gatekeeping" role under *Daubert* applies the same reliability standard to all "scientific," "technical," or "other specialized" matters within the scope of *Rule 702*.

The testimony of the Sheriff's Department employee is lame when compared to the credentials and the report of the true expert finally retained for Applicant, thanks to his family member.

## GROUND FOUR
## INEFFECTIVE ASSISTANCE OF COUNSEL
### (Failure To Assert An Available Defense)

Applicant's counsel failed to assert an available defense. Counsel failed to be ready to combat the State's case against Applicant. He failed to use the funds provided by the court for a defense expert's reconstruction of the collision, and to have the witness to testify on behalf of Applicant. He failed to move for additional funds.

To couch the problem another way: A defense was out there, waiting, available. Applicant's counsel simply failed to assert it for Applicant. Consequently, Applicant was convicted and sentenced to twenty years with a $5,000 fine. No reasonable or rational juror would have convicted him had the defense been presented.

## GROUND FIVE
## INEFFECTIVE ASSISTANCE OF COUNSEL
### (Failure In Performance)

*Counsel pressed Applicant to testify at the punishment phase of the trial, disregarding his physical and mental condition.* Applicant's attempt to kill himself the night before his punishment hearing is clearly established by the record. Not only was it unconstitutional, it was unconscionable to press him to trial at that time. The trial judge expressed some understanding, but hardly any sympathy, for Applicant's traumatic situation, stating, "Mr.

9

Sixta, I'm not—what ever happened last night, obviously, I'm glad you're alive and all that stuff..." The judge then admonished Applicant to keep his mouth shut about the incident. (See EXHIBIT ELEVEN)

Applicant's counsel did nothing, save going along with whatever the judge wanted. The record is clear that no one in the courtroom sought to protect Applicant's constitutional rights regarding the matter.

Injured and traumatized, Applicant was pressed on to testify, the net result being his severe sentence, his being denied the right to a fair trial. He did not receive that constitutionally protected quality of punishment hearing to which he was entitled, and this habeas process, albeit already previously attempted by Applicant, is the remedy by which he must now seek his justice.

## GROUND SIX
## INEFFECTIVE ASSISTANCE OF COUNSEL
### (Failure In Performance)

*Counsel failed to present mitigating evidence at the punishment phase of the trial.* The State hammered Applicant at the punishment phase of his trial. Oddly, and unconstitutionally, Applicant's counsel asked only nine questions which might, possibly, relate to mitigating evidence. Either counsel didn't know of this duty, or he knew about it and ignored it, or he felt that Applicant was in no condition, in view of his attempted suicide, to undergo a proper showing of mitigating evidence. In either case, the net result was the same—the denial of Applicant's right to due process of law—his right to a fair punishment hearing.

There was no anecdotal evidence regarding Applicant's good qualities, no showing of anything in his life which might have caused his behavior, no attempt to humanize him, no showing of his accomplishments or his good qualities. His long list of accomplishments

10

and good deeds were ignored by his counsel. (See EXHIBIT TWELVE)

Art. 37.02, Sec. 3, Tex. Code Crim. Proc., is not that difficult to understand. That counsels failure in this regard constituted *ineffective assistance of counsel* is shown by *Miller v. Dreke* 420 F. 3d356 (5th Cir. 2005)

During the punishment phase the jury is concerned "with evaluating a defendant's background and character independent of the commission of the crime on trial." *Sparkman v. State*, 580 S.W. 2d 358, 360 (Tex. Crim. App. 1979). The Court has observed that, in assessing what is relevant to sentencing, the important question is "what is helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case."

This fact should be considered beyond dispute:  HAD APPLICANT'S COUNSEL PRESENTED AVAILABLE MITIGATING EVIDENCE TO THE JURY APPLICANT'S SENTENCE WOULD NOT HAVE BEEN AS SEVERE.

## GROUND SEVEN
## INEFFECTIVE ASSISTANCE OF COUSEL
### (Failure in Performance)

*Counsel failed to preserve error re. Exhibit No. 54 (a tape).* While it is true the State introduced Exhibit No. 54 (a tape) into evidence, Applicant submits it shows this State's witness (Alford) was lying. Applicant called this to the attention of his trial counsel, who shrugged the matter off, telling Applicant the matter would be addressed in another way, such as an appeal. It never happened.

Consequently, Applicant was left alone to challenge this issue, failing in his *pro se* attempt to gain possession of the tape from the authorities in the county of his conviction.

All Applicants' efforts to gain possession of the tape from the Harris County officials failed. He was engaged in an arduous task, one which should have been handled

11

by his counsel at the trial and appellate levels.

By this writ-application, Applicant now has the matter pending before the district court of his conviction, and, before the Texas Court Of Criminal Appeals. The Harris County District Clerk, or others who have possession of this exhibit, should be ordered to produce it for the use and benefit of Applicant and inspection by the courts.

### Further authorities to support claim of Ineffective Assistance Of Counsel

The effectiveness of counsel's assistance is graded by the entire body of his performance. *Ex parte Menchaca,* 864 S.W. 2d 128, 132 (Tex. Crim. App. 1993)

The representation of his counsel fell below any objective standard of reasonableness *Strickland v. Washington,* 466 U.S. 668 (1984); *Jackson v. State* 877 S.W. 2d 768, 77-771 (Tex. Crim. App. 1994)

It is not necessary to show a bundle of errors in order to show ineffectiveness of counsel, as it can be shown "even by an isolated error of counsel if that error is sufficiently egregious and prejudicial." *Murray v. Carrier,* 477 U.S. 478, 496 (1986)

We know that this area of law (*Ineffective Assistance of Counsel*) constitutes the largest number of claims raised on art. 11.07 habeas. These claims will always be considered by the Court, with the narrow exception set out in *Ex parte Nailor,* 149 S.W. 3d 125 (Tex. Crim. App. 2004) and *Ex parte Torres,* 943 S.W. 2d 469 (Tex. Crim. App. 1997).

The courts will of course use the standard set out in *Strickland v. Washington,* 466 U.S. 668 (1984). The Court adopted the *Strickland* standard in *Hernandez v State,* 726 S.W. 2d 53, (Tex. Crim. App.1986). *Strickland* held, in part:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious

12

that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result was reliable"

A defendant in a criminal case in Texas is entitled to reasonably effective assistance of counsel. *Ex parte Duffy*, 607 S.W. 2d 507 (Tex. Crim. App. 1980). To get habeas relief for ineffective assistance of counsel under *Strickland* an applicant must show that his counsel's performance was deficient and that there is a "reasonable probability," one sufficient to undermine confidence in the result, that the outcome would have been different but for counsel's deficient performance. *Ex parte Scott*, 190 S.W. 3d 672 (Tex. Crim. App. 2006).

The right to counsel is required at each stage of a criminal proceeding where the substantial rights of the accused are affected. *Mempa v. Rhay*, 389 U.S. 128 (1967). And, this right to counsel (as in Applicant's case) applies to the *punishment phase* as well as to the guilt-innocence phase of the trial. *Ex parte Hernandez*, 988 S.W. 2d 770 (Tex. Crim. App. 1999).

## GROUND EIGHT: DENIAL OF DUE PROCESS OF LAW
### (Denied Due Process By Failure Of Counsel And Court To Give Him Any Notice Or Advice Regarding His Habeas Rights)

Applicant urges that the *availability* of *habeas corpus*, state and federal (Tex. Code Crim. Proc. 11.07 and 28 U.S.C. Sec. 2254) was a *collateral consequence* of his conviction, protected by the Fifth, Sixth and Fourteenth Amendments, and that it was within the scope of the duties of his trial and appellate attorneys, and the judge, to give to Applicant at least minimal notice of the availability of these valuable post-conviction rights, and that this

13

failing by counsel and court deprived Applicant of his right to *effective assistance of counsel* and to *due process and equal protection of the law.*

Applicant submits that *Padilla*, while dealing with deportation, gives the Court guidance in Applicant's case, as it shows:

(1) The Court does not make a distinction between *direct* and *collateral consequences:* "We, however, have never applied a distinction between direct and collateral consequences to define the scope of constitutionally, 'reasonable professional assistance' required under *Strickland*." (*Strickland v. Washington*, 466 U.S. 668 (1984)

(2) *Padilla* is the first case in which the Supreme Court applied the rule in *Strickland* to the failure of counsel to advise the defendant regarding a *collateral consequence* of his conviction.

(3) The Court held counsel to be ineffective in failing to warn the defendant of a *collateral consequence* of his conviction. (His deportation)

(4) The Court did not limit the applicability of its decision to *misadvise* regarding the collateral consequences of a conviction.

(5) The case says, Applicant submits, that it's holding is *retroactive.* However, later case law has held otherwise. Retroactive or not, Applicant urges that the substance of the case applies to his case.

Applicant should have been given some *heads-up*, some *notice,* regarding his habeas rights, akin to that notice given to defendants regarding their right to appeal (Tex. Rules App. Proc. 25.2) and their right to file a *pro se* petition for discretionary review. (Tex. Rules App. Proc. 48.4) The following is offered in further support of Applicant's position:

14

(A) We know that the issues presented via the habeas process are not those presented at the first level of direct review where the appeal entails adjudication on the merits. We do not ordinarily deal with "first-level" rights. To the contrary, issues which were raised or should have been raised on direct appeal look to be barred at the habeas level.

(B) Yet, we know that denial of counsel at *any critical state* of the proceeding entitles the writ-applicant to relief. *Ex parte Sanders*, 588 S.W. 2d 383 (Tex. Crim. App. 1979) (A motion to revoke probation)

(C) We know that *denial of counsel* may be *constructive*, as with *sleeping lawyers* in *Burdine v. Johnson*, 266 F. 3rd (5th Cir. 2001)

(D) We know that states have "affirmative obligations to assure all prisoners meaningful access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977) See also *Thaddeus – X v. Blatter*, 15 F.3rd 378, 391 (6th Cir. 1999)

(E) We know that the right to a real lawyer attaches even to the process of pleading guilty. *Ex parte Biggins*, 635 S.W. 2d 743 (Tex. Crim. App. 1982)

Applicant was denied any notice or advice from his lawyers or the judge regarding his post-conviction habeas corpus rights. While he believes that *Ex parte Graves*, 70 S.W. 3d 103 (Tex. Crim. App. 2002) would seriously challenge a claim of *denial of counsel*, he nevertheless urges that the authorities submitted, when considered in their totality, support his claim that he has been denied *effective assistance of counsel* and *due process and equal protection of the law*. (U.S. CONST. amends. V, VI, XIV)

Applicant has chosen to present the broader, and perhaps more profound, ground of *Denial Of Due Process Of Law* rather than merely attacking counsel.

15

The attached copy of the statistics (EXHIBIT THIRTEEN) compiled by this Court, showing the numbers of writ applications filed, together with other interesting facts, is revealing. The volume of junk applications filed each year without the assistance of *real* counsel undoubtedly presents an unnecessary drain on the resources of the trial courts, the Clerk of this Court, the Texas State Law Library, and this Honorable Court.

Any doubt regarding what notice or advice his counsel or the court did, or did not, give to Applicant regarding his habeas rights can be resolved by *Ex parte Brown*, 158 S.W. 3d 449 (Tex. Crim. App. 2005) which demonstrates an exception in which a habeas applicant may raise his claims for the first time by writ of habeas corpus, with the case *remanded* to the trial court in order to *expand the record.* (In Applicant's case it *cannot* be *presumed* that he was given some kind of notice regarding his habeas rights – i.e., as to the trial records themselves there should be *no presumption of regularity* in this case.)

Requiring that the convicted person be given notice, or assisted in some way, with regard to the challenging habeas world would serve not only to help secure the right to due process of law, but would strengthen and streamline this post-conviction process to the benefit of all involved.

The filing of an Application for a writ of habeas corpus after a conviction is an occurrence which is as likely as unlikely to happen: It is in reality a "collateral consequence" of a conviction.

## GROUND NINE: OUR WRIT OF HABEAS CORPUS LAW IS UNCONSTITUTIONAL
### (Section 4 (a)-(c), Art. 11.07 Tex. Code Crim. Proc.)

Section 4 (a)-(c), Art. 11.07, Tex. Code Crim. Proc. is *unconstitutional.* Having many moving parts, speaking lawyer's language, it is too complicated for the average "inmate" to negotiate.

16

By way of review, prior to the adoption of the Habeas Corpus Reform Act of 1995 there was no statute restricting the filing of subsequent applications. The purpose of the Act was to fulfill the Texas Constitutional mandate requiring a speedy and effective habeas corpus remedy by limiting the availability of subsequent applications and encouraging all-inclusive initial applications. *Ex parte Kerr*, 64 S.W. 3d 414, 418 (Tex. Crim. App. 2002).

A floodgate was opened, through which all manner of documents would pass, the applicants encouraged to throw in "everything but the kitchen sink", yet risking penalties if too many "kitchen sinks" were thrown in.

The present habeas law, as constructed and construed, violates Applicant's right to due process of law, to equal protection of the laws, and to due course of law. U.S. CONST., amends. V, XIV, Tex. CONST. Art. I, Sec. 10. Applicant's interest at issue is more than an unrealistic wish. As required in *Kentucky Department Of Corrections v. Dumschat*, 452 U.S. 458, 101 S. Ct. 2460 the interest amounts to more than a "unilateral" hope.

Article 11.07 has created "an expectation or entitlement" as referred to in *Ex parte Montgomery*, 894 S.W. 324, (Tx. Crim. App. 1995). This is so because the statute places "substantive limitations on official discretion" to deny the particular interest created by the statute. *Kentucky Department Of Corrections v. Thompson*, 490 U.S. at 462, as shown by *Ex parte Montgomery*, with the case also making this distinction: Unfettered discretion shown by an absence of standards or mandatory prerequisites does not give rise to an entitlement.

Right off, from the start, Article 11.07 announces:
"Sec. I. This article establishes the procedure for an Application
For writ of habeas corpus in which the Applicant seeks relief from
a felony judgment imposing a penalty other than death".

The statute hardly gives anyone unfettered discretion. It proceeds to exact duties from the Applicant, the clerk of the court, the attorney representing the state, the

17

convicting court, the court appointed attorney or magistrate, the reporter, the state itself. All this before we have even reached Sec. 4(a), the enemy of subsequent writ applications.

Applicants are provided with a writ form which at first glance might look easy. And that is the beginning of an applicant's road to failure. This statute, together with the writ form provided to Applicant, created Applicant's expectation of entitlement. He was entitled to the benefits of the habeas law. He has maintained his innocence. His freedom was at stake. He relied on the only legal avenue left open for him. Yet, he was ill equipped to deal with the habeas law and was destined for certain failure. Even if he successfully placed his "facts" where they were supposed to be on the form, even if he had done a little better job on his Application in its entirety, he was destined not to succeed. He had no lawyer for his first two Applications. THE COURT'S OWN STATISTICS MAKE CLEAR THAT THE ODDS WERE AGAINST HIM.

Scores of Applicant's attempt to take the habeas trip without counsel. The belief that they have a fair chance at success is based upon a legal fiction. The writ of habeas corpus should be "The Great Writ Of Liberty" as envisioned by *Blackstone*. In his biennial address to the 83rd Texas Legislature, Texas Supreme Court Chief Justice Wallace B. Jefferson asked lawmakers to establish a special commission to investigate wrongful convictions. His message was clear: That public faith in our legal system is being under-minded by wrongful convictions.

18

## Encapsulation Of Applicant's Case

At trial Applicant, who was actually innocent, and indigent, received two fatal shots to his right to a fair trial, to due process of law, to due course of law, to equal protection of the law: He was *denied a defense* which would have resulted in his acquittal, and, having been convicted, he was *denied mitigating evidence* which would have lessened his punishment. In short, he was *denied effective assistance of counsel* by the several failings of counsel.

After trial, his first tier efforts to secure his rights to a fair trial failed, and he then found himself alone to face the post-conviction writ-world. He was untrained in the law, and had been given no warning, advice, or "heads-up" by his counsel or by the trial court.

Further, he asserts that the "abuse of writ doctrine," Section 4 (a)-(c), Art. 11.07, Tex. Code Crim. Proc. is unconstitutional.

However, it all falls on deaf ears unless Applicant shows himself entitled to get another "bite out of the apple." In his effort to accomplish this tough, prohibitive, "herculean", task he has urged (1) his *actual innocence* with his *newly discovered evidence*, and, (2) his *actual innocence "intertwined with Constitutional errors."* (3) Also, he shows *new laws*.

Article 11.073, Tex. Code Crim. Proc., effective September 1, 2013, dealing with *"relevant scientific evidence"* is already being referred to by some as the "junk science law." Applicant asserts that this new law, at the very least, elevates, lends credibility, to his claim of *newly discovered* evidence.

*Padilla* assists Applicant, as it emphasizes the continuing duties of trial counsel to give the convicted person some warning regarding the *collateral consequences of the conviction.*

19

introduced to the "Writ-World" and it is likely that he or she will have a serious confrontation with it.

*Respectfully Submitted, This Concludes Applicant's Memorandum Of Law*

WHEREFORE, APPLICANT PRAYS THAT THE COURT GRANT APPLICANT ALL THAT RELIEF TO WHICH HE MAY BE ENTITLED IN THIS PROCEEDING.

_____
**ARDON MOORE**
Attorney For Applicant

| | |
|---|---|
| SBOT Number: | 14390000 |
| Address: | P. O. Box 133183 |
| | Tyler, Texas 75713-3183 |
| Telephone: | (903) 593-1116 |
| Fax: | (903) 590-1752 |

_____
**DANIEL JAMES SIXTA, Applicant**

## CERTIFICATE OF COMPLIANCE

In compliance with TRAP 73.1(f) this is to certify that according to the word count of the computer program used to prepare this document the number of words in this document is 5528, not including appendices, exhibits, cover page, table of contents, table of authorities, and certificate of compliance.

Ardon Moore
**Petitioner-Attorney for Applicant,**
**Daniel James Sixta**

21

# EXHIBT ONE

Vol. __ Page __ AXC__

THE STATE OF TEXAS

VS.

DANIEL JAMES SIXTA
5903 CAPE HATTERAS **838th**
HOUSTON, TEXAS 7704__ **GJ**

SPN: 00817067
DOB: WM 9-9-60
DATE PREPARED: 9-10-02

D.A. LOG NUMBER: 756436 8 00941
CJIS TRACKING NO.: 9032899406-A001
BY: MDL DA NO: 066146600
AGENCY: HCSO
O/R NO: 0202213280
ARREST DATE: 04-04-02

NCIC CODE: 0901 33

RELATED CASES:

FELONY CHARGE: INTOXICATION MANSLAUGHTER
CAUSE NO: 907697 — 0923949
HARRIS COUNTY DISTRICT COURT NO: 351ST
FIRST SETTING DATE:

BAIL: $NO BOND 25 K
PRIOR CAUSE NO:

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, DANIEL JAMES SIXTA, hereafter styled the Defendant, heretofore on or about FEBRUARY 21, 2002, did then and there unlawfully, by accident and mistake when operating A MOTOR VEHICLE IN A PUBLIC PLACE while intoxicated, namely not having the normal use of his mental and physical faculties by reason of the introduction of ALCOHOL into his body, and by reason of that intoxication, cause the death of LINDA COBLE, hereafter called the Complainant, by DRIVING HIS MOTOR VEHICLE INTO A MOTOR VEHICLE OCCUPIED BY THE COMPLAINANT.

It is further presented that in Harris County, Texas Daniel James Sixta, hereafter styled the Defendant heretofore on or about February 21, 2002 by accident and mistake when operating A MOTOR VEHICLE IN A PUBLIC PLACE while intoxicated, namely having an alcohol concentration of at least 0.08 in his BLOOD, and by reason of that intoxication, cause the death of LINDA COBLE, hereafter called the Complainant, by DRIVING HIS MOTOR VEHICLE INTO A MOTOR VEHICLE OCCUPIED BY THE COMPLAINANT.

It is further presented that at the time the Defendant committed the offense of operating a motor vehicle while intoxicated as hereinabove alleged committed on or about February 21, 2002, he had an open container of an alcoholic beverage in his immediate possession in the passenger compartment of said motor vehicle.

It is further presented that at the time the Defendant committed the felony offense of INTOXICATION MANSLAUGHTER on or about FEBRUARY 21, 2002, as hereinabove alleged, he used and exhibited a deadly weapon, namely, a AUTOMOBILE during the commission of and during the immediate flight therefrom.

It is further presented that before the commission of the offense hereinabove alleged committed on or about February 21, 2002 the Defendant on October 6, 1994 in County Criminal Court at Law No. 13 of Harris County, Texas, in Cause No. 9208849, was convicted of the offense of Operating a Motor Vehicle While Intoxicated.

It is further presented that before the commission of the offense hereinabove alleged committed on or about February 21, 2002, the Defendant on May 11, 1989, in the County Criminal Court at Law No. 5 of Harris County, Texas, in Cause No. 8907002 was convicted of the offense of Operating a Motor Vehicle While Intoxicated.

338th                                    FOREMAN

AGAINST THE PEACE AND DIGNITY OF THE STATE.

FOREMAN OF THE GRAND JURY

INDICTMENT

C00002

# EXHIBIT TWO

## INDEX

| | DATE FILED | PAGE |
|---|---|---|
| CAPTION | | 1 |
| INDICTMENT FROM CAUSE NO. 923494 | 9-12-02 | 2 |
| DOCUMENTS FROM PREVIOUS CAUSE NO. 907697 | | |
| COMPLAINT FROM PREVIOUS CAUSE NO. 907697 | 4-4-02 | 3 |
| PROBABLE CAUSE FOR FURTHER DETENTION & STATUTORY WARNINGS BY MAGISTRATE | 4-5-02 | 4 |
| LETTER TO THE COURT | 4-25-02 | 6 |
| INDICTMENT FROM PREVIOUS CAUSE NO. 907697 | 5-16-02 | 9 |
| REQUEST FOR NOTICE OF INTENT TO INTRODUCE RULE 404, RULE 609, AND ART. 37.07 EVIDENCE | 7-9-02 | 10 |
| MOTION TO REDUCE BOND | 7-9-02 | 13 |
| DEFENDANT'S MOTION IN LIMINE | 7-9-02 | 16 |
| DISCOVERY ORDER | | 21 |
| DEFENDANT'S MOTION TO APPOINT INVESTIGATOR AND ORDER OF THE COURT | 7-9-02 | 24 |
| AGREED SETTING | 7-9-02 | 26 |
| AGREED SETTING | 8-7-02 | 27 |
| NOTICE OF INTENT TO SEEK AFFIRMATIVE FINDING OF DEADLY WEAPON | 9-9-02 | 28 |
| MOTION TO DISCLOSE EXPERTS | 9-9-02 | 29 |
| MOTION TO STACK | 9-9-02 | 33 |
| DISMISSAL | 9-19-02 | 36 |
| STATE'S NOTICE OF INTENT TO USE AS EVIDENCE BUSINESS RECORDS ACCOMPANIED BY AFFIDAVIT | 9-20-02 | 37 |
| DOCKET SHEET FROM PREVIOUS CAUSE NO. 907697 | | 44 |
| DOCUMENTS FROM PRIMARY CAUSE NO. 923949 | | |
| MOTION TO TRANSFER MOTIONS AND NOTICES | 9-13-02 | 46 |
| DEFENDANT'S MOTION TO SUPPRESS ORAL STATEMENTS | 10-21-02 | 48 |
| DEFENDANT'S MOTION TO SUPPRESS EVIDENCE | 10-21-02 | 53 |
| DEFENDANT'S MOTION IN LIMINE | 10-21-02 | 56 |

# EXHIBIT THREE




RE: Writ No. WR-60,547-03
STYLE: SIXTA, DANIEL JAMES
TRIAL CT NO: 923949-A
12/13/2006

02 1A    **$ 00.24⁰**
0004615122    DEC 13 2006
MAILED FROM ZIP CODE 78701

     This is to advise that the Court has denied without written order the application for writ of habeas corpus on the findings of the trial court without a hearing.

                                   Louise Pearson, Clerk

        DANIEL JAMES SIXTA
        Neal Unit - TDC #1143232
        9055 Spur 591
        Amarillo, TX 79107

---

**OFFICIAL BUSINESS**
**STATE OF TEXAS**
**PENALTY FOR**
**PRIVATE USE**



RE: Writ No.
STYLE: Sixta
TRIAL CT NO: 923949-B
5/23/2012

02 1M    **$ 00.32⁰**
0004288372    MAY 24 2012
MAILED FROM ZIP CODE 78701

The Court has dismissed your application for a writ of habeas corpus without written order for non-compliance with Texas Rules of Appellate Procedure 73.1. Specifically, applicant's facts supporting grounds one and four are not on the prescribed form. See Ex parte Blacklock, 191 S.W.3d 718 (Tex. Crim. App. 2006).

                                  Louise Pearson, Clerk

        Daniel James Sixta
        Neal Unit - TDC #1143232
        9055 Spur 591
        Amarillo, TX 79107

Scanned Jun 27, 2006

No. 923949-A

EX PARTE                                    *        IN THE 351ST DISTRICT COURT

                                            *        OF

DANIEL JAMES SIXTA                          *        HARRIS COUNTY, TEXAS


## AFFIDAVIT


Before me, the undersigned notary public, appearred Michael E. Barrow, who upon oath stated the following:

"My name is Michael E. Barrow. I am a licensed attorney practicing in Houston, Harris County, Texas. My Texas Bar card number is 01831900. On May 20, 2002, I was appointed by Judge Mark Ellis of the 351st District Court to represent Daniel Sixta in cause number 870084, a motion to adjudicate alleging that Mr. Sixta had violated a condition of his deferred adjudication probation for injury to a child. On June 6, 2002, I was appointed by Judge Ellis to represent Mr. Sixta in cause number 907697 (later reindicted under cause number 923949) against the charge of intoxication manslaughter alleged to have occurred on February 21, 2002. Mr. Sixta's trial commenced on December 9, 2002, and on December 12, 2002, he was found guilty by a jury of intoxication manslaughter. On December 13, 2002, Mr. Sixta was assessed a term of twenty years in the penitentiary by the jury.

1. State whether trial counsel investigated potential witnesses who could have rebutted the State's physical evidence.

Counsel spoke to the two prior attorneys who had represented Mr. Sixta before

2005 OCT 20 AM 10: 26

IMAGED

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

C00079

counsel's appointment. Counsel also spoke with numerous attorneys who all indicated that they knew of no expert who would testify for the nominal fee approved by the Court. Counsel did a scene investigation but due to the time elapsed since the date of the offense to the appointment of counsel no physical evidence could be obtained. Counsel was left with the facts recorded by the State's investigator Harris County Sheriff's deputy David Pearson and his accident reconstruction. Counsel reviewed those facts, figures and computations and again after consulting with other attorneys came to the conclusion that a defense witness could not have testified differently as to the evidence presented by the State.

2. State the extent to which counsel advised Applicant regarding Applicant's right to accept the plea bargain or proceed to trial.

Counsel met with the Applicant on at least six occasions in Court. Counsel also met with Applicant four times at the county jail. From counsel's first visit with Applicant through all other visits Applicant indicated to counsel that he would not accept a plea bargain but wanted a trial. Counsel informed Applicant of every plea bargain offer made by the State and Applicant refused to accept any offer. Further on the day trial was to commence, Applicant was admonished by the Court of the State's final plea offer and Applicant refused to plead guilty.

3. State the extent to which counsel advised the Applicant regarding the potential range of punishment for the primary offense, including if counsel advised Applicant to refuse the plea bargain.

Counsel never advised the Applicant to refuse any plea bargain offer made by the State. Counsel never advised Applicant to refuse a plea bargain "because of the way the law read".

C00060

Scanned Jun 27, 2006

Counsel advised Applicant that the range of punishment for the primary offense of intoxication manslaughter was from two to twenty years in the penitentiary and a possible fine of up to ten thousand dollars. Counsel also advised Applicant that the range of punishment for the lesser included offense of felony driving while intoxicated was from two to ten years in the penitentiary and a possible fine of ten thousand dollars. Additionally, counsel advised Applicant that if the Court adjudicated him guilty for injury to a child, that he faced a punishment of six months to two years in a state jail. Counsel also advised Applicant that if he were found guilty of the primary offense and was adjudicated guilty on his deferred probation the Court in its discretion could have the sentences run consecutively as opposed to concurrently.

4. State the extent to which counsel advised the Applicant regarding his right to trial by jury and state whether Applicant manifested a desire to have a jury trial.

Counsel advised Applicant that he had an absolute right to a jury trial. Further, counsel advised Applicant that it was Applicant's decision whether or not to have a trial. From counsel's first meeting with Applicant until the Court admonished Applicant on the day of trial, it was always Applicant's desire to have a trial.

5. State whether counsel investigated, discussed, and considered Applicant's mental history, including his alleged attempted suicide and blood loss.

In the approximately six months from date of appointment until trial, counsel never received any indication that Applicant had any mental problems. Counsel was always able to communicate with Applicant and Applicant appeared to have no problems in discussing the facts of his case or trial strategies. Counsel was not aware of any attempted suicide by Applicant until the

C00081

day the punishment portion of the trial was set to begin (December 13, 2002). Counsel was informed by the bailiff that Applicant had cut his wrist the night before in jail. Applicant was brought into the courtroom where counsel consulted with Applicant. Applicant had some bandages on his arms and was told by the Court that he would have to unroll his sleeves to cover the bandages in front of the jury. Counsel spoke with Applicant who other than being depressed about being found guilty appeared to be fine. Counsel consulted with Applicant about his testimony during punishment and Applicant had no problem in responding. Counsel could not perceive any reason not to continue the trial. As to blood loss by Applicant, there was no indication to counsel that Applicant was not able to continue trial

6. State whether counsel observed anything in Applicant's speech, behavior and demeanor which caused counsel any concern about Applicant's competence to stand trial.

Counsel did not observe anything in Applicant's speech, behavior and demeanor which caused counsel any concern about Applicant's competence to stand trial.

7. State whether counsel believed that Applicant had sufficient present ability to consult with counsel with a reasonable degree of rational understanding and had a rational and factual understanding of the proceedings against him on the date of his trial.

Counsel believes that Applicant had sufficient present ability to consult with counsel with a rational understanding and Applicant had a rational and factual understanding of the proceedings against him. Applicant was very involved in his trial. He took notes throughout the trial and proposed questions for counsel to ask. Counsel and Applicant had numerous discussions of trial strategy and Applicant was a vocal participant. The day after Applicant's alleged suicide attempt,

Scanned Jun 27, 2006

counsel spoke with Applicant about his testimony during the punishment stage and again Applicant was a vocal participant. Counsel never saw any indication that Applicant was unable to discuss his case or that he did not understand the proceedings. Applicant never indicated to counsel that there was any kind of problem and. counsel in speaking with and observing Applicant never saw a problem"

Michael E. Barrow

Signed this 27 day of October , 2005.

CYNTHIA MONTANA
MY COMMISSION EXPIRES
October 29, 2009

Notary Public

C00083

A P P E A R A N C E S

MS. MARKAY STROUD

Assistant District Attorney

SBOT NO. 24000229

MS. ELIZABETH SHIPLEY

Assistant District Attorney

SBOT NO. 24008031

1201 Franklin

Houston, Texas 77002

PHONE:   713.755.5800

**ATTORNEYS FOR THE STATE OF TEXAS**

MR. MICHAEL BARROW

SBOT NO. 01831900

1314 Texas Avenue, Suite 1300

Houston, Texas   77002

PHONE:   713.224.8383

**ATTORNEY FOR THE DEFENDANT**

convicted of the offense of operating a motor vehicle while intoxicated.

THE COURT: To that allegation of a prior conviction, how do you plead, true or not true?

THE DEFENDANT: True.

MS. SHIPLEY: It is further present that before the commission of the offense hereinabove alleged committed on February 21, 2002, the defendant on May 11, 1989, in the County Criminal Court at Law No. 5 of Harris County, Texas, in Cause No. 8907002 was convicted of the offense of operating a motor vehicle while intoxicated.

Against the peace and dignity of the State. Signed, foreman of the grand jury.

THE COURT: To that allegation of prior conviction, how do you plead, true or not true?

THE DEFENDANT: True.

THE COURT: All right. You may be seated.

Does the State wish to make an opening statement?

MS. SHIPLEY: We do, Your Honor.

THE COURT: You may proceed.

STATE'S OPENING STATEMENT

MS. SHIPLEY: On February 21st, Martha Alford was getting ready to have dinner with her sister. She was on FM 1960 about 11 o'clock. She was getting ready

You will also be hearing from -- after Martha, you will be hearing from Deputy Pearson. You will hear that he is an accident reconstruction expert. And he will tell you that the investigation that he did, when he got to the scene, based on his interview of the witnesses, based on his looking at the skid marks, based on his estimation of the speed, Martha Alford's left-hand turn did not kill her sister. It was the defendant's intoxication.

He will tell you that based on all of his experience and his analysis of the scene, the defendant had time to stop. He had time to slow down. He had time to swerve, but because of his intoxication he didn't do those things. It could have been just a fender-bender. That is what the deputy is going to tell you. It could have been that he swerved and missed her completely. But because he was almost three times the legal limit, he didn't do those things. Instead, he smashed right in the center, crushing Linda Coble with his 4-Runner. That is what the deputy will tell you.

You will also hear from Carolyn Messen, who, I submit to you, is some of the most important testimony you are going to hear. Because Carolyn Messen was also involved in that accident and she was sitting in the passenger seat of the defendant's truck. She is going to

NO. 923949-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 351ST DISTRICT COURT |
| | § | OF |
| DANIEL JAMES SIXTA, Applicant | § | HARRIS COUNTY, T E X A S |

## RESPONDENT'S ORIGINAL ANSWER

Respondent, the State of Texas, through its Assistant District Attorney for Harris County, files this, its original answer in the above-captioned cause, having been served with an application for writ of habeas corpus pursuant to TEX. CRIM. PROC. CODE ANN. art. 11.07 § 3 (Vernon Supp. 2004), and would show the following:

### I.

Applicant is confined pursuant to the judgment and sentence of the 351st District Court of Harris County, Texas, in cause number 923949 (the primary case), where Applicant was convicted by a jury for the felony offense of intoxication manslaughter. The jury assessed punishment, enhanced by two (2) prior convictions, at twenty (20) years confinement in the Texas Department of Criminal Justice - Institutional Division.

The First Court of Appeals delivered an opinion affirming Applicant's conviction in the primary case on December 18, 2003. *Sixta v. State*, No. 01-02-01316-CR. The Court of Criminal Appeals refused Applicant's petition for discretionary review on May 26, 2004.

### II.

Respondent denies the factual allegations made in the instant application, except those supported by official court records, and offers the following additional reply:

## REPLY TO APPLICANT'S FIRST GROUND FOR RELIEF

In his first ground for relief, Applicant alleges he was denied the effective assistance trial counsel. *Applicant's writ* at 7. Specifically, Applicant alleges Michael Barrow, trial counsel:

1. Failed to Investigate;

2. Failed to Object;

3. Failed to Assist Applicant in plea bargaining; and

4. Failed to request a competency evaluation.

The United States Supreme Court held in *Strickland v. Washington*, 466 U.S. 668, 686 (1984), that the benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. The Court in *Strickland* set forth a two-part standard, which has been adopted by Texas. *See Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). First, the defendant must prove by a preponderance of the evidence that counsel's representation fell below an objective standard of reasonableness. *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002); *Narvaiz v. State*, 840 S.W.2d 415, 434 (Tex. Crim. App. 1992) (citing *Strickland*, 466 U.S. at 688). Reasonably effective assistance of counsel does not require error-free counsel, or counsel whose competency is judged by hindsight. *Mercado v. State*, 615 S.W.2d 225, 228 (Tex. Crim. App. 1981). Second, there must be a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.*

Article I, Section 10 of the Texas Constitution also requires that a criminal defendant receive effective assistance of counsel. However, the Texas constitutional

2

provision does not create a standard that is more protective of a defendant's rights than that established in *Strickland*. *Black v. State*, 816 S.W.2d 350, 357 (Tex. Crim. App. 1991) (citing *Hernandez v. State*, 726 S.W.2d 53 (Tex. Crim. App. 1986)). Therefore, an analysis of the effectiveness of Applicant's trial counsel in the primary case pursuant to the *Strickland* standard satisfies both the federal and state constitutional requirements.

## Failure to Investigate

Applicant alleges that his trial counsel failed to investigate the blood sample and the accident report. *Applicant's writ* at 7; *Applicant's memorandum* at 7. Applicant alleges that defense counsel did not have a complete copy of the accident report until the beginning of trial which allegedly states that the other driver, Ms. Martha Alford, was inattentive and failed to yield. *Applicant's memorandum* at 7.

To obtain habeas relief in a failure to investigate claim, Applicant must show what a more in depth investigation would have revealed. *Mooney v. State*, 817 S.W.2d 693 (Tex. Crim. App. 1991). In habeas proceedings, the Applicant must allege sufficient facts which, if true, would entitle him to relief. *Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985).

Applicant fails to show what a more in depth investigation of the blood sample would have revealed and fails to show how Ms. Alford's inattentiveness and failure to yield establish a reasonable probability that, but for counsel's failure to investigate the accident report, the result of the proceeding would have been different. Therefore, Applicant fails to allege sufficient facts, which, if true, would entitle him to relief. *Maldonado*, 688 S.W.2d at 116.

Accordingly, the instant allegation is without merit and should be denied.

3

## Failure to Investigate Witnesses

Applicant alleges that his trial counsel failed to hire an expert witness and failed to interview all of the witnesses until the day of trial. *Applicant's writ* at 7; *Applicant's memorandum* at 11. Specifically, Applicant alleges the court granted a motion designating money to be used to hire an expert in accident site reconstruction. *Applicant's memorandum* at 6. However, Applicant alleges counsel was ineffective because no expert was presented. *Id.* Applicant further alleges that counsel failed to seek out an expert witness who would have impeached the state's physical evidence. *Id.* Applicant identifies William Russell Haight of the Collision Safety Institute as a possible expert witness, and alleges that with Mr. Haight's testimony, counsel could have developed a better defense. *Id.* at 6-7.

To obtain relief for counsel's failure to present or investigate witnesses, an Applicant must show that potential witnesses were available, and that their testimony would have benefited the defense. *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983); *Wilkerson v. State*, 726 S.W.2d 542, 551 (Tex. Crim. App. 1986).

Applicant fails to carry his habeas burden because he fails to show the potential witness was available and that his testimony would have benefited the defense. Applicant's conclusory allegation that Mr. Haight's testimony would have "developed a better defense" is not enough to warrant habeas relief. *Ex parte Young*, 418 S.W.2d 824 (Tex. Crim. App. 1967). Even if sworn to, the allegation is insufficient to overcome the State's denial. *Ex parte Empey*, 757 S.W.2d 771, 775 (Tex. Crim. App. 1988).

Furthermore, assuming, *arguendo*, that defense counsel limited his investigation, an attorney's decision to limit his investigation may be reasonable under the circumstances. *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir.); *Butler v. State*, 716

4

be resolved in the instant proceeding. Respondent further requests that the Court order Applicant's counsel in the primary case, MICHAEL E. BARROW, to file an affidavit summarizing the actions taken to represent the Applicant and responding to the allegations contained in the application.

## IV.

Applicant raises questions of law and fact which can be resolved by the Court of Criminal Appeals upon review of official court records and without need for an evidentiary hearing.

## V.

Service has been accomplished by sending a copy of this instrument to the following address:

DANIEL JAMES SIXTA
#1143232 – Neal Unit
9055 Spur 591
Amarillo, TX 79107-9696

SIGNED this 29th day of September, 2005.

Respectfully submitted,

Jack Roady
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 755-5826
Texas Bar I.D. #24027780

Prepared by Mary E. Elizondo
Legal Intern, Harris County

12

## AFFIDAVIT

**THE STATE OF NEBRASKA**

**COUNTY OF** Douglas

BEFORE ME, the undersigned notary, on this day personally appeared Janet Koski, a person whose identity is known to me. After I administered an oath to her, upon her oath she stated:

My name is Janet Koski. I am over twenty-one (21) years of age. I am a resident of Douglas County, Nebraska. I am fully competent to make this Affidavit. All statements within this Affidavit are within my personal knowledge and are true and correct.

Daniel James Sixta, who is presently incarcerated at the Coffield Unit, Tennessee Colony, Texas, TDCJ No. 1143232 is my brother. He was convicted of intoxication manslaughter in 2002 in the 351st District Court of Harris County, Texas in cause no. 923949. He is filing his application for writ of habeas corpus.

A critical question in his trial was who actually caused the collision between the vehicle he was driving and another vehicle, the passenger in the other vehicle having died as a result of the collision?

My brother was financially unable to make bail or to retain an attorney, and he was compelled to go to trial without his own expert witness to combat the State's version of the collision. It was not until funds were provided by me that we were able to retain an accident reconstruction expert, and the "Cope" report was clearly in my brother's favor, showing he did not cause the collision. This defense was denied to him at his trial, through no lack of diligence on his part.

This "evidence" was "newly discovered" as far as he was concerned, and he used "due diligence" to obtain it. I believe the report will be a part of his writ application.

_Janet Koski_
**JANET KOSKI**

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned Notary Public on this ___30th___ day of ___October___, 2013.

_Kristyn Wiehl_

My commission expires: _7-14-15_     Notary Public for _FUBO_

County, State of Nebraska

GENERAL NOTARY - State of Nebraska
KRISTYN WIEHL
My Comm. Exp. July 14, 2015

# EXHIBIT EIGHT

## PETITIONER AFFIDAVIT

On December 12, 2012, I **DANIEL JAMES SIXTA** TDCJ #1143232, was convicted of Intoxication Manslaughter, Case No. 923949.

The **NEWLY DISCOVERED EVIDENCE**, was only found, because I never surrendered my rights to exercise **DUE DILLIGENCE** to obtain an expert in auto accident recollision. The report was thus obtained solely as the result of an unexpected and previously unforeseen "Beneficence" of a third party that had no prior duty or obligation to provide any funding.

I was unable to secure funds before this date because I was **"INDIGENT"** I didnot have the means to hire any auto collision expert because of this fact.

At the time of my arrest, I could not make bail, because I was under **DUAL** indictments for the same charge, and because of this fact I had fell behind on my mortgage payments, and I was unable to sale my home of which I had live in for over 16 years and had $65,000.00 in equity. I have never recieved any type of settlement from my mortagage company or my auto insurance company.

This **NDE** was unavailable until July 2007, when a Ms. Janet Koski agreed to provide funding to hire and expect. I was unable to obtain such evidence free of charge. I have never had more than afew hundred dollars on my commissary account since my arrest.

Although there was some delay between my obtaining this experts report. I was ultimately able to secure the funding to hire an expert and have the facts analysis, and prove that the State's finding were incorrect and were a product of erroneous analysis of available data.

## INMATE'S DECLARATION

I, DANIEL JAMES SIXTA, BEING PRESENTLY INCARCERATED IN TDCJ at the Coffield Unit, Declare under penalty of perjury that, according to my belief, the facts stated in this **PETITIONER AFFIDAVIT** are true and correct.


Signed on June 22, 2013.

DANIEL JAMES SIXTA
TDCJ #1143232
Coffield Unit
2661 FM 2054
Tennessee Colony, TX 75884

# EXHIBIT NINE

# INDEX

## REGARDING APPLICANT'S ACCIDENT RECONSTRUCTION REPORT

**AFFIDAVIT OF EXPERT**

**HIS RESUME' AND CREDENTIALS**

**THE ACCIDDENT RECONSTRUCTION REPORT**

**COPE'S EXPERT TESTIMONY IN OTHER COURT CASES**

# EXHIBIT NINE

## TRIAL COURT CAUSE NO. 923949

| | | |
|---|---|---|
| DANIEL J. SIXTA<br>Appellant | §<br>§<br>§ | IN THE DISTRICT COURT |
| | §<br>§ | HARRIS COUNTY, TEXAS |
| VS. | §<br>§ | |
| THE STATE OF TEXAS<br>Appellee | §<br>§<br>§ | 351ST JUDICIAL DISTRICT |

### AFFIDAVIT OF CAM COPE

THE STATE OF TEXAS

COUNTY OF MONTGOMERY

BEFORE ME, the undersigned notary, on this day, personally appeared Cam Cope, a person whose identity is known to me. After I administered an oath to him, upon his oath, he stated:

"My name is Cam Cope. I am over twenty-one (21) years of age. I am a resident of Montgomery County, Texas. I have never been convicted of a crime, and I am fully competent to make this Affidavit. All statements within this Affidavit are within my personal knowledge and are true and correct.

In 1971, I obtained a Bachelor of Science degree in Biology and Chemistry from New Mexico Highlands University.

After graduation from New Mexico Highlands University, I served in the United States Army from 1971 through 1974. As part of my duties in the United States Army, I was involved in surgical research at both Walter Reed Army Medical Center and William Beaumont Army Medical Center.

Upon discharge from the United States Army, I took sixty (60) hours of undergraduate and graduate courses at Texas A&M University. These courses included, but were not limited to, chemistry and physics. Also, within the Texas A&M University

1

System, I completed an eighty (80) hour course in Advanced Accident Reconstruction. Accident Reconstruction courses are not a part of any engineering degree program, so the engineering and reconstruction technology is basically obtained through the Society of Engineers and their peer reviewed articles and teaching.

In fact, I have continued with my education over the years, attending classes taught by the Society of Automotive Engineers and accident reconstruction organizations regarding vehicular accidents and occupant restraint systems. Courses I have completed include Crash Data Retrieval Systems, Air Bag Litigation, Vehicle Restraint Systems and Airbags, Occupant Restraint and Protection, Airbag Field Performance, GM Technical on Airbags, Technology and Performance of Airbags, and Airbag Design and Performance. For a detailed list of the courses that I have taken in my effort to continue my education, please see my most recent curriculum vitae attached to this Affidavit and incorporated herein by reference as if fully set forth.

I am a member of the National Association of Professional Accident Reconstruction Specialists and the Texas Association of Accident Reconstruction Specialists. Also, I am a member of the Society of Automotive Engineers. Additionally, I am a member of the American College of Forensic Examiners. For a detailed list of my professional affiliations, please see my most recent curriculum vitae attached to this Affidavit and incorporated herein by reference as if fully set forth.

During the course of my career, I have continued to be active with the Society of Automotive Engineers as a sectional leader and have also been Chairman of the Engineering and Technology for the American College of Forensic Examiners, and I have published several papers. For a detailed list of my published papers, please see my most

2

recent curriculum vitae attached to this Affidavit and incorporated herein by reference as if fully set forth.

Since 1985, I have worked in the area of accident reconstruction, primarily involving motor vehicles, with an emphasis on occupant restraint systems, including airbags. In this connection, I have testified as an expert witness on many occasions.

In September 1996, I founded Cam Cope Consulting. This firm provides consulting services with an emphasis on accident reconstruction and identification of occupant restraint system usage, including airbags and seatbelts. Auto Fire & Safety Consultants, Inc. d/b/a Cam Cope Consulting has been an ongoing venture from September 1996 to the present.

I am also a Licensed Private Investigator, with the State of Texas, this is in compliance with Section 1702.104, Texas Department of Public Safety, Licensing and Duties of Investigation Companies and Security Service Contractors. Unless the person holds a license as an investigation company, a person may not: Engage in business activity for which a license is required under this chapter. A person acts as an investigation company for the purposes of this chapter if the person: (1) engages in the business of obtaining or furnishing, or accepts employment to obtain or furnish, information related to: (a) crime or wrongs done or threatened against a state or the United States; (b) the identity, habits, business, occupation, knowledge, efficiency, loyalty, movement, location, affiliations, associations, transactions, acts, reputation, or character of a person; (c) the location, disposition, or recovery of lost or stolen property; or (d) the cause or responsibility for a fire, libel, loss, accident, damage, or injury to a person or to property. (2) engages in the business of securing, or accepts employment to secure, evidence for use before a

3

court, board, officer, or investigating committee; (3) engages in the business of securing, or accepts employment to secure, the electronic tracking of the location of an individual or motor vehicle other than for criminal justice purposes by or on behalf of a governmental entity; or (4) engages in the business of protecting, or accepts employment to protect, an individual from bodily harm through the use of a personal protection officer. Copy of the related sections attached.

Our firm has been contacted by Janet Koski on behalf of defendant, Daniel J. Sixta, to evaluate and reconstruct a vehicular accident involving a 1994 Toyota 4-Runner driven by Daniel J. Sixta and a 2001 Ford Focus SE driven by Martha Alford that occurred on February 21, 2002, at 11000 FM 1960 W., Houston, Harris County, Texas.

Our investigation is based on the collision analysis, injury analysis, accident avoidance analysis, injury avoidance analysis, accident causation analysis, accident prevention and injury reduction analysis, speed of vehicles during pre-trip, trip and post-trip phases of the rollover event, motion of vehicles during pre-trip, trip and post-trip phases of the rollover event, accident severity, vehicle deformation, accident scene geometry, potential avoidance scenarios, vehicle deceleration rates, driver actions including reaction time, perception, visibility and contributing factors and cause of the rollover event.

1.     Although I was not present at the accident and have no personal knowledge of the accident this is not the criteria required in *du Pont de Nemours & Co. v. Robinson*, 923 S.W. 2d 549 (Tex. 1995); *Frye v. United States*, (1923), *Daubert v. Merrell Dow Pharmaceutical*, 509 U.S. 579 (1993).

2.     The investigation of accidents in the State of Texas requires that you are

4

licensed with the State of Texas as a Licensed Private Investigator, my license number is Texas P.I. # A09524. The investigation of this accident was needed to establish the opinions listed in my report.

3.    It is not required that measurements be taken at the scene. For the scene evaluation I used aerial photographs which are also widely used by the Accident Reconstruction Profession and information listed on the police report to illustrate for the jury the positioning of the vehicles prior to and during the collision. Since no measurements or evidence was retained by the police department on the day of the accident, the methodology I have used to document the scene is well accepted by the reconstruction profession. Please refer to *Accident Reconstruction Analysis* by Rudolph Limpert, Fifth Edition, Chapters 3 & 5. (See attached).

4.    Measurements of same or similar vehicles involved in the accident were obtained from All Data and manufacturer specifications that accurately document similar vehicles. Copies of the All Data Spec Sheets are provided with this Affidavit. Exemplar photographs of the exemplar vehicles have also been taken to document the structure of the vehicles. The inspection of similar vehicles was conducted in this investigation since the vehicles and scene were not available. The photographs provided by the various entities represent and show the damage to the vehicles. The photographs accurately show the crush and evidence marks that we were able to use in the reconstruction of this accident.

5.    The crash tests, studies and calculations used in the reconstruction of

5

this accident are available through the Society of Automotive Engineers, Accident Reconstruction Journals, various other peer reviewed literature, testing and calculations to show the sequence of events in this accident.

6. I relied on the police report to the extent recommended by the accident reconstruction profession and the various sources of literature related to the use of police and witness statements. See Chapters 3 & 5 of *Accident Reconstruction Analysis* by Rudolph Limpert, Fifth Edition.

7. The factual observation of the accident scene by the Harris County Sheriff's Department was documented by the investigating officer using the skills required by the officer's profession.

8. The Harris County Sheriff's Department report is a factual report that represents the investigation as it was conducted on the day of the accident. As an officer, D.T. Pearson has the duty to document the I evidence and factors associated with the accident. I have reviewed Officer Pearson's report and trial testimony.

9. I have used Engineering Dynamics Corporation (EDC) software, with the aid of an on-staff engineer, which includes, HVE, EDCRASH, EDSMAC and SIMON. The HVE simulation environment was introduced in 1996 for the 3-D user, with the 2-D simulations dating back to the 1980's and early 1990's. The 3-D, 5.0 version was developed as a sophisticated, 3-dimensional user environment for setting up and executing simulations involving humans and vehicles interacting with their environment. In 2001, SIMON along with DyMESH was introduced to provide simulation

6

involving rollover and override, as well as other 3-dimensional collision issues. The HVE programs have been widely accepted by the Accident Reconstruction profession, widely published and peer reviewed. This program was used to formulate other plausible scenarios based on the evidence made available.

10. I have used the photographs provided and the simulation to determine the speeds at impact, as well as post-impact speeds to determine the factors associated with the rollover event.

11. My opinions are based on vehicle evidence shown in the photographs, an understanding of the scene, and an understanding of the vehicle dynamics and the motions of the vehicle. These opinions regarding this accident can be expressed to the jury using the scientific knowledge and scientific methodology used by the accident reconstruction profession. The photographs reviewed of the vehicles involved in this accident show the factual evidence needed to provide the opinions I have listed in my report."

Further Affiant sayeth not.

_____
Cam Cope, President
Auto Fire & Safety Consultants, Inc.
d/b/a Cam Cope Consulting

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned Notary Public on this the 23rd day of October 2007.

_____
Notary Public for Montgomery County
State Of Texas

My Commission: __10/27/2010__

KACY D. GIBSON
Notary Public, State of Texas
My Commission Expires
October 27, 2010

8

The cases listed below are the guidelines and criteria used in reconstructing an accident scene.

In _Frye v. United States_ (1923), the _Frye_ Rule states:

Novel scientific evidence must be shown to be generally accepted in the relevant scientific community in order to be admissible. The _Frye_ test has come to be known as the general acceptance.

In reality, for decades few challenges were made to the admissibility of expert evidence, so the _Frye_ test was not an issue for most fire investigators.

In _Daubert v. Merrell Dow Pharmaceutical_, 509 U.S. 579 (1993), the Supreme Court made trial judges the gatekeeper of scientific expert testimony on the basis of four criteria:

1. Whether the theory used by the expert can be and has been tested;
2. Whether the theory or technique has been subjected to peer review;
3. The known or potential rate of error of the method used;
4. The degree of the methods or conclusion's acceptance within the relevant scientific community.

Rule 702 Federal Rules of Evidence states, testimony by experts, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Our scientific investigation will clearly satisfy the first three components of Daubert and understand that the fourth is likely to be debated in many instances.

Other reference materials include:

1. _Low Speed Automobile Accidents_, Accident Reconstruction and Occupant Kinematics, Dynamics and Biomechanics, Second Edition by Alan J. Watts, Ph.D., Dale R. Atkinson, B.S., and Corey J. Hennessy, M.A.;
2. _Low Speed Rear Impacts and the Elastic Properties of Automobiles_, SAE 896142, by D.P. Romilly, R.W. Thomson, F.P.D. and Navin, M.J. Macnabb;
3. _Dynamics of Low Speed Crash Tests With Energy Absorbing Bumpers_, SAE 921573, by Thomas J. Szabo and Judson Welcher;
4. _Analysis of Human Test Subject Kinematic Responses to Low Velocity Rear End Impacts_, SAE 930889, by Whitman E. McConnell, Richard P. Howard, Herbert M. Guzman, John B. Bomar, James H. Raddin, James V. Benedict, Harry L. Smith and Charles P. Hatsell;
5. _Human Occupant Kinematic Response to Low Speed Rear-End Impacts_, SAE 940532, by Thomas J. Szabo, Judson B. Welcher, Robert D. Anderson, Michelle M. Rice, Jennifer A. Ward, Lori R. Paulo and Nicholas J. Carpenter;
6. _Human Subject Kinematics and Electromyographic Activity During Low Speed Rear Impacts_, SAE 962432 by Thomas J. Szabo and Judson B. Welcher; and,
7. _Data and Methods for Estimating the Severity of Minor Impacts_, SAE 950352 by Mark N. Bailey, Bing C. Wong and Jonathan M. Lawrence.

9

# AUTO FIRE & SAFETY CONSULTANTS



## CAM COPE
## Curriculum Vitae

www.firesafetyconsultant.com                                    ccope@firesafetyconsultant.com

### AREAS OF SPECIALIZED EXPERTISE

Accident Reconstruction
Occupant Restraint Systems / Airbags
Nikon Total Station Scene Surveys
Crash Data Retrieval GM – Ford vehicles
Case Evaluation Vehicle Products Liability / Vehicle Assessment / Defects

Fire Origin and Cause
Fuel Systems Integrity, FMVSS 301
Interior Flammability, FMVSS 302
Trucking Accidents
Vehicle Fire Testing

Mr. Cope received a Bachelor of Science degree in Biology and Chemistry in 1971 and has been investigating and reconstructing accidents for the past twenty (20) years. During that period, he continued his education and training through the Society of Automotive Engineers (SAE). This organization provides the most peer reviewed literature and training with regards to vehicles and accident reconstruction. Engineering and reconstruction of accidents is primarily taught through SAE and various Accident Reconstruction seminars conducted throughout the United States. The Texas Accident Reconstruction Association as well as the National Accident Reconstruction Association also provides training and literature for the Accident Reconstructionist. The National Fire Protection Association, International Association of Arson Investigators, National Association of Fire Investigators and various Chapters of Accident Reconstruction and Fire Investigation also provide training and technology in the field of vehicle accident reconstruction. In addition to these training organizations, he has also received training through the Texas A & M Extension Service related to Accident Reconstruction, including Advanced Accident Reconstruction. Since none of the University Engineering Degreed programs offer education or training in Accident Reconstruction or Fire Science Technology, this education must be obtained through the various organizations listed in his Curriculum Vitae. Mr. Cope currently teaches vehicle fire investigation at Eastern Kentucky University, which is one of the few universities offering a degree in Fire Science Technology. Cam Cope currently works on the SAE Accident Reconstruction Committee and the Vehicle Fire Task Force Committee, which is a part of the revisions committee for the vehicle section of NFPA 921. Please refer to the attached Curriculum Vitae for Cam Cope for his complete educational background and list of seminars attended.

## ACADEMIC EDUCATION

B.S., Biology/Chemistry, New Mexico Highlands University, 1971
Undergraduate and Graduate Courses (60 Hours), Texas A & M University, 1973
Advanced Accident Reconstruction, Texas A & M (80 Hour Course), 1993
CFEI, Certified Fire Explosion Investigator
CFII, Certified Fire Investigator Instructor
CVFI, Certified Vehicle Fire Investigator

## MILITARY

U.S. Army 1971-1974
Surgical Research, Walter Reed Army Medical Center
Medical and Veterinary Team, Fort Benning, GA
Veterinary Team, K-9 unit, Viet Nam
Surgical Research, William Beaumont Army Medical Center

## LAW ENFORCEMENT

College Station Police Department, Reserve Officer, 1985 to 1990
Police Academy Training-Accident Investigation, Routine Patrol

## PROFESSIONAL EXPERIENCE

September 1996 to Present                    **Auto Fire & Safety Consultants, Inc.**
                                             **Formerly Cam Cope Consulting**

- Vehicle and structural fire investigation (origin and cause)
- Vehicle Fire Testing
- Accident Reconstruction: computer modeling (EDCRASH-EDSMAC-HVE 3D, SIMON, DyMESH)
- Case evaluation and rapid response in the documentation of vehicular accidents
- Scene drawings & diagrams, inspection of vehicles, and research
- Nikon NPL-820 Total Station, AIMS Software
- Products liability and identification of defective products, testing, and research
- Identification of occupant restraint system usage, including airbags and seatbelts
- Crash Data Retrieval (CDR) in GM Vehicles (1996-2003): Retrieval of data five seconds pre-impact and five seconds post-impact, and near-deployment data (black box data)
- Rollovers, trucking accidents, industrial and construction accidents

January 1991 to 1998                         **Engineering Reconstruction Associates**
- Accident reconstruction
- Model building
- Partner with M. Lewis Coody, Registered Professional Engineer, State of Texas #48387
- Assistant Professor Department of Construction Science

January 1992 to September 1996               **Crowley, Marks, and Douglas**
- Accident reconstruction, evaluation, and research
- Vehicular fires (cause and origin) determination and documentation
- Evaluation and investigation of vehicle products liability

January 1985 to January 1992                 **Crowley and Waltman**
- Investigation of motor vehicle accidents including the related injuries, fires, occupant restraint systems involving serious injury or death
- Fire cause and origin

## PROFESSIONAL AFFILIATIONS

NAFI, National Association of Fire Investigators (Board Member)
CFEI, Certified Fire and Explosion Investigator
CFII, Certified Fire Investigation Instructor
CVFI, Certified Vehicle Fire Investigator
NSTI, National Safety and Transportation Institute (Board Member)
NAPARS, National Association of Professional Accident Reconstruction Specialists
TAARS, Texas Association of Accident Reconstruction Specialists
SAE, Society of Automotive Engineers
      Committee Accident Investigation Practices Standards
      Vehicle Fires Committee
      Auto/Pedestrian Standards
      Sectional Leader, Gulf Coast Chapter
NSC, National Safety Council
IAAI, International Association of Fire and Arson Investigators
NFPA, National Fire Protection Association
ACFE, American College of Forensic Examiners
      Engineering and Technology Board
      Diplomat, Chairman of Engineering and Technology 2000
      Continuing Education Committee and Editorial Review Board
Texas Board of Private Investigators and Private Security Agencies
      Licensed Private Investigator, License A09524
TALI, Texas Association of Licensed Investigators, Inc.
FIAA, Fire Investigation Association of Alberta (Chapter 38 IAAI)
CTFIA, Central Texas Fire Investigators Association

## PUBLICATIONS AND PRESENTATIONS

♦ Cam Cope, The Investigation of Electrical Fires in Vehicles," April 20 – 21, 2007, Irmo, South Carolina; Fire Explosions, and Electricity: Intensive Instruction in Irmo (Instructor)

♦ Cope, Cam, "2006 ISFI 2006 – International Symposium on Fire Investigation Science and Technology; June 26 – 29, 2006, Cincinnati, Ohio; Fire Technology Involving Vehicles & Structures; Faro Scene 3D Laser Scanner. (Instructor)

♦ Cope, Cam, Inner Circle of Investigators 2005 Annual Conference, "Heavy Truck Fires," Williamsburg, Virginia, October 14-15, 2005. (Instructor).

♦ Cope, Cam, 2005 Vehicle Fire, Arson & Explosion Investigation Science and Technology Seminar, NAFI and Eastern Kentucky University, Richmond, Kentucky, Sept. 26-29, 2005. (Instructor).

♦ Cope, Cam. "Crash Data Retrieval", 2004 Vehicle Fire, Arson & Explosion Investigation Science and Technology Seminar, NAFI and Eastern Kentucky University, Richmond, Kentucky, Sept. 27-30, 2004. (Instructor).

♦ Cope, Cam. "Sources of Information", 2004 Vehicle Fire, Arson & Explosion Investigation Science and Technology Seminar, NAFI and Eastern Kentucky University, Richmond, Kentucky, Sept. 27-30, 2004. (Instructor).

♦ Cope, Cam. "Vehicle Systems Design, Form, & Function," "Crash Data Retrieval;" Test Burns. 2004 Vehicle Fire, Arson, & Explosion Investigation Training Program, NAFI, Eastern Kentucky University, Richmond, KY; September 27-30, 2004. Live burns- Vehicle Fire Testing.

♦ Cope, Cam. "Vehicle Fire Investigation", International Symposium on Fire Investigation, NFPA, Fire Service College, Moreton-in-Marsh, Gloucestershire, UK, June 27-30, 2004. (Instructor).

♦ Cope, Cam. "Vehicle Systems Design, Form, & Function," "Crash Data Retrieval;" Test Burns. 2003 Vehicle Fire, Arson, & Explosion Investigation Training Program, NAFI, Eastern Kentucky University, Richmond, KY; October 1-4, 2003. Live burns- Vehicle Testing.

♦ Cope,Cam. "Vehicle Investigation Issues." 2003 National Fire, Arson & Explosion Investigation Training Program, NAFI, Sarasota, Florida; August 13, 2003. Vehicle testing and live burns.

♦ "2002 Vehicle Fire, Arson & Explosion Investigation & Technology Seminar," National Association of Fire Investigators and Fire and Safety Engineering Technology; Eastern Kentucky University, Richmond, KY; September 30 -October 2, 2002. (Instructor).

♦ Cope, Cam and Bill Camp. "Use of Digital Photography in Investigation." American Trial Lawyers Association Presentation: Chicago, Illinois; July 31, 2000.

♦ Cope, Cam. "Airbag Investigation." The Legal Investigator – All CLI Issue. National Association of Legal Investigators; May 2001.

♦ Cope, Cam. "Motor Vehicle Fires and NFPA 921." Test Burning of Vehicles 2001: National Advanced Fire, Arson, and Explosion Investigation Science and Technology: Eastern Kentucky University, Richmond, Kentucky; March 13-17, 2001.

♦ Cope, Cam and Bob Swint. "Airbag Safety & Investigation." The Forensic Examiner. May/June 2000.

♦ Cope, Cam and Dennis Andrews. "Low-Speed Rear-End Impact Analysis / Seat Belts / Airbags." ACFE Workshop Presentation: New York City, New York; October 29 - November 1, 1999.

♦ Cope, Cam. "History of Occupant Restraint Systems." ACFE 6th National Scientific Academy: Naples, Florida; October 12-14, 1998.

♦ Cope, Cam and Bob Swint. "The Documentation of Vehicles Involved in Accidents." Engineering and Technology, The Forensic Examiner. Vol. 7: Sept/Oct 1998.

♦ Cope, Cam. "Investigation of Vehicle Rollover." Advanced Forensic Civil Investigations. Lawyers & Judges Publishing Co., 1997.

♦ Cope, Cam. "Restraint System Documentation and Investigation." Presentation at 5th National Scientific Academy & Retreat of the American College of Forensic Examiners: San Diego, CA; December 11-13, 1997.

♦ Cope, Cam. "Investigation of an Automobile Accident." Presentation at the National Association of Legal Investigator Mid-Winter Conference: Chicago, Illinois; March 1995.

♦ Cope, Cam. "Investigation of a Products Liability Case." Presentation at the National Association of Legal Investigator Silver Anniversary Conference: St. Louis, Missouri; 1992.

♦ Cope, Cam. "Vehicle Documentation." Presentation at N.A.L.I. National Convention: Houston, Texas; 1991.

♦ Cope, Cam. "Accident Investigation Forms," A series of data forms to be used by Accident Investigators.

## CONTINUING EDUCATION

♦ Technical Committee on Hazard and Risk of Contents & Furnishings; National Fire Protection Association (NFPA); May 1 – 2, 2007.

♦ The Warren Group, Forensic Engineers & Consultants, Fires Explosions and Electricity: Intensive Instruction in Irmo; April 20 – 21, 2007.

♦ 2007 SAE World Congress, Detroit Michigan, SAE ABA Fire Safety Committee, SAE Motor Vehicle Fire Investigation Task Force, and AIRP Committee Meeting; April 16-19, 2007.

- "Fire and Materials 2007", Interscience Communications Limited, Fire School, San Francisco, California, January 29-31, 2007.

- Cope, Cam, "Central Texas Fire Investigators Associations Annual Meeting & Conference; December 12 - 13, 2006, Austin, Texas; Electrical Fires 102 Training Program

- Cope, Cam, "2006 ISFI 2006 – International Symposium on Fire Investigation Science and Technology; June 26 – 29, 2006, Cincinnati, Ohio; Fire Technology Involving Vehicles & Structures.

- Cope, Cam. "2006 ARC-CSI Crash Conference", June 5-8, 2006, Las Vegas, Nevada. Crash Testing – Rollover, Motorcycle and Bus.

- 2006 SAE World Congress, Detroit, Michigan, SAE AIRP Committee Meeting, SAE ABA Fire Safety Committee, Hydrogen Vehicle Safety (Parts 1 & 2), Fire Statistics and Analysis (Parts 1 & 2), Material Flammability and Fire Experiments (Parts 1 & 2); April 3-7, 2006.

- Live Burn Testing of Five (5) Ford Vehicles Related to Cruise Control Deactivation Switches conducted by Nationwide Insurance, Houston, Texas; December 5, 2005.

- Inner Circle of Investigators, 2005 Annual Conference, Investigative Professional Development Conference, Williamsburg, Virginia, October 14-15, 2005. (10 hrs)

- "Vehicle Fire, Arson & Explosion Investigation", (Total Burns - Testing) Science & Technology Seminar, NAFI, Fire and Safety Engineering Technology, Eastern Kentucky University, September 26-29, 2005.

- NFPA 921 – Task Force Committee Meetings Relative Changes to NFPA 921, Minneapolis, Minnesota, September 14 – 16, 2005.

- 2005 NAFI - National Seminar on Fire Analysis Litigation, Sarasota, Florida, August 11-12, 2005.

- 2005 NAFI - National Fire, Arson & Explosion Investigation Training Program, Sarasota, Florida, Computer Fire Modeling, August 8-10, 2005.

- 2005 SAE World Congress, Detroit, Michigan, "Fire Safety" "Accident Reconstruction", "Side Impact & Rollovers", "Restraints Systems". (AIRP Standards Committee & VFI Advisory Group); April 12-15, 2005.

- "Fire and Materials 2005", Interscience Communications Limited, Fire School, San Francisco, California, January 31-February 1, 2005.

- "Fire Hazard To Occupants of Road Vehicles", Interscience Communications Limited, Fire School, San Francisco, California; January 31-February 1, 2005.

- "Cone Calorimeter Predictions of FMVSS 302 Performance", Interscience Communications Limited, Fire School, San Francisco, California; January 31-February 1, 2005.

- "Vehicle Fire, Arson & Explosion Investigation", (Vehicle Burns – Testing) Science & Technology Seminar, NAFI, Fire and Safety Engineering Technology, Eastern Kentucky University, September 27-30, 2004.

- "Electrical Faults as Fire Causes" (The Investigator's Perspective), NFPA, International Symposium on Fire Investigation, Fire Service College, Moreton-in-Marsh, Gloucestershire, UK, June 29, 2004.

- "Forensic Pathology", NFPA, International Symposium on Fire Investigation, Fire Service College, Moreton-in-Marsh, Gloucestershire, UK, June 29, 2004.

- "Scene Management", NFPA, International Symposium on Fire Investigation, Fire Service College, Moreton-in-Marsh, Gloucestershire, UK, June 29, 2004.

- "Scene Examination (Case Study Based)", NFPA, International Symposium on Fire Investigation, Fire Service College, Moreton-in-Marsh, Gloucestershire, UK, June 28, 2004.

- "Fire Dynamics and Fire Science", NFPA, International Symposium on Fire Investigation, Fire Service College, Moreton-in-Marsh, Gloucestershire UK, June 28, 2004.

- "Highway Vehicle Event Data Record Symposium: State-of-the-Art of Passenger Vehicle Accident Recorder Technology; EDR Device Research and Validation; and EDR End-User and Accident Reconstruction," National Transportation Safety Board; George Washington University, Virginia Campus, June 3-4, 2004.

- "2004 SAE World Congress", Detroit, Michigan; March 8-11, 2004; "Force Response during Tire Tread Detachment Event."

- "2003 NFPA Fall Education Conference," Reno, Nevada; November 16-19, 2003; Pre-Conference Seminars, November 14-15, 2003.

- "2003 Vehicle Fire, Arson & Explosion Investigation Training Program," (Live Burns – Testing) National Association of Fire Investigators; Eastern Kentucky University, Richmond, KY; October 1-4, 2003.

- "2003 National Fire, Arson & Explosion Investigation Training Program," National Association of Fire Investigators; Sarasota, Florida; August 11-15, 2003.

- "Vehicle Dynamics & Simulation," Society of Automotive Engineers 2003 World Congress; Detroit, MI; March 5, 2003.

- "Vehicle Agressivity & Compatibility in Automotive Crashes," Society of Automotive Engineers 2003 World Congress; Detroit, MI; March 5, 2003.

- "Engineering Safety Specifications: Designing for Safety," Society of Automotive Engineers 2003 World Congress, Detroit, MI, March 3-4, 2003. (16 hours)

- "Accident Reconstruction," Society of Automotive Engineers 2003 World Congress; Detroit, MI; March 4-5, 2003.

- "Side Impact, Rear Impact & Rollover," Society of Automotive Engineers 2003 World Congress; Detroit, MI; Mar. 3, 2003.

- "2002 Vehicle Fire, Arson & Explosion Investigation & Technology Seminar," National Association of Fire Investigators and Fire and Safety Engineering Technology; Eastern Kentucky University, Lexington, KY; September 30 – October 2, 2002.

- "2002 National Seminar on Fire Analysis Litigation," National Association of Fire Investigators and National Fire Protection Agency; Sarasota, FL; August 15-16, 2002. (16 hrs)

- "2002 National Fire, Arson & Explosion Investigation Training Program," National Association of Fire Investigators and National Fire Protection Agency; Sarasota, FL; August 12-14, 2002. (32 hrs)

- "A Fire Scene Analysis," 2001 National Advanced Fire; Eastern Kentucky University, Richmond, Kentucky; March 2002. (16 hrs)

- "Engineering Dynamics Corporation-HVE-2D-EDCRASH Reconstruction Course," Terry Day–PDOF and Damage Profile of Vehicle, Collision Deformation Classification, EDCRASH Input Data; CA State University Northridge; Burbank, CA; January 21-25, 2002. (40 hrs)

- "Investigation of Motor Vehicle Fires," Lee S. Cole. Peter Klaput Investigation of motor vehicle fires; Where and how did it start; Hands-on investigation of burned vehicles; Elements Necessary for a Fire; Loyola University, New Orleans, Louisiana; December 5-7, 2001.

- "Hot Wheels 2001," Investigating Vehicle Fires; 15 vehicles burned, investigation, methodology, ignition sources, fuel loads, electrical failures, presentations for vehicles burned; Fire Investigation Association of Alberta; Calgary, Alberta, Canada; September 20-22, 2001.

- "NFPA 921 Structural and Vehicles," Live Vehicle Burn IAAI-Louisville Fire Department.

- "Post Impact Fuel Fed Fires," Tom DeSantis and Lou Molnar (Design Analysis Engineers at Ford Motor Company); "Origin and Cause on Vehicles Fires Utilizing NFPA 921," Ralph Newell (Newell Investigation); "Electrical Fires in Components-Vehicles," Chuck Adams (Design Analysis Engineer at Ford Motor Company); "Mechanical Fires – Fuel-Fed Fires - Vehicles," John Washington and Sunil Sharma (Design Analysis Engineers at Ford Motor Company); "Electrical System," Mark Hoffman (Ford Motor Company); "NFPA 921," David Smith; Live Vehicle Burn, Electrical Short in dash, Flammability of Vehicle Fuels tested, Testing of Interior Temperatures, Roof, Engine, Occupant and Truck in Vehicle Fires; Louisville, Kentucky; August 22-24, 2001.

- "Fire and Pattern Analysis," Patrick Kennedy; "Processing the Fire Scene - Diagramming Evidence and Note Taking," Dennis Smith; "Determining Origin-Heat and Flame Vector Analysis" and "Fire Scene Photography," Michael Schulz; "Philosophy of Fire Analysis," Patrick Kennedy; "Electrical," Daniel Churchward; 2001 National Fire, Arson and Explosion Investigation Training Program; Sarasota, Florida; July 22-27, 2001.

- "Texas Association of Legal Investigators, 2001 Convention and Seminar," San Antonio, Texas; June 15-17, 2001. (10 hrs Continuing Education Credit).

- "Introduction to Explosives Theory and Explosion Devices," Tom Thurman, 2001 National Advanced Fire, Arson, and Explosion Investigation Science and Technology Program; Eastern Kentucky University, Richmond, Kentucky; March 13-17, 2001. (8 hrs on-site explosion and fire investigation of burning vehicles).

- "Fire Scene Analysis," 2001 National Advanced Fire; Eastern Kentucky University, Richmond, Kentucky; March 16, 2001. (8 hrs)

- "Analysis of Electrical Fires Causes," 2001 National Advanced Fire; Eastern Kentucky University, Richmond, Kentucky; March 15, 2001. (8 hrs)

- "PC-Crash Program, 3D Accident Simulation and Reconstruction," William Cliff and Hermann Steffan, Detroit, Michigan; March 8-9, 2001. (16 hrs)

- "Society of Automotive Engineers (SAE) Accident Reconstruction Conference," Detroit, Michigan; March 5-8, 2001.

- "Certified Fire Investigator Instructor Program," Ron Hopkins, Fire and Safety Engineering Technology; Eastern Kentucky University; March 2001. (8 hrs and examination)

- "Crash Data Retrieval Systems," Don Gilman, Vetronix Corporation, WREX2000; College Station, Texas; September 24-29, 2000.

- "Lamp Examination for ON or OFF in Traffic Accidents," Gary Stephens, WREX 2000I; College Station, Texas; September 24-29, 2000.

- "Full Force / Weight Tests of Air-Braked Trucks, Truck Tractor & Semi Trailer Compared to Automobiles," Dave Stopper, WREX 2000; College Station, Texas; September 24-29, 2000.

- "Trailer Underride; Conspicuity, Human Factors and Rear Bumpers," Joseph E. Badger, WREX 2000; College Station, Texas; September 24-29, 2000.

- "WREX 2000 World Reconstruction Exposition," Accident Reconstruction and Crash Testing; College Station, Texas; September 24-29, 2000. (36 credit hrs)

- "Demonstration of Crush Deformation Measurement System and Current Validation of the EDCRASH Computer Program," Tom Curtis, WREX 2000; College Station, Texas; September 24-29, 2000.

- "Airbags and Restraint Systems," ATLA Convention, Product Liability A.I.E.G.; Chicago, Illinois; July 31, 2000.

- "The Dynamics of Fire Investigation" and "Fire Pattern Development and Fire Analysis," Patrick Kennedy / National Fire, Arson, and Explosion Investigation Training Program; Chicago, Illinois; July 24-28, 2000.

- "Chemistry of Fire-Properties of Materials" and "Fire Dynamics for Fire Investigation," Ron Hopkins / National Fire, Arson, and Explosion Investigation and Training Program; Chicago, Illinois; July 24-28, 2000.

- "Basic Electricity and the Investigation of Electrical Fires" and "Cause Determination NFPA," Daniel Churchward and Dennis Smith / National Fire, Arson, and Explosion Investigation and Training Program; Chicago, Illinois; July 24-28, 2000.

- "Fire Cause and Origin," National Association of Fire Investigators; Chicago, Illinois; July 24-28, 2000.

- Society of Automotive Engineers 21st Annual Section Officers Leadership Seminar, Pittsburgh, PA, May 20-23, 2000.

- "Accident Reconstruction – State-of-the-Art," SAE-TOPTEC; "Frontal Collision Performance," Dagmar Jewkes, Ph.D.; "Side-Collision Performance," Greg D. Stephens; "Rear-Collision Performance & Rollover Reconstruction," Stein E. Husher; Costa Mesa, CA; December 9-10, 1999.

- "A.C.F.E. National Convention," Engineering and Technology Accident Reconstruction; New York City, New York; October 28-31, 1999.

- "Low Speed Accident Reconstruction and Litigation," Lawyers & Judges Convention; Scottsdale, AZ; October 21-23, 1999.

- "Issues in Automotive Crashworthiness Litigation, Trial Evidentiary," A.I.E.G.; Scottsdale, AZ; September 23-25, 1999. "Liability Issues," National N.A.L.I. Convention, New Orleans, Louisiana; June 3-5, 1999.

- "TTLA's On-Line, Hands-on Investigation Research Workshop," Houston, Texas; April 29, 1999.

- "GM Fuel System Integrity," A.I.E.G.; Atlanta, GA; April 15-17, 1999.

- "Airbag Field Performance: An Engineer's Perspective," Jerome M. Kossar, A.I.E.G., Atlanta, GA; April 15-17, 1999.

- "Analysis and Investigation of Post-Accident Air Bag Systems," Bill Rosenbluth ASA, A.I.E.G.; Atlanta, GA, April 15-17, 1999.

- "Evolution of the Lock-for-the-Latch," Kendall Few; "Forensic Analysis of Skip Lock," Alan Cantor; "Biomechanics and Injury Criteria of Child and Adult Dummies," Dr. Tony Sances; "Motor Vehicle Glass," Patrick M. Ardis, A.I.E.G.; Atlanta, GA; April 15-17, 1999.

- "Vehicle Fires and Restraint Systems;" Atlanta, GA, April 15-17, 1999.

- "Auto Focus AIEG Airbags, Rollovers, Auto Fires, Inertia Release (Seat Belt Buckles)," San Francisco, CA; October 24-26, 1998.

- "A.C.F.E. National Convention," Engineering and Technology Accident Reconstruction, Naples, Florida; October 12-14, 1998.

- "Facts & Mechanics for Injury Analysis – Pathologists," Patrick E. Besant-Matthews, M.D., TAARS Annual Meeting; Lago Vista, Texas; June 25-27, 1998.

- "Mechanics of Vehicle Rollover," Richard J. Schleuter, P.E., TAARS Annual Meeting; Lago Vista, Texas; June 25-27, 1998.

- "Texas Association of Accident Reconstruction Specialists—Accident Reconstruction," Austin, Texas; June 25-27, 1998 (additional seminars not listed since 93).

- "Occupant Protection," Society of Automotive Engineers – TOPTEC; Tempe, AZ; May 20-21, 1998.

- "Side Impact," Society of Automotive Engineers – TOPTEC; Tempe, AZ; May 18-19, 1998.

- "Inertially Unlatching Seat Belt Buckles-Proving the Defect," Ben Hogan, Kendall Few and Dr. Tony Sances, A.I.E.G.; San Antonio, Texas; May 14-16, 1998.

- "Car Crashes and Occupant Injuries – Frontal Impact – Side Impact – Rollovers," Greg Stephens, Stein Husher and Ed Moffatt, Association for the Advancement for Automotive Medicine; Tempe, AZ; April 16-17, 1998.

- "Car Crash and Occupant Injuries: A Team Approach to Crash Investigation," AAAM, Tempe, AZ; April 16-17, 1998.

- "GM Technical on Airbags," SDM System Operation-Component Locations, Glenn C. Libby, Milford Training Center; Houston, Texas; March 5, 1998.

- "A.C.F.E. National Convention," American Board of Forensic Engineering and Technology; San Diego, CA; December 11-13, 1997.

- "Technology and Performance of Airbags," David Biss, A.I.E.G.; Scottsdale, AZ; September 25-27, 1997.

- "Airbag Litigation," Larry Coben and Don Slavik, A.I.E.G.; Scottsdale, AZ; September 25-27, 1997.

- "Airbag Design and Performance," Society of Automotive Engineers – TOPTEC; Costa Mesa, CA; August 14-15, 1997.

- "Evaluating and Preparing Vehicle Rollovers," Michael Kerensky, Texas Trial Lawyers Association; Houston, TX, February 1-2, 1996

- "Vehicle Restraint Systems and Airbags," Brent Carpenter, Texas Trial Lawyers Association; Houston, TX; Feb. 1-2, 1996.

- "Vehicle Fuel Tank Integrity," Mick McBee, Texas Trial Lawyers Association; Houston, TX, February 1-2, 1996.

- "Liftgates and Seatbacks," Todd Tracy, Texas Trial Lawyers Association; Houston, TX; February 1-2, 1996.

- "Motor Vehicle Crashworthiness Frontal Collisions: Safety Issues" and "Rollover Crashworthiness," Engineering Demonstrations / Arndt and Associates / A.I.E.G.; Phoenix, AZ; October 29-30, 1993.

- National Association of Fire Investigation Schools (NAFI), Certification Program; Chicago, Illinois; 1990, 1991, 1992. "Advanced Theories in Automotive Restraint Crashworthiness Cases," Donald H. Slavik, A.I.E.G.; Sonoma County, CA; September 26-27, 1992.

- "Fire and Explosion Investigation," John A. Kennedy, National Fire, Arson, and Explosion Investigation; Chicago, Illinois; August 18-21, 1992.

- "Forensic Fire Science and Technology Laboratory Training," NAFI, Kennedy and Associates; Chicago, IL; August 17, 1992.

- "Rear Seat Lap-Only Belt Litigation," Jeffery Burke, Ralph Hoar, Ben Kelly, A.I.E.G.; Dallas, Texas; April 25-26, 1992.

- "Hands-on Reconstruction Techniques," Fred E. Arndt and Mark Arndt, A.I.E.G.; Phoenix, AZ; October 11-12, 1991.

- "Computerized Reconstruction," Fred E. Arndt, A.I.E.G.; Phoenix, AZ; October 11-12, 1991.

- "A Brief Review of Motor Vehicle Accident Reconstruction," Robert J. Caldwell, P.E., A.I.E.G.; Phoenix, AZ; October 11-12, 1991.

- "Occupant Restraint and Protection," Don Slavik, A.I.E.G.; Denver, Colorado; April 19-20, 1991.

- "Advance Fire Pattern Analysis," Ron Hopkins, NAFI; Chicago, Illinois; August 8-10, 1990.

- "Human Factors and Safety Evaluation," Edward W. Karnes, Ph.D., ATV Adult Toys, A.I.E.G.; Phoenix, AZ; April 6-7, 1990.

- "Chemistry and Incendiary Devices," Rolfe Scofield PhD.; "Searching Diagramming and Evidence Collection at the Fire Scene," Sgt. Gene Deck; "Fire Pattern Analysis," Patrick Kennedy, Ph.D., NAFI Seminar; Chicago, Illinois; September 9-11, 1987.

- "Photography In Fire, Arson and Explosion Investigation," Patrick Kennedy, PhD., NAFI Fire School; Chicago, Illinois; September 11, 1987.

- "Fire and Safety Engineering Technology," Ron Hopkins, Eastern Kentucky University; Richmond, Kentucky; September 1987.

- "Fire, Arson and Explosion Training," A.J. Scardino, Ph.D., and John Odom, P.E., NAFI; Chicago, Illinois; September 17-19, 1986.



# AUTO FIRE & SAFETY CONSULTANTS

# Report Relative to the Matter of

## Daniel Sixta

### AFSC # 07152

### Prepared for:

Janet Koski
8708 Harney
Omaha, NE 68114

c/o Daniel Sixta
1143232
Neal Unit
9055 Spur 591
Amarillo, Texas 79107-9696

### Date of Accident:
02/21/02

### Time of Accident:
10:59 PM

### Location of Accident:
11000 FM 1960 West
Houston, Harris County, Texas

Auto Fire and Safety Consultants
18500 Trails End Rd.
Conroe, Texas 77385
281-362-0930

## 1.0 RECONSTRUCTION

The main objective of this accident reconstruction was to properly conduct a(n):

1. Collision Analysis,
2. Injury Analysis,
3. Accident Avoidance Analysis,
4. Injury Avoidance Analysis, and
5. Accident Causation Analysis.

With respect to my investigation relating to the vehicle dynamics utilizing accident reconstruction principals of the accident in this case, my methodology consisted of the following: I reviewed the facts of the case which included scene photographs, witness statements, accident report, documents, reconstruction thoughts and calculation. I then applied my knowledge in accident investigation, which I have obtained in my many years of evaluating and reconstructing accidents to determine how the accident occurred and to evaluate the above listed objectives of accident reconstruction.

The purpose of this investigation and analysis is to evaluate and determine if the above referenced accident was scientifically and professionally conducted in fairness to all drivers and occupants of the vehicles involved. The accident reconstruction should be able to discuss how the accident occurred, determine the pre-impact, impact and post impact speeds of the vehicles. The reconstruction should also discuss the changes in velocity (delta-V) which assist in the evaluation of the injuries and the performance of the vehicles. The investigation should also evaluate and discuss the possibilities of evasive action, driver's perception/reaction, timing and defensive driving.

The main objective of accident reconstruction especially in accidents that may involve civil or criminal litigation is to determine what happened immediately before, during and after the accident. Established principles and scientific methodology should be followed by the accident reconstruction professionals. This analysis and accident reconstruction should have included the following specific objectives of accident reconstruction:

1. Speed of vehicles during pre-trip, trip, and post-trip phases to the accident;
2. Motion of the of the vehicles during pre-trip, trip and post-trip phases of the accident;
3. Accident severity;
4. Vehicle deformation;
5. Accident scene geometry;
6. Potential avoidance scenarios;
7. Vehicle deceleration rates;
8. Driver actions including reaction time, perception and visibility; and
9. Contributing factors and causes of the accident.

For this accident we were determining the traveling speed of Daniel Sixta, the driver of **Unit 1/ Toyota 4-Runner,** and the events that resulted in the death of Maratha Alford.

## 2.0 Materials Reviewed

The materials relied upon in reviewing this case are listed in this section. In addition, my education, training, and experience in accident reconstruction, the following sources of information and activities were utilized to form my observations and findings. Additional materials forming the basis of the undersigned opinions include many documents reviewed and general literature, knowledge of accident reconstruction and products associated with vehicles.

1. Accident Report prepared by Officer D.T. Pearson, **Harris County Sheriff Office;**

2. Police Photographs of **Unit 1/ 1994 Toyota 4-Runner**
3. Photographs of **Unit 2/ 2001 Ford Focus SE**
4. Photographs of accident scene provided by Harris County Sheriffs Office;
5. Trial testimony of:
   a. Officer D.T. Pearson;

## Applicable Standards, and Reference Materials

7. *Forensic Aspects of Driver Perception and Response*, by Paul L. Olson;
8. *Motor Vehicle Accident Reconstruction and Cause Analysis, 5th Edition*, by Rudolf Limpert;
9. *Law Enforcement Guidelines;*
10. Engineering Dynamics Corporation (EDC) related articles, publications, and research associated with the Software;
11. All Data - service bulletins, etc.;
12. Society of Automotive Engineers publications;
13. ANSI standards;
14. National Highway Transportation Safety Association (NHTSA) Technical Service Bulletins; and,
15. Any and all prior case documents, photographs, reports, evaluations, studies, exemplar vehicles and designs.

During my career and as a part of my Training and Experience, I have reviewed an extensive number of publications, journals, manufacturer documents, depositions, test results, SAE publications and various other documents and literature related to the Reconstruction of the Accident. The list below is a small sample of the materials that have been apart of my career in the area of motor vehicle accidents.

16. *Vehicle Structure/Exterior and Chassis Theme Group;*
17. *Fundamentals of Vehicle Dynamics*, Thomas D. Gillespie, SAE R-114;
18. *Vehicular Accident Investigation and Reconstruction*, Donald J. Van Kirk, CRC Press;
19. *Vehicle Accident Analysis and Reconstruction Methods*, Raymond M. Brach and R. Matthew Brach, SAE R-311;
20. *SAE Accident Reconstruction Technology Collection* on CD-ROM ARCD2004;
21. *Automotive Vehicle Safety*, by George A. Peters and Barbara J. Peters;
22. *Automotive Safety Handbook*, by Ulrich Seiffert and Lothar Wech, SAE R-325;
23. *Highway Vehicles Safety Database on the World Wide Web and CD-ROM;*
24. *Recent Developments in Automotive Safety Technology*, by Daniel J. Holt, PT-119;
25. *Texas Department of Public Safety Driver's Handbook;*
26. *Texas Law for Law Enforcement Officers;*
27. *Texas Driving Procedures;*
28. *Physical Forces Affecting and Automobile in Motion;*
29. *Human Factors in Traffic Safety,* by Robert E. Dewar and Paul L. Olson;
30. *Forensic Aspects of Vision and Highway Safety* by Merrill J. Allen, O.D., Ph.D., Bernard S. Abrams, O.D., Arthur P. Ginsburg, Ph.D., and Leslie Weintraub, O.D.;
31. *Accident Investigation Quarterly,* Issue 40, Fall 2004; *FMVSS 207, Seating Systems;*
32. *Vehicle Crash Mechanics*, by Matthew Huang, CRC Press, SAE;
33. *NHTSA Defect Investigation Report,* Sept. 14, 2000;
34. *FMVSS Standard 208,* Occupant Crash Protection; and,
35. *Collision Performance, LM Safety Car,* by Derwyn M. Severy, SAE 670458;
36. "Rollover, Side and Rear Impact," SP18800, SAE International, March 2004;
37. *Tires, Suspension and Handling*, SAE R-168 2nd Edition, Dixon.

Additional materials forming the basis of the undersigned opinions include materials on Fundamentals of Vehicle Dynamics, knowledge and references in the field of accident reconstruction, and research associated with acts of Other Similar Incidents (OSI's). These various materials have been incorporated into my research and experience regarding this accident.

## 3.0 Scene



Aerial Photograph of the scene of accident is an important part of the reconstruction

## 4.0 Introduction and Review of Accident Report of Officer D.T. Pearson

This report represents an accident that occurred on 02/21/02, at approximately 10:59 PM at 11000 FM 1960 W. Houston, Harris County, Texas.

This accident occurred at night on a concrete roadway. Weather conditions were cloudy. The posted speed limit was 45 mph.

**Vehicle/Unit 1** was a Green 1994 Toyota 4-Runner with VIN  JT3VN29V9R0023232 and TX license plate number 02TXHN4428. This vehicle was driven by Daniel J. Sixta of 5903 Cape Hatteras Dr., Houston, Texas 77041. Daniel J. Sixta's date of birth is listed as 09/09/60, and his/her TX driver's license number is 12056603.  The owner of this vehicle is listed as Daniel J. Sixta of 5903 Cape Hatteras Dr., Houston, Texas 77041.  This vehicle is herein referred to as **"Unit 1/ 1994 Toyota 4-Runner".**



| Occupant's Position | Name | Injury |
|---|---|---|
|  |  |  |
| Driver | Daniel J. Sixta | Non-incapacitating |
| Right Front | Carolyn Haydel | Possible Injury |

**Vehicle/Unit 2** was a 2001 Blue Ford Focus SE with VIN 1FAFP34P01WZ41205 and TX license plate number 02txl16pfp. This vehicle was driven by Martha Alford of 10730 Glennora #113, Houston, Texas 77065. Martha Alford's date of birth is listed as 07/01/57, and his/her TX driver's license number is 09444841. The owner of this vehicle is listed as Enterprise Rent a Car. This vehicle is herein referred to as **"Unit 2/ 2001 Ford Focus SE"**.

| Occupant's Position | Name | Injury |
|---|---|---|
| | | |
| Driver | Martha Alford | Incapacitating injury |
| Right Front | Linda Coble | Fatality |

The accident report gives the narrative opinion of Investigating Officer D.T. Pearson as follows:

*"Unit 1 was traveling W/B on FM 1960 W in the middle lane and crossed the intersection of Jones on a green light. Unit 2 was E/B in the left turn lane and made a left turn in the path of Unit 1. Unit 1 braked prior to striking Unit 2 with FR and RP. Unit 2 states that she did not see Unit 1 approaching"*



**Scene Diagram by Officer D.T. Pearson**

## 4.0    Vehicle inspections



**Unit 1/ 1994 Toyota 4-Runner side view**



Unit 1/ 1994 Toyota 4-Runner showing right front fender and damage
showing offset collision to passenger side not a direct frontal impact,
most likely indicating that the driver of this vehicle was steering to the left
as a possible evasive action . This vehicle shows little damage to the
drivers side of the vehicle.



Unit 2/ 2001 Ford Focus SE passenger side impact, which
is important as to the crush damage and injury mechanism for
the passenger



## 5.0  Vehicle data information

The auto stats are attached to this report for Unit 1/ 194 Toyota 4-Runner and Unit 2/ 2001 Ford Focus SE.

## 6.0  FINDINGS AND OPINIONS

The following findings and opinions offered with regards to this case are from the information available to me at the time this report is written. These opinions and finding also address some of the reconstruction methodology that may have been over looked or not discussed at trial and may have changed the result and opinions.

1.  Daniel Sixta, driver of **Unit 1/1994 Toyota 4-Runner**, was traveling at approximately 45-53 mph before braking.
2.  Police investigation indicates that the driver of **Unit 1/ 1994 Toyota 4-Runner** braked. Prior to impact.
3.  Police investigation failed to address the evasive action by **Unit 1/ 1994 Toyota 4-Runner**, this is based on the actual damage to both units.

4. Police investigation failed to address the speed of **Unit 2**. ( stopped and turned or didn't stop and increased speed to cross in front of Unit I rather than wait)
5. Mr. Sixta experienced a Delta-V of approximately 22mph upon impact based on crush measurements and computer simulations using EDCRASH and EDSMAC.
6. The police investigation only provided momentum calculations, which don't appear to account for crush or damage to the vehicle.
7. Discussions related to non injuries in Unit 1 vs. death in Unit 2.
8. Texas State defensive driving courses teach don't drink and drive but equally teach look before turning and defensive driving.
9. Is maximum punishment related to maximum fault.?
10. Martha Alford, the driver of **Unit 2/ 2001 Ford Focus SE**, experienced a Delta-V of approximately 30mph upon impact.
11. Martha Alford, the driver of **Unit 2/ 2001 Ford Focus SE** failed to yield right of way to east bound traffic. (Investigating officer indicated the driver of **Unit 2/ 2001 Ford Focus SE** was in the middle lane making a left turn, this should have been addressed)
12. The driver of **Unit 2/ 2001 Ford Focus SE** stated to investigating officers that she never saw **Unit 1/ 1994 Toyota 4-Runner** the oncoming east bound traffic.
13. No evidence was presented or discussed related to failure to yield right away, of **Unit 2/ 2001 Ford Focus SE**.
14. No evidence was presented or discussed related to no evasive action by **Unit 2/2001 Ford Focus SE**. (no braking or steering was determined)
15. No discussion were provided or reviewed that showed evidence that any vehicle traveling with the flow of traffic in the east bound lanes would have been capable of avoiding this accident..
16. Facts remain in our profession that certain levels of alcohol in the human system are illegal when operating a motor vehicle. The effects of alcohol on the drivers and passengers of motor vehicles should be evaluated to determine the responsibility of all parties and products. What input did the passenger have in the accident or avoidance of the accident.?
17. Driver of **Unit 2/2001 Ford Focus SE** failed to keep a proper look out. ( never saw **Unit 1/1994 Toyota 4-Runner**, yet no visibility factors were discussed)
18. A reasonable and prudent driver with a reaction time of approximately 1.5 seconds would most likely not have been able to avoid the impact to Martha Alford's vehicle.
19. It is my opinion that not only momentum calculations were conducted by investigating officers and should have been used in conjunction with crush measurements and accurately and fairly determining the speeds and Delta-V's (change of velocity) for the accident.
20. It is my opinion that the weather and road conditions at the approximate time of the accident should have been considered when calculating the co-efficient of friction.
21. The type of vehicle, road surface (wet for example) and location should be considered.
22. It is also my opinion that the integrity and structure of **Unit 2/ 2001 Ford Focus SE** should have been evaluated and made a part of the reconstruction to better evaluation of the injury mechanisms and assist in properly determining responsibility for injuries associated with the accident..
23. **Unit 2/ 2001 Ford Focus SE** was not equipped with adequate side impact protection or side airbags that are available on similar sized and year vehicles.
24. It is also my opinion that a jury trial without an Accident Reconstruction professional is highly unfair and would be almost impossible for any accused driver to receive a fair trial.
25. Should have hired an attorney and an accident reconstruction professional in serious accidents.
26. State should have provided funds for accident reconstruction professional.
27. Accident Reconstruction professionals should be able to address and discuss other similar instances in the evaluation of such accidents. (Example: DPS Trooper impacts the side of a vehicle that was crossing two lanes of travel, as in Mr. Sixta's case, and it was determined that the DPS Trooper did nothing wrong. Fault was placed on the other vehicle that failed to yield the right of way, failed to keep a proper look out, and failed to make a proper stop. The Reconstructionist was able to scientifically determine that the DPS vehicle was traveling 20 mph over the speed limit, and failed to display his lights, which resulted in the death of one of the individuals in the vehicle that had the side impact.)

This expert has worked for the plaintiff, defense and prosecutor in various cases, and has the opinion that a Reconstruction is important as well as competent legal representation in any case involving accidents.

Please note that these are my opinions at the writing of this report and are based on the current sources of information and that I anticipate and reserve the right to respond to those who might request further clarification of my opinions regarding the event or parties involved in the event. I also reserve the right to reexamine and alter these opinions should new or additional information be provided or discovered during the course of the case through discovery, deposition, or any other form of information retrieval. Lastly, I reserve the right to correct any typographical errors, grammatical errors or mistakes determined during the evaluation, deposition or review of this report by the expert or other involved parties.

With respect to my investigation relating to the vehicle dynamics utilizing accident reconstruction principals of the accident in this case, my methodology consisted of the following: I reviewed the facts of the case which included scene photographs, witness statements, accident report, documents, reconstruction thoughts and calculation. I then applied my knowledge in accident investigation, which I have obtained in my many years of evaluating and reconstructing accidents to determine how the accident occurred and to evaluate the above listed objectives of accident reconstruction. I have also used Engineering Dynamics Corporation (EDC) software, with the aid of an on staff engineer, which includes, HVE, EDCRASH, EDSMAC and SIMON. The HVE simulation environment was introduced in 1996, for the 3-D user, with the 2-D simulations dating back to the 1980's and early 1990's. The 3-D, 5.0 version was developed as a sophisticated, 3-dimensional user environment for setting up and executing simulations involving humans and vehicles interacting with their environment. In 2001, SIMON along with DyMESH was introduced to provide simulation involving rollover and override, as well as other 3-dimensional collision issues. The HVE programs have been widely accepted by the Accident Reconstruction profession and has been widely published and peer reviewed. This program was used to formulate other plausible scenarios based on the evidence made available.

This report is based on my investigation as detailed in the above-referenced case. This report may be modified or amended as new information is gathered, learned, or produced, regarding the above-referenced case.

Sincerely yours,

Cam Cope, CFEI, CFII, CVFI
President
Auto Fire & Safety Consultants, Inc.
Dba Cam Cope Consulting

Aaron Zeamer, CVFI, CFEI
Fire Investigator
Auto Fire & Safety Consultants, Inc
Dba Cam Cope Consulting

CC/sr

Attachment: CV

AUTO FIRE & SAFETY CONSULTANTS
12066 CLARK LANE
CONROE  TX 77385

07-11-2007

1994 TOYOTA 4RUNNER (L4)  2DR 4X4 UTILITY

CURB WEIGHT:                          3785 lbs.      1717 kg.
    Curb Weight Distribution -    Front: 54 %      Rear: 46 %

    Gross Vehicle Weight Rating:      5350 lbs.      2427 kg.

    Number of Tires on Vehicle:       4
    Drive Wheels:                     4 Wheel Drive

HORIZONTAL DIMENSIONS

|  | Inches | Feet | Meters |
|---|---|---|---|
| Total Length | 176 | 14.67 | 4.47 |
| Wheelbase: | 103 | 8.58 | 2.62 |
| Front Bumper to Front Axle | 30 | 2.50 | 0.76 |
| Front Bumper to Front of Front Well | 9 | 0.75 | 0.23 |
| Front Bumper to Front of Hood | 3 | 0.25 | 0.08 |
| Front Bumper to Base of Windshield | 46 | 3.83 | 1.17 |
| Front Bumper to Top of Windshield | 68 | 5.67 | 1.73 |
| Rear Bumper to Rear Axle | 43 | 3.58 | 1.09 |
| Rear Bumper to Rear of Rear Well | 27 | 2.25 | 0.69 |
| Rear Bumper to Rear of Trunk | 5 | 0.42 | 0.13 |
| Rear Bumper to Base of Rear Window | 6 | 0.50 | 0.15 |

WIDTH DIMENSIONS

| | Inches | Feet | Meters |
|---|---|---|---|
| Maximum Width | 67 | 5.58 | 1.70 |
| Front Track | 59 | 4.92 | 1.50 |
| Rear Track | 59 | 4.92 | 1.50 |

VERTICAL DIMENSIONS

|  | Inches | Feet | Meters |
|---|---|---|---|
| Height | 67 | 5.58 | 1.70 |
| Ground to: |  |  |  |
| Front Bumper (Top) | 30 | 2.50 | 0.76 |
| Headlight - center | 35 | 2.92 | 0.89 |
| Hood - top front | 40 | 3.33 | 1.02 |
| Base of windshield | 49 | 4.08 | 1.24 |
| Rear Bumper - top | 24 | 2.00 | 0.61 |
| Trunk - top rear |  |  |  |
| Base of rear window | 47 | 3.92 | 1.19 |

Reg. To: AUTO FIRE & SAFETY CONSULTANTS     S/N:04R-010716AQ04101

1994 TOYOTA 4RUNNER (L4)   2DR 4X4 UTILITY

INTERIOR DIMENSIONS

|  | Inches | Feet | Meters |
|---|---|---|---|
| Front Seat Shoulder Width | 54 | 4.50 | 1.37 |
| Front Seat to Headliner | 39 | 3.25 | 0.99 |
| Front Leg - seatback to floor (max) | 42 | 3.50 | 1.07 |
| Rear Seat Shoulder Width | 54 | 4.50 | 1.37 |
| Rear Seat to Headliner | 38 | 3.17 | 0.97 |
| Rear Leg - seatback to floor (min) | 32 | 2.67 | 0.81 |

Seatbelts: 3pt - front and rear
Airbags: NO AIRBAGS

STEERING DATA

| | | Inches | Feet | Meters |
|---|---|---|---|---|
| Turning Circle (Diameter) | | 444 | 37.00 | 11.28 |
| Steering Ratio: | 17.50:1 | | | |
| Wheel Radius: | | 13 | 1.08 | 0.33 |
| Tire Size (OEM): | 225-75R15 | | | |

ACCELERATION & BRAKING INFORMATION

Brake Type: FRONT DISC - REAR DRUM
ABS System: ABS UNKNOWN

Braking, 60 mph -> 0 (Hard pedal, no skid, dry pavement):
  d = 138 ft   t = 3.1 sec.   a =-28.0 ft/sec/sec   G-force = -0.87

ACCELERATION:

| | | | | |
|---|---|---|---|---|
| 0->30 mph | t = 3.2 sec. | a = 13.7 ft/sec/sec | G-force = | 0.43 |
| 0->60 mph | t = 9.6 sec. | a = 9.2 ft/sec/sec | G-force = | 0.28 |
| 45->65 mph | t = 4.8 sec. | a = 6.1 ft/sec/sec | G-force = | 0.19 |

Transmission Type:          5spd MANUAL

NOTES:

Federal Bumper Standard Requirements = NO REQUIREMENT
This vehicles Rated Bumper Strength:      5  mph

N.S.D.C.  = 1990 - 1995

Reg. To: AUTO FIRE & SAFETY CONSULTANTS    S/N:04R-010716AQ04101

### 1994 TOYOTA 4RUNNER (L4)  2DR 4X4 UTILITY

OTHER INFORMATION

    TIP-OVER STABILITY RATIO   =   1.10    REASONABLY STABLE
    NHTSA Star Rating (calculated)          **

CENTER OF GRAVITY (No Load):
        Inches behind front axle     =   47.38
        Inches in front of rear axle =   55.62
        Inches from side of vehicle  =   33.50
        Inches from ground           =   26.73
        Inches from front corner     =   84.32
        Inches from rear corner      =  104.15
        Inches from front bumper     =   77.38
        Inches from rear bumper      =   98.62

MOMENTS OF INERTIA APPROXIMATIONS (No Load):
    YAW MOMENT OF INERTIA                 =   2555.55  lb-ft-sec^2
    PITCH MOMENT OF INERTIA               =   2582.20  lb-ft-sec^2
    ROLL MOMENT OF INERTIA                =    597.70  lb-ft-sec^2

FRONT PROFILE INFORMATION
    ANGLE FRONT BUMPER TO HOOD FRONT         =   73.3   deg
    ANGLE FRONT OF HOOD TO WINDSHIELD BASE   =   11.8   deg
    ANGLE FRONT OF HOOD TO WINDSHIELD TOP    =   21.0   deg
    ANGLE OF WINDSHIELD                      =   36.0   deg
    ANGLE OF STEERING TIRES AT MAX TURN      =   26.6   deg

FIRST APPROXIMATION CRUSH FACTORS:

        Speed Equivalent (mph) of Kinetic Energy (KE) used in
causing crush or indentation may be evaluated using the
following formula, the appropriate Crush Factor (CF), and
Maximum Indentation Depth (MID), in feet:

            V(mph) = Sqr root of (30 * CF * MID)

        KE Equivalent Speed (Front/Rear/Side)   = 21 CF

        Bullet vehicle IMPACT SPEED estimation
          based on TARGET VEHICLE damage ONLY   = 27 CF
            (Tested for Rear/Side Impact only)

These CF values are based upon analysis of NHTSA Barrier Crash
data, and from over 1000 vehicle accidents where independant
evaluation of speed was possible. (These are NOT 'A', 'B', 'C',
or 'G' values)

The Rear Impact data with more than 2-3 inches of crush damage
should be looked at carefully, since some vehicles have very weak
trunk & fender strength. Therefore, on some cars, esp. GM, your
estimate from the rear crush data may be high by as much as 4-5
mph (on a crush of 18 inches).

Reg. To: AUTO FIRE & SAFETY CONSULTANTS     S/N:04R-010716AQ04101

AUTO FIRE & SAFETY CONSULTANTS
12066 CLARK LANE
CONROE  TX 77385

07-11-2007

2001 FORD FOCUS  4DR SEDAN

CURB WEIGHT:                                    2564 lbs.        1163 kg.
   Curb Weight Distribution -         Front: 60 %      Rear: 40 %

   Gross Vehicle Weight Rating:           3550 lbs.        1610 kg.

   Number of Tires on Vehicle:            4
   Drive Wheels:                          FRONT

HORIZONTAL DIMENSIONS

| | Inches | Feet | Meters |
|---|---|---|---|
| Total Length | 175 | 14.58 | 4.44 |
| Wheelbase: | 103 | 8.58 | 2.62 |
| Front Bumper to Front Axle | 35 | 2.92 | 0.89 |
| Front Bumper to Front of Front Well | 20 | 1.67 | 0.51 |
| Front Bumper to Front of Hood | 5 | 0.42 | 0.13 |
| Front Bumper to Base of Windshield | 43 | 3.58 | 1.09 |
| Front Bumper to Top of Windshield | 74 | 6.17 | 1.88 |
| Rear Bumper to Rear Axle | 37 | 3.08 | 0.94 |
| Rear Bumper to Rear of Rear Well | 23 | 1.92 | 0.58 |
| Rear Bumper to Rear of Trunk | 5 | 0.42 | 0.13 |
| Rear Bumper to Base of Rear Window | 20 | 1.67 | 0.51 |

WIDTH DIMENSIONS

| | Inches | Feet | Meters |
|---|---|---|---|
| Maximum Width | 67 | 5.58 | 1.70 |
| Front Track | 59 | 4.92 | 1.50 |
| Rear Track | 59 | 4.92 | 1.50 |

VERTICAL DIMENSIONS

| | Inches | Feet | Meters |
|---|---|---|---|
| Height | 56 | 4.67 | 1.42 |
| Ground to: | | | |
|   Front Bumper (Top) | 22 | 1.83 | 0.56 |
|   Headlight - center | 27 | 2.25 | 0.69 |
|   Hood - top front | 26 | 2.17 | 0.66 |
|   Base of windshield | 38 | 3.17 | 0.97 |
|   Rear Bumper - top | 28 | 2.33 | 0.71 |
|   Trunk - top rear | 44 | 3.67 | 1.12 |
|   Base of rear window | 45 | 3.75 | 1.14 |

Reg. To: AUTO FIRE & SAFETY CONSULTANTS      S/N:04R-010716AQ04101

2001 FORD FOCUS   4DR SEDAN

## INTERIOR DIMENSIONS

| | Inches | Feet | Meters |
|---|---|---|---|
| Front Seat Shoulder Width | 54 | 4.50 | 1.37 |
| Front Seat to Headliner | 39 | 3.25 | 0.99 |
| Front Leg - seatback to floor (max) | 43 | 3.58 | 1.09 |
| Rear Seat Shoulder Width | 54 | 4.50 | 1.37 |
| Rear Seat to Headliner | 39 | 3.25 | 0.99 |
| Rear Leg - seatback to floor (min) | 38 | 3.17 | 0.97 |

Seatbelts: 3pt - front and rear
Airbags: FRONT SEAT AIRBAGS

## STEERING DATA

| | | Inches | Feet | Meters |
|---|---|---|---|---|
| Turning Circle (Diameter) | | 432 | 36.00 | 10.97 |
| Steering Ratio: | 16.00:1 | | | |
| Wheel Radius: | | 11 | 0.92 | 0.28 |
| Tire Size (OEM): | P195/60R15 | | | |

## ACCELERATION & BRAKING INFORMATION

Brake Type: FRONT DISC - REAR DRUM
ABS System: ALL WHEEL ABS - OPTIONAL

Braking, 60 mph -> 0 (Hard pedal, no skid, dry pavement):
   d = 130 ft   t = 3.0 sec.   a = -29.7 ft/sec/sec   G-force = -0.92

ACCELERATION:

   0->30 mph   t = 2.8 sec.   a = 15.7 ft/sec/sec   G-force = 0.49
   0->60 mph   t = 9.3 sec.   a = 9.5 ft/sec/sec   G-force = 0.29
   45->65 mph   t = 5.2 sec.   a = 5.6 ft/sec/sec   G-force = 0.18

Transmission Type:          5spd MANUAL

NOTES:

   Federal Bumper Standard Requirements =   2.5 MPH
   This vehicles Rated Bumper Strength:   2.5 mph

N.S.D.C. = 2000 - 2004

Reg. To: AUTO FIRE & SAFETY CONSULTANTS   S/N:04R-010716AQ04101

2001 FORD FOCUS   4DR SEDAN

· OTHER INFORMATION

    TIP-OVER STABILITY RATIO   =   1.34   STABLE
    NHTSA Star Rating (calculated)         ****

CENTER OF GRAVITY (No Load):
    Inches behind front axle    =  41.20
    Inches in front of rear axle =  61.80
    Inches from side of vehicle  =  33.50
    Inches from ground           =  21.98
    Inches from front corner     =  83.24
    Inches from rear corner      = 104.32
    Inches from front bumper     =  76.20
    Inches from rear bumper      =  98.80

MOMENTS OF INERTIA APPROXIMATIONS (No Load):
    YAW MOMENT OF INERTIA                =  1434.92  lb-ft-sec^2
    PITCH MOMENT OF INERTIA              =  1389.36  lb-ft-sec^2
    ROLL MOMENT OF INERTIA               =   311.52  lb-ft-sec^2

FRONT PROFILE INFORMATION
    ANGLE FRONT BUMPER TO HOOD FRONT     = 38.7   deg
    ANGLE FRONT OF HOOD TO WINDSHIELD BASE = 17.5  deg
    ANGLE FRONT OF HOOD TO WINDSHIELD TOP  = 22.1  deg
    ANGLE OF WINDSHIELD                  = 27.3   deg
    ANGLE OF STEERING TIRES AT MAX TURN  = 27.3   deg

FIRST APPROXIMATION CRUSH FACTORS:

    Speed Equivalent (mph) of Kinetic Energy (KE) used in
causing crush or indentation may be evaluated using the
following formula, the appropriate Crush Factor (CF), and
Maximum Indentation Depth (MID), in feet:

$$V(mph) = Sqr\ root\ of\ (30 * CF * MID)$$

    KE Equivalent Speed (Front/Rear/Side)   = 21 CF

    Bullet vehicle IMPACT SPEED estimation
    based on TARGET VEHICLE damage ONLY   = 27 CF
    (Tested for Rear/Side Impact only)

These CF values are based upon analysis of NHTSA Barrier Crash
data, and from over 1000 vehicle accidents where independant
evaluation of speed was possible. (These are NOT 'A', 'B', 'C',
or 'G' values)

The Rear Impact data with more than 2-3 inches of crush damage
should be looked at carefully, since some vehicles have very weak
trunk & fender strength. Therefore, on some cars, esp. GM, your
estimate from the rear crush data may be high by as much as 4-5
mph (on a crush of 18 inches).

Reg. To: AUTO FIRE & SAFETY CONSULTANTS    S/N:04R-010716AQ04101

# Auto Fire & Safety Consultants

## CAM COPE EXPERT TESTIMONY

- 03-22236; Artemio Ceballos Salinas, et al v. Ace Transportation, et al; 12th Judicial District Court of Walker County, Texas; October 15, 2007; Trial

- 75998D; Drusilla M. Boudreaux, et al v. Gonzales Tire Co., Inc.; In the 23rd Judicial District Court of Ascension Parish, LA ; October 3, 2007; Trial

- *Debbie Hunter, et al v. Ford Motor Co., Inc.*; In the 170th Judicial District Court of McLennan County, Texas, August 28, 2007, Deposition

- Cause No. 06-C-285; *Floyd Screws v. Hughes Springs ISD*; In the 5th Judicial District Court of Cass County, Texas , August 16, 2007, Deposition

- Cause No. 6275 & 6276; *The State of Texas v. Rusty Horton*, In the Judicial District Court of Sabine County, Texas, June 25-29, 2007, Trial

- Cause No. 32,910; *Donnisia Brown and Benjamin Brown v. Wal-Mart Stores, Inc and Paul Johnson*; In the 149th Judicial District Court of Brazoria County, Texas, May 8-9, 2007, Trial

- Civil Action No. 50200938; *Jack Dotterer, et al v. Whirlpool Corporation, et al*; In the Circuit Court for Montgomery County, Tennessee at Clarkesville, Tennessee, February 12-13, 2007, Deposition

- 2006-04168; *Connie Mosier, Individually, Gary Mosier, Individually, and as the sole heirs of Christopher Mosier, and on behalf of the Estate of Christopher Mosier v. John Michael Reed, Individually and J.M. Reed Plumbing Co., Inc.*; In the 234th Judicial District Court, Harris County, Texas, February 16, 2007, Deposition

- 5020049; *Kiefer, et al v. Whirlpool Corporation, et al*; Montgomery County, Tennessee, February 12 and 13, 2007, Deposition

- 35539; *Ronald Ocmand and Cynthia Ocmand vs. General Motors Corp., et al*; Division A - 18th JDC, for the Parish of West Baton Rouge, Louisiana, December 6, 2006, Deposition

- 01-CV-288; *Donald Oelke v. Rosemurgy Motors, et al*; Marathon County, Wisconsin, November 16, 2006, Trial

- N. 862449; *Liem Xuan Pham v. Evelyn Hall and Aldine Independent School District*; In the County Civil Court at Law No. 1, Harris County, Texas, November 13, 2006, Trial

- *Debbie Hunter, et al v. Ford Motor Co., Inc.*; In the 170th Judicial District Court of McLennan County, Texas, October 10, 2006, Deposition

- No. 10,887; *Cheryl Pearson, Individually and as the Representative of the Estate of Christopher Pearson, Deceased and Carol Fleenor, Individually and as Guardian on Behalf of Jonathan Pearson and Joseph Pearson, Minors v. Mack Trucks, Inc.*, McNeilus Truck Manufacturing, September 27, 2006, Deposition

- Cause No. 75998D; *Drusilla M. Boudreaux, Individually and on Behalf of her Minor Child, Donavan Lance Mapes and Matthew Adams Mapes v. Gonzales Tire Company, Inc., Michelin North America, Inc., DBA Michelin Americas Small Tires; Mitsubishi Motors North American, Inc., and Dale Thomas*; In the 23rd Judicial District Court for the Parish of Ascension, State of Louisiana, Division D; July 6, 2006, Deposition

- Cause No. DV05-02945-A; *Marcella Pesina-Narvaez, et al v. Uniroyal Goodrich Tire Company, et al*; In the A-14th Judicial District of Court of Dallas County, Texas; June 22, 2006, Deposition

- *State of Texas v. Robert D. Clough*; Judge Michael May, 410th Judicial District Court of Montgomery County, Texas; May 22, 2006, Trial

- Cause No. 5-05CV0105-C; *Diaz, Mendy, Individually and as Next Friend of Emilio Vasquez, Cody Vasquez and Destiny Diaz, Minor Children v. Continental Tire North America, Inc.*; In the United States District Court for the Northern District of Texas, Lubbock Division; May 9, 2006, Deposition

- Cause No. 2005-17546; *Raleigh L. Woodard and Beatrice Collins v. Ford Motor Company and Texas Instruments, Inc.*; In the 55th Judicial District Court; Harris County, Texas; February 23, 2006, Deposition

- Cause No. D-173,795; *Margaret Platt Thorne, Individually and as Independent Executrix of the Estate of Martha Merrill Platt, Deceased and Clyde Platt, Individually v. Parigi & Messina, Ltd.*; In the 136th Judicial District Court of Jefferson County, Texas; February 21, 2006, Deposition

- Cause No. 1:03CV592M; *Shelter Insurance Company, et al. v. Mercedes Benz, USA*; United States District Court, Northern District of Mississippi; February 7-8, 2006, Trial

- Cause No. 345,460; *In Re: Estate of William Thomas Gorden, Deceased*; In the Probate Court, Number Three, Harris County, Texas; January 31, 2006, Deposition

- CV No. 04-1715; *Thomas Fielder, et al v. Graco Children's Products, Inc*; Judge Melancon; Magistrate Judge Hill; United States District Court Western District of Louisiana, Lafayette-Opelousas Division; January 16, 2006, Deposition

- Cause No. 03-60929-4; *Shirley Watson, et al v. Leon Zimmerman*; Law Number Four, Nueces County, Texas; December 13-14, 2005, Trial

- Cause No. 2003-38188; *Richard Fielder, et al v. Cernex, Houston Shell, et al.*, 281st Judicial District Court of Harris County, Texas; December 9, 2005, Deposition

- Cause No. 04-07-05973-CR; *State of Texas v. Charles Crawford*; 284th Judicial District Court of Montgomery County, Texas; December 1, 2005, Trial

- *Estate of Alvaro Zamorano*; November 8, 2005, Deposition

- Cause No. 03CV0006; *Molly Fitzgerald, as Representative of Minors Cassidy Ann Sandoval, Austin Sandoval, Patrick Sandoval, Heirs of Marcus Sandoval, et al. v. Sun Builders, et al*; In the 405th Judicial District Court, Galveston County, Texas; October 19, 2005, Deposition

- Cause No. CV67500; *Anthony Blake, Individually and As Heir to Andrea Blake, Deceased v. Daimler-Chrysler*; 333rd District Court of Harris County, Texas; July 25, 2005, Deposition

- Civil Action No. CV04-1144; *Shawn Douglas and Paige Brown v. General Motors Corporation*; July 22, 2005, Deposition

- Cause No. 2004-202; *David Lea Reid, Plaintiff v. Daphne Allen, as Personal Representative of the Estate of Jaicey Lynn Roberson Deceased, Defendant* in the District Court of Rusk County, Texas 4th Judicial District; July 20, 2005, Trial

- Cause No. 198,121-C; *Rachelle Chronister, Individually and on behalf of the Estate of Kathy Johnson, Deceased, Plaintiffs, v. Ford Motor Company and Cleo Bay, Ltd. D/B/A Cleo Bay Used Cars, Defendants*; July 18, 2005, Deposition

- Cause No. 1:03CV592M; *Shelter Insurance Company, et al. v. Mercedes Benz, USA*; United States District Court, Northern District of Mississippi; May 26, 2005, Deposition

- Cause No. 153-199296-03; *Judith McFarland, Individually and on behalf of the Estate of Katy McFarland, Deceased, v. Volvo Cars of North America, Inc., AB Volvo, Volvo Car Corporation and Juan Pantoja, Jr.*; April 26, 2005, Deposition

- Cause No. 03-L-2027; *Dora Mae Jablonski and John L. Jablonski, Jr., as Special Administrator and Personal Representative of the Estate of John L. Jablonski, Sr., Plaintiffs, v. Ford Motor Company and Natalie S. Ingram, Defendants*; April 11, 2005, Trial by Jury, Jury Verdict in favor of Plaintiff

- Cause No. 2002-2252; *Elizabeth Lopez, Individually and On Behalf of Claudia Itzel Garcia, Ximena Lizbeth Garcia, And Yusemi Garcia, Minors, And on Behalf of the ESTATE of Gustavo Garcia, Deceased, Plaintiffs vs. Stoneridge, Inc. Thomas G. Loeffler, Nancy Ann Loeffler,* in the 327th Judicial District Court of El Paso County, Texas; April, 8, 2005, Deposition

- Cause No. 03-L-2027; *Dora Mae Jablonski and John L. Jablonski, Jr., as Special Administrator and Personal Representative of the Estate of John L. Jablonski, Sr., Plaintiffs, v. Ford Motor Company and Natalie S. Ingram, Defendants*; March 24, 2005, Second Deposition

- Cause No. C2003388; *Maria Salas, et al., as heir to Obdulio Hernandez, Deceased v. General Motors Corporation, and Durant Chevrolet, Inc.*; February 3, 2005, Deposition

- Cause No. 03-05-16687-CV; *Ruth Jeannette Moody, et al v. Hankook Tire America Corp., Hearne I.S.D., et al*; January 7, 2005, Deposition

- Cause No. 03-1294-JTM; *David L. Doonan, et al v. General Motors Corporation*; District of Kansas; December 14, 2004, Deposition

- Cause No. A-115, 158; *Rosario Fatima Salgado and Leticia Salgado Rojo, individually and as next friend of Socorro Ashley Salgado, a minor v. Ford Motor Company, et al.*; 70th Judicial District of Ector County, Texas; October 20, 2004, Deposition

- Cause No. 2002-46146; *Elna Lopez Garcia in the Estate of Mariano Juarez Garcia, et al v. Charles Anderson*; September 7, 2004, Deposition

- Cause No. 16082JG0. *Dawn Winters v. Barbara Tribble*, in the 239th Judicial District Court, Brazoria County, Texas; August 17-18, 2004, Trial

- Cause No. 03-L-2027; *Dora Mae Jablonski and John L. Jablonski, Jr., as Special Administrator and Personal Representative of the Estate of John L. Jablonski, Sr., Plaintiffs, v. Ford Motor Company and Natalie S. Ingram, Defendants*; August 10, 2004, Deposition

- Cause No. 20311-RM02; *Jean Meyerson v. Key Energy Services, Inc.*; District Court, Brazoria County, Texas, 149th Judicial District; August 5, 2004, Trial

- Cause No. 20311-RM02; *Jean Meyerson v. Key Energy Services, Inc.*; District Court, Brazoria County, Texas, 149th Judicial District; June 22, 2004, Deposition

- Cause No. 2001-02048; *Lorenzo Vargas Ramirez v. Mega Interest, Inc., doing business as Jet Wrecker Service and William Mark Sheppard,* in the 55th Judicial District, Harris County, Texas; April 24, 2004, Trial

# Ca../Cope Expert Testimony

- Cause No. C-2371-03D; *Daniel Villareal & Georgina Villareal v. Eliodoro Tellez and Chico Trucking Co., Inc.*, District Court of Hidalgo County, Texas, 206th Judicial District; April 21, 2004, Deposition

- Cause No. A-02-CA-720-SS; *Juan Arguello, et al v. General Motors Corporation*, in the Western District of Texas, Austin Division; March 4, 2004, Deposition

- Cause No. 2003; *Xuan T. Vu and MTNV, Inc. v. Quan Van Pham d/b/a C.E. King Super Market*, in the 280th Judicial District Court of Harris County, Texas; February 9, 2004, Deposition

- Cause No. 2002-4829. *Darrell Pettefer v. Progressive Security.* Parish of Calcasieu, 14th Judicial District, Louisiana; January 14, 2004, Trial

- Cause No. 16082JG0. *Dawn Winters v. Barbara Tribble,* In the 239th Judicial District Court, Brazoria County, Texas; December 15, 2003, Deposition

- Cause. No 03-00626-B; *Andrea Aguilar and Rueben Barcena as Representatives of the Estate of Marcelo Barcena Aguilar, deceased v. Michael V. Higdon and Dr. Pepper Bottling Company;* 1992 Pontiac Dallas County, Texas, 44th Judicial District; November 26, 2003, Deposition

- Cause No.: 01-CV-828. *Donald v. Oelke v. Ford Motor Company, et al.* Circuit Court Branch III, Marathon County, Wisconsin; November 21, 2003, Deposition

- Cause No. 2002-4829. *Darrell Pettefer v. Progressive Security.* Parish of Calcasieu, 14th Judicial District, Louisiana; October 27, 2003, Deposition

- Cause No. 2001-371-CV; *Manuel & Berna Sena Individually and as Guardians/Conservators of the person and Estate of Romain Sena v. Arnold L. Jacquez, et al.* Santa Fe, New Mexico; October 22, 2003, Deposition

- Cause No. 14,967; *Lanita Harmes and Jason Kyle Endicott v. Michael Scott Miller.* District Court, Lampasas County, Texas; August 25, 2003, Deposition

- Cause No. 01-05823; *Randy E. Kenner, and Cindy Kenner v. Chrysler Motors Corp., et al.* 192nd District Court, Dallas County, Texas; May 21, 2003, Deposition

- *Heloise Medine v. General Motor,* St. Bernard Parish, Louisiana; March 24, 2003, Deposition

- Cause No. 2001-02048; *Lorenzo Vargas Ramirez v. Mega Interest; Inc., doing business as Jet Wrecker Service and William Mark Sheppard,* in the 55th Judicial District, Harris County, Texas; February 27, 2003, Deposition

- *Bagwell;* January 27, 2003, Deposition

- *Horacio Orozco, et al v. Park Village/Partners, L.P. et al.;* January 14, 2003, Deposition

# Cam Cope Expert Testimony

- Cause No. 2001-CVE-000391-D1, 49th District Court of Webb County, Texas. *Candido Arreola, Virginia Arreola, Delia Sanchez, Jorge Meza and Norma Coria and Benjamin Guijosa Garcia, Individually and on behalf of Ruth Guijosa Coria, Deceased v. Mauricio Juarez and Montemayor Trucking, Inc;* October, 31, 2002, Deposition

- Cause No. 3-01-0232; U.S. District Court for the Middle District of Tennessee; *Dianne Coggins, Guardian and Next Friend of Lindsey Garretson v. KLLM, Inc., KLLM Transport Services, Inc. and Vernon Sawyer Transportation;* September 18, 2002, Deposition

- Cause No. A-000200-C, *Teresa Kovatch v. West Orange Grove I.S.D. and Rickey Allen Ryan,* 244th Judicial District Court of Ector County, Texas; June 28, 2002, Deposition

- Cause No. A-165, 158 in the 58th District Court of Jefferson County, Texas, *Howard Pete v. David Wilson, James Thorpe d/b/a J&L Transportation;* June 24, 2002, Deposition

- *B&D Trucking, Inc. v. Brian J. Goodman* for the law firm of Rose Walker, Dallas, Texas; April 29, 2002, Deposition

- Cause No. 2000-48432; *Homer Douglas Brown, Jr., Individually and as Next Friend of Ruby Brown, Deceased, and in his Representative Capacity as Administrator of the Estate of Ruby Brown, Deceased vs. Nathaniel Tramaine Barrs, Frank Gillman Pontiac Co. and Gillman, Inc. d/b/a Gillman Honda;* In the 80th Judicial District Court of Harris County, Texas; March 26, 2002, Deposition

- Cause No. 31,225-98-6; *Yolanda Tipps, Individually and As Next Friend of Jason Donnell Tipps, a minor, v. Gayle Marcus Hogue and Pilgrim Pride Corporation;* in the Judicial Court of Angelina County, Texas; March 11, 2002, Deposition

- Cause No. 98-3704; *Heather Moran, et al v. General Motors* Division B, 27th Judicial District Court, St. Landry Parish, Louisiana; April 10, 2001, Deposition

- Cause No. 99-00514; *Johnny Ray Foley, as Wrongful Death Beneficiary, and as Heir to the Estate of Patricia Ann Foley, Deceased, v. Andy Tran;* 280th Judicial District Court of Travis County, Texas; September 13, 2000

- Cause No. 98-00099; *Rafael Astacio v. General Motors Corporation,* Commonwealth of Massachusetts Superior Court. Law firm was Cambell Edwards and Conroy, 1 Constitution Plaza, Boston, MA

- Cause No. 98-08441; *Brett Fishburn and Christine Fishburn for Joseph Fishburn v. Warren E. Collins, Inc. and Terry L. Thompson;* 157th Judicial District Court of Harris County, Texas; September 15, 1999

- Cause No. 109278, *Patrick Day v. Kinsel Industries,* 268th District Court of Fort Bend County, Texas

# Ca...Cope Expert Testimony

- Cause No. 97-561,021, *Elwood Ellis v. Burlington Northern Santa Fe Railway Company, the City of Lubbock and James Allan Cox*, in the 72nd District Court of Lubbock County, Texas (Live trial testimony)

- Cause No. 599-CV-206; *Jeffrey Hendricks v. Chrysler Corporation*; In the U.S. District Court for the Eastern District of Texas, Texarkana Division

- Cause No. 84980-7-T.D., *Jones v. Covenant Transport & Daniel Beck*; 13th Judicial District Court, Memphis, TN

- *Janis Lynn Mann Jackson v. General Motors Corp & Burlington Northern Railroad, CODA Energy and Mobil Producing*

- Cause No. C-2371-03D; *Daniel Villarreal, et ux v. Eliodoro, et al*; in the 206th Judicial District Court, Hidalgo County, Texas

- Cause No. 33.702-361; *Paul Emola, et al. v. Mr. Coffee, Inc., et al*; 361st Judicial District Court of Brazos County, Texas; September 19, 1991

MR. BARROW: I have no objections, Your Honor.

THE COURT: State's 18 is admitted.

(State's Exhibit(s) No. 18 Admitted)

MS. STROUD: This is a stipulation of evidence in which the defendant has stipulated to those two priors.

THE COURT: All right.

MS. STROUD: At this time, the State would call Martha Alford.

THE COURT: You may proceed, Ms. Stroud.

**MARTHA ALFORD,**

having being first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MS. STROUD:

Q. Would you state your name for the record.

A. Martha Alford.

Q. Ms. Alford, where are you from?

A. Born, you mean?

Q. Where were you born?

A. San Antonio, Texas.

Q. When did you come here to Houston?

A. In '78.

Q. Are you a little bit nervous?

A. Yeah.

church?

A. A little after 10:00.

Q. While you were at the church, did you have any food or drink?

A. No.

Q. Prior to going to the church, had you had any alcoholic beverages?

A. No.

Q. When you left the church, who left with you?

A. Linda.

Q. Was it just the two of you in your car?

A. Yes.

Q. And what kind of car were you driving?

A. A Ford Focus.

Q. And was that your car?

A. No.

Q. Whose car was it?

A. It was a rental car she rented.

Q. So, Linda had rented the car. And were you driving it?

A. Yeah.

Q. Can you tell the Court why you were driving and not Linda?

A. Because it was raining and Lakewood Church was real far from where I live, and she felt more comfortable

with my driving over there.

Q. Was she used to driving in Houston?

A. No.

Q. When you left the church and you were driving, where was Linda sitting?

A. On the passenger side.

Q. Did you have your seat belts on?

A. Yes.

Q. When you left the church, where did you and Linda go?

A. We were going home, but she was worried about me not eating because I am diabetic. So, we were going to Taco Cabana to eat.

Q. You were going to Taco Cabana?

A. To get something to eat.

Q. And is this Taco Cabana on your way home?

A. Yes.

Q. Are you familiar with the area where Taco Cabana is located?

A. Yes.

Q. Martha, would a map of the area that the Taco Cabana is located, would it help you explain to the jury where your car was that day?

A. Yeah.

MS. STROUD: Your Honor, may I approach?

remember stopping and looking in front of me since I was not going at the light. The driveway is right before the light. I stopped, looked straight ahead and saw cars stopped waiting for the turn.

Q. Martha, let me stop you there.

You indicated that you were in this lane here; is that correct?

A. Yes.

Q. Referring to State's 17.

Now, was there a vehicle in front of you?

A. No.

Q. Was there anything in front, between you and the red light for this intersection?

A. No.

Q. Can you tell the Court what cross street this is?

A. Jones.

Q. Jones Road?

A. Yes.

Q. In your opinion, is that a very busy intersection?

A. Yes.

Q. When you were stopped here, getting ready to make your turn, did you come to a complete stop or did you slow down?

A. I stopped.

Q.   You stopped.

And you stated there were no vehicles in front of you; is that correct?

A.   Yeah.

Q.   Do you remember seeing any other vehicles?

A.   Yes.

Q.   And where were they located?

A.   One was directly in front of me over here (indicating).

Q.   And was he trying to also make a turn?

A.   No.  He had a red light.

Q.   He had a red light?

A.   He was stopped.

Q.   But was he in a turn lane?

A.   Yes.

Q.   And anybody else?

A.   There was -- I'm not sure which lane, but either here or here, there was another vehicle (indicating). And they had a red light and they were waiting.

Q.   And so, as you stopped, ready to make your turn into the Taco Cabana, what do you remember happening?

A.   I looked in front of me and saw the traffic.  And I looked towards the -- this lane that you can make a right-hand turn on to make sure --

Q.   Are you referring to this lane here (indicating)?

A. Yes.

Q. Where this arrow shows a right-hand turn?

A. Because it's so close to the driveway of the Taco Cabana that I am driving into, I wanted to make sure that it was clear and when I turned --

Q. And after you turned, what happened?

A. My sister screamed out, Watch out. And I looked at her and said, What?

And the next thing I saw was the grill of his car at the window and the grill hit her and the glass shattered. And I tried to catch her. I didn't see him. And that is all that happened.

Q. Martha --

A. Yeah.

Q. -- are you testifying that Linda had time to yell out, Watch out, and you had time to respond and turn your head and say, What?

A. Yes.

Q. Before the vehicle hit your vehicle; is that correct?

A. No. Right as the impact -- right when it hit.

Q. Is when you turned and said, What?

A. Yes. And it hit.

Q. And you said you tried to catch Linda?

A. Yes. Because she was bouncing around. I

# EXHIBIT ELEVEN

REPORTER'S RECORD

**VOLUME 6 OF 7 VOLUMES**

TRIAL COURT CAUSE NO. 923949

DANIEL JAMES SIXTA       )      IN THE DISTRICT COURT

        Appellant     )

                   )

VS.                  )      HARRIS COUNTY, TEXAS

                   )

THE STATE OF TEXAS        )

        Appellee      )     351ST JUDICIAL DISTRICT

FILED IN
1ST COURT OF APPEALS
HOUSTON, TEXAS

MAY 2 0 2003

MARGIE THOMPSON
CLERK

03 MAY 15 PM 2:45
MARGIE THOMPSON
CLERK
FILED IN
COURT OF APPEALS
HOUSTON, TEXAS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PUNISHMENT**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 13th day of December, 2002, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Mark Kent Ellis, Judge presiding, held in Houston, Harris County, Texas:

Proceedings reported by computer-aided transcription/stenograph machine.

**A P P E A R A N C E S**

MS. MARKAY STROUD

Assistant District Attorney

SBOT NO. 24000229

MS. ELIZABETH SHIPLEY

Assistant District Attorney

SBOT NO. 24008031

1201 Franklin

Houston, Texas 77002

PHONE:   713.755.5800

**ATTORNEYS FOR THE STATE OF TEXAS**

MR. MICHAEL BARROW

SBOT NO. 01831900

1314 Texas Avenue, Suite 1300

Houston, Texas   77002

PHONE:   713.224.8383

**ATTORNEY FOR THE DEFENDANT**

(Open court, defendant present, no jury)

(Witnesses sworn)

THE COURT: Gentlemen, the Rule has been invoked. That means you have to be outside the courtroom unless you are testifying. You cannot talk to one another about the testimony. You can only talk about it here in court, so please step out in the hallway.

Here's the stipulation.

(Discussion off the record)

THE COURT: Mr. Sixta, I'm not -- whatever happened last night, obviously, I'm glad you're alive and all that stuff, but that's not relevant to this hearing. So, you're not to talk about it. Nobody is going to ask you any questions about it. So, that's not relevant to the decision the jury has to make. All right?

THE DEFENDANT: I understand, sir.

THE COURT: Okay. Bring me the jury.

(Open court, defendant and jury present)

THE COURT: Please be seated.

All right. Is the State ready to proceed on punishment?

MS. SHIPLEY: We are, Your Honor.

THE COURT: Defense ready to proceed on punishment?

MR. BARROW: Yes, sir.

REPORTER'S RECORD

**VOLUME 6 OF 7 VOLUMES**

TRIAL COURT CAUSE NO. 923949

ORIGINAL

DANIEL JAMES SIXTA ) IN THE DISTRICT COURT

               Appellant )

                  )

VS. ) HARRIS COUNTY, TEXAS

                  )

THE STATE OF TEXAS )

               Appellee ) 351ST JUDICIAL DISTRICT

FILED IN
1ST COURT OF APPEALS
HOUSTON, TEXAS

MAY 2 0 2003

MARGIE THOMPSON
CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PUNISHMENT**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

03 MAY 15 PM 2:45
MARGIE THOMPSON
CLERK

FILED IN
COURT OF APPEALS
HOUSTON, TEXAS

On the 13th day of December, 2002, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Mark Kent Ellis, Judge presiding, held in Houston, Harris County, Texas:

Proceedings reported by computer-aided transcription/stenograph machine.

Q. Mr. Sixta, when were you first aware that a fatality had occurred on February the 21st of 2002?

A. After we were leaving the hospital, the deputy informed me.

Q. So, and you heard -- that would be Deputy Smith?

A. Correct.

Q. And you heard all the testimony over the past two days of you showing no remorse, correct?

A. Yes, sir.

Q. The fact of the matter is, no one had informed you that --

MS. STROUD: Object to leading, Your Honor.

THE COURT: Sustained.

Q. (By Mr. Barrow) The first time you understood there was a fatality was when?

A. When I left the hospital with the deputy.

Q. You were unaware at the scene?

A. Yes, sir.

Q. Did you ever even approach Ms. Alford's vehicle?

A. I didn't have an opportunity. I was trying to help my passenger and the paramedics arrived and then the officer came and got me.

Q. Did you serve in the military, Mr. Sixta?

A. Yes, sir.

Q. What branch?

A. The Marine Corps.

Q. And when was your service?

A. 1978 to the late 1980s.

Q. Honorably discharged?

A. Yes, sir.

Q. What rank did you achieve?

A. Corporal.

Q. Prior to February the 21st of 2002, were you employed?

A. Yes.

Q. And what was your employment?

A. I owned the Guardian Fence Company and Sixta Access Systems.

Q. And could you briefly describe what your job entailed?

A. I specialized in installations of access equipment, automatic gates, telephones, surveillance cameras, electronics dealing with such.

Q. How do you feel about the events that occurred on February 21st, 2002, Mr. Sixta?

A. I've been devastated every day. If I could, I would replace her life with my own.

MR. BARROW: Pass the witness.

THE COURT: Ms. Stroud.

MS. STROUD: Thank you, Your Honor.

# EXHIBIT THIRTEEN

## COURT OF CRIMINAL APPEALS ACTIVITY: FY 2013

| Regular Appeals | Pending: 9/1/2012[1] | Cases Added | Total on Docket | Dispositions | Pending: 8/31/2013 |
|---|---|---|---|---|---|
| Direct Appeals:  Death Penalty | 17 | 8 | 25 | 10 | 15 |
| DNA Appeal-Death Sentence | 0 | 4 | 4 | 1 | 3 |
| Habeas Corpus & Extraordinary Matters | 15 | 209 | 224 | 215 | 9 |
| Other Appeals | 2 | 3 | 5 | 3 | 2 |
| Petitions for Discretionary Review (*includes Granted MRH & Reinstated*) | 328 | 1,470 | 1,798 | 1,491 | 307 |
| Granted Petitions for Discretionary Review | 64 | 121 | 185 | 102 | 83 |
| Redrawn Petitions for Discretionary Review | 9 | 195 | 204 | 191 | 13 |
| **SUBTOTAL** | 435 | 2,010 | 2,445 | 2,013 | 432 |
| **Applications for Writ of Habeas Corpus** | | | | | |
| 11.07 Writs (other than death penalty) | 597 | 4,288 | 4,885 | 4,473 | 412 |
| 11.071 Writs (death penalty) | 24 | 43 | 67 | 54 | 13 |
| Supplemental 11.07 Writs (other than death penalty) | 78 | 352 | 430 | 327 | 103 |
| Supplemental 11.071 Writs (death penalty) | 9 | 15 | 24 | 14 | 10 |
| **SUBTOTAL** | 708 | 4,698 | 5,406 | 4,868 | 538 |
| **Original Proceedings[2]** | | | | | |
| Writs of Certiorari | 0 | 7 | 7 | 7 | 0 |
| Writs of Habeas Corpus | 2 | 66 | 68 | 63 | 5 |
| Supplemental Received Writ of Habeas Corpus | 0 | 1 | 1 | 0 | 1 |
| Writs of Mandamus | 76 | 641 | 717 | 676 | 41 |
| Supplemental Received Writ of Mandamus | 29 | 219 | 248 | 209 | 39 |
| Original & Supplemental 11.071 Matters | 0 | 10 | 10 | 10 | 0 |
| Writs of Prohibition | 1 | 8 | 9 | 7 | 2 |
| Supplemental Received Writ of Prohibition | 1 | 1 | 2 | 2 | 0 |
| **SUBTOTAL** | 109 | 953 | 1,062 | 974 | 88 |
| **Motions for Rehearing & Reconsideration** | | | | | |
| Rehearing on Direct Appeal | 1 | 4 | 5 | 5 | 0 |
| Rehearing on Refused Petitions for Discretionary Review | 3 | 60 | 63 | 61 | 2 |
| Rehearing on Granted Petitions for Discretionary Review | 5 | 10 | 15 | 15 | 0 |
| Rehearing on Habeas Corpus (filed & set) | 1 | 12 | 13 | 13 | 0 |
| Motions for Reconsideration (for original proceedings & 11.07 & 11.071 writs) | 2 | 12 | 14 | 12 | 2 |
| Motions for Stay of Execution (for 11.071 writs) | 1 | 6 | 7 | 5 | 2 |
| **SUBTOTAL** | 13 | 104 | 117 | 111 | 6 |
| **Motions for Extensions of Time[3]** | 0 | 1,525 | 1,525 | 1,525 | 0 |
| **TOTAL** | 1,265 | 9,290 | 10,555 | 9,491 | 1,063 |

## PENDING CASE STATUS: FY 2013

| | 9/1/2012 | | | | 8/31/2013 | | | |
|---|---|---|---|---|---|---|---|---|
| | Not Set for Submission | Set for Submission | Submitted | Total Pending | Not Set for Submission | Set for Submission | Submitted | Total Pending |
| Direct Appeal: Death Penalty | 9 | 2 | 6 | 17 | 8 | 1 | 6 | 15 |
| Direct Appeal: DNA Appeal | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 3 |
| Other Appeals | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| Direct Appeal: Habeas Corpus & Extraordinary Matters | 6 | 5 | 4 | 15 | 3 | 0 | 6 | 9 |
| Granted Petitions for Discretionary Review | 16 | 11 | 44 | 64 | 28 | 10 | 45 | 83 |
| **TOTAL** | 31 | 18 | 54 | 103 | 41 | 12 | 59 | 112 |

[1] Cases pending at the beginning of the fiscal year (September 1) may not equal cases pending at the end of the previous fiscal year (August 31) due to docket adjustments.
[2] Original proceedings are filed directly with the Court of Criminal Appeals. Applications for writ of habeas corpus, although seeking relief from the Court of Criminal Appeals, must be filed in the trial court, which has 35 days in which to submit findings of fact, conclusions of law, and a recommendation to the Court of Criminal Appeals.
[3] Motions for extensions of time to file transcripts of court reporter's notes, bill of exceptions, briefs and petitions for discretionary review.

# MANNER OF DISPOSITION: Appeals & Original Proceedings, FY 2013

**Direct Appeals:**

*Death Penalty*

| | |
|---|---|
| Affirmed | 10 |
| **TOTAL: Death Penalty** | **10** |

*Death Penalty – DNA Appeal*

| | |
|---|---|
| Affirmed | 1 |
| Other Appeals | 3 |
| **TOTAL: Other Appeals** | **4** |

*Habeas Corpus & Extraordinary Matters*

| | |
|---|---|
| Habeas corpus application granted | 180 |
| Habeas corpus application denied | 15 |
| Habeas corpus application dismissed | 1 |
| Habeas corpus denied in part and dismissed in part | 1 |
| Mandamus conditionally granted | 10 |
| Mandamus & prohibition relief conditionally granted | 2 |
| Prohibition relief granted | 1 |
| Remanded to trial court | 3 |
| Withdraw prior opinion – habeas corpus relief granted | 2 |
| **TOTAL: Habeas Corpus & Extraordinary Matters** | **215** |

| | |
|---|---|
| **TOTAL: Direct Appeals** | **229** |

**Petitions for Discretionary Review**

| | |
|---|---|
| Dismissed | 2 |
| Granted | 117 |
| Refused | 1,090 |
| Struck | 230 |
| Untimely | 52 |
| Withdrawn | 0 |
| **TOTAL: Petitions for Discretionary Review** | **1,491** |

**Granted Petitions for Discretionary Review**

| | |
|---|---|
| Affirmed court of appeals | 26 |
| Affirmed as reformed | 2 |
| Affirmed court of appeals, remanded to trial court | 1 |
| Court of appeals, as modified, affirmed | 2 |
| Dismissed as improvidently granted | 3 |
| Reversed court of appeals, trial court reformed | 2 |
| Reversed court of appeals, trial court reinstated | 5 |
| Reversed court of appeals, acquittal ordered | 2 |
| Reversed court of appeals & remanded to court of appeals | 23 |
| Reversed court of appeals & remanded to trial court | 6 |
| Reversed court of appeals & affirmed trial court | 11 |
| Reversed court of appeals & trial court, remanded to trial court | 1 |
| Reversed court of appeals | 3 |
| Vacated court of appeals & remanded to court of appeals | 15 |
| **TOTAL: Granted Petitions for Discretionary Review** | **102** |

**Redrawn Petitions for Discretionary Review**

| | |
|---|---|
| Granted | |
| Refused | 3 |
| Untimely | 187 |
| | 1 |
| **TOTAL: Redrawn Petitions for Discretionary Review** | **191** |

**Applications for Writ of Habeas Corpus**

| | |
|---|---|
| Abuse of writ order entered | 22 |
| Abuse of writ order previously entered | 63 |
| Dismissed - direct appeal pending, no action | 187 |

| | |
|---|---|
| Dismissed - Art. 11.07, Section 4 | 858 |
| Dismissed - Art. 11.07, Tex.Gov. Code §501.0081 | 58 |
| Dismissed | 132 |
| Filed & set | 182 |
| Habeas corpus remanded for evidentiary hearing/aff with order | 352 |
| Habeas corpus remanded application prematurely forwarded | 11 |
| Habeas corpus remanded for report/findings | 9 |
| Habeas corpus remanded live hearing | 4 |
| Habeas corpus returned to district clerk | 1 |
| Habeas corpus dismissed/Daniel | 6 |
| Habeas corpus relief denied without written order | 953 |
| Habeas corpus relief denied with written order | 57 |
| Habeas corpus relief denied with hrg on findings of trial court | 42 |
| Habeas corpus relief denied w/o hrg on findings of trial court | 1,237 |
| Habeas corpus denied/dismissed with order | 35 |
| Habeas corpus dismissed – juvenile matter | 1 |
| Habeas corpus dismissed – misdemeanor offense | 5 |
| Habeas corpus dismissed – moot | 39 |
| Habeas corpus dismissed – sentence discharged | 198 |
| Habeas corpus dismissed – community supervision not revoked | 22 |
| Habeas corpus dismissed with written order | 11 |
| Habeas corpus dismissed for non compliance | 236 |
| Habeas corpus dismissed – Ybarra | 79 |
| **TOTAL: APPLICATIONS FOR WRIT OF HABEAS CORPUS** | **4,800** |

**11.071 Applications for Writ of Habeas Corpus**

| | |
|---|---|
| 11.071 Writ denied/dismiss with order | 2 |
| 11.071 Writ denied with written order | 27 |
| 11.071 Writ dismissed with order | 26 |
| 11.071 Writ filed & set | 6 |
| 11.071 Writ remanded with order | 7 |
| **TOTAL: 11.071 Applications for Writ of Habeas Corpus** | **68** |

**Original Proceedings – Non Capital**

| | |
|---|---|
| Motion for leave to file denied without written order | 640 |
| Motion for leave to file held in abeyance with written order | 228 |
| Motion for leave to file dismissed – Padilla | 75 |
| Motion for leave to file denied with written order | 4 |
| Motion for leave to file abuse order entered | 2 |
| Motion for leave to file dismissed as moot | 1 |
| Dismissed | 4 |
| Filed & set | 10 |
| **TOTAL: Original Proceedings – Non Capital** | **964** |

**Original Proceedings – Capital**

| | |
|---|---|
| Motion for leave to file dismissed moot | 3 |
| Motion for leave to file filed and set | 3 |
| Motion for leave to file denied w/o written order | 3 |
| Motion for leave to file dismissed | 1 |
| **TOTAL: Original Proceedings** | **10** |

**Motions for Reconsideration and Stay of Execution**

| | |
|---|---|
| Motion for reconsideration denied | 92 |
| Motion for reconsideration granted [4] | 12 |
| Motion for reconsideration—no action [5] | 89 |
| Motion for reconsideration – dismissed | 47 |
| Motion for stay of execution denied w/ order | 5 |
| **TOTAL: Motions for Reconsideration and Stay of Execution** | **245** |

---

[4] Applications for Writ of Habeas Corpus disposed.
[5] Includes dispositions of cases that had not been counted as filed on the activity report.

Cause No. 923949-C

EX PARTE ( IN THE 351st DISTRICT COURT

) OF

DANIEL JAMES SIXTA ( HARRIS COUNTY, TEXAS
Applicant

## APPLICANT'S PROPOSED FINDINGS OF FACT,

## CONCLUSIONS OF LAW, RECOMMENDATION, AND ORDER

### FINDINGS OF FACT

1. The expert evidence needed for Applicant's defense could have been obtained by Applicant's trial counsel, had he made the effort. His court-ordered affidavit makes clear that his effort fell short of that required by due process of law. He failed to talk to experts, and, he made no effort to gain further funds for that purpose.

2. The question in this case is not merely whether Applicant's *new evidence* ground satisfies the *newly discovered evidence* test; the application in this case shows that his innocence is "intertwined" with the violation of his constitutional right to due process of law. He was denied his defense.

3. Applicant's first two applications were filed by Applicant, *pro se,* and the record makes clear that he was ill-equipped to negotiate the habeas process.

### CONCLUSIONS OF LAW

1. The record, together with the application when considered in its entirety, shows that relief should be granted.

2. Further, the Court has considered the Application for writ of habeas corpus, the State's answer, Applicant's response to the State's answer, and official court records in the above-captioned cause. The Court finds that the applicant has shown sufficient specific facts establishing that the current claims could not have been presented previously because the factual or legal basis for the claim was unavailable; and that, by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt. *Tex. Code Crim. Proc., Art. 11.07, Sec. 4(a)*

## RECOMMENDATION

It is the recommendation of this Court that relief be GRANTED.

## ORDER

THE CLERK IS ORDERED to prepare a transcript of all papers in cause no. 923949-C and transmit same to the Court of Criminal Appeals as provided by Tex. Code Crim. Proc., Art. 11.07, Sec. 3.

The transcript shall include certified copies of the following documents:

    A. The applicant's Application for a Writ Of Habeas Corpus;

    B. The State's answer;

    C. The applicant's Response to the State's Original Answer;

    D. The indictment, judgment and sentence and docket sheets in cause number 923949-C (unless they have been sent to the Texas Court Of Criminal Appeals pursuant to a post-conviction writ of habeas corpus order);

    E. The State's proposed findings of fact, conclusion of law and order;

    F. Applicant's proposed findings of fact, conclusions of law and order;

    G. The Court's orders re. the Application

THE CLERK is further ORDERED to send a copy of this order to the applicant's habeas attorney, Ardon Moore, P.O. Box 133183, Tyler, TX 75713; and a copy to the counsel for the State, Ana M. Benavides, 1201 Franklin, Suite 600, Houston, TX 77002.

By the following signature, the Court adopts Applicant's Proposed Findings Of Fact, Conclusions Of Law, Recommendation, and Order in cause no. 923949-C.

Signed on this _____ day of _____, 2014.

_____

Judge Presiding

351st District Court

Harris County, Texas

Cause No. 923949-C

EX PARTE ( IN THE 351st DISTRICT COURT

) OF

DANIEL JAMES SIXTA ( HARRIS COUNTY, TEXAS
Applicant

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that I have served a copy of APPLICANT'S PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, RECOMMENDATION, AND ORDER in cause no. 923949-C to the State's attorney on the _____ day of _____, 2014, by mail to the listed address:

ANA M. BENAVIDES
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002

Ardon Moore
Attorney At Law
P.O. Box 133183
Tyler, TX 75713
Texas Bar I.D. No. 14390000
903-593-1116

EX PARTE                              (          IN THE 351ˢᵗ DISTRICT COURT

                                      )                      OF

DANIEL JAMES SIXTA                    (          HARRIS COUNTY, TEXAS
        Applicant


## APPLICANT'S RESPONSE TO STATE'S ORIGINAL ANSWER


Applicant, DANIEL JAMES SIXTA, by his undersigned attorney responds to *State's Original Answer* as follows:

### I.

The State has launched the customary attack against an applicant's effort to obtain more than "one bite out of the apple." *Tex. Code Crim. Proc. Art. 11.07, Sec. (a)*. However, this harsh rule, which presents applicants with "Herculean" tasks, is satisfied by the facts presented in the application and record in this case.


### II.

The purpose of the Habeas Corpus Reform Act of 1995 was to encourage all-inclusive initial applications. *Ex parte Kerr*, 64 S.W. 3d 414, 418 (Tex. Crim. App. 2002) The Act was meant to be restrictive, but not prohibitive. Applicant urges that when the rule is too strictly applied, especially with regard to *pro se* applicants, it becomes prohibitive, thus unconstitutional. (Applicant has made the rule's constitutionality an issue in his ninth ground.)


### III.

The record itself, as set out in the application, together with the affidavits, shows the failure of Applicant's trial counsel to provide a defense, a defense which was out there, waiting to be discovered and presented by him, the person constitutionally obligated to discover and present it. Yet, it was Applicant, himself, an "indigent," who was left to

discover it for himself, after his trial, and in a time and manner showing acceptable due diligence.

## IV.

Further, in ground two of his application, Applicant shows that a constitutional error was "intertwined" with his actual innocence, a violation of his right to due process of law.

## V.

Also, Applicant has shown 1) that recently enacted Art. 11.073, *Tex. Code Crim. Proc.* appears to elevate the status of *scientific evidence* 2) that Applicant received no "heads-up" or advise from court or counsel regarding his habeas rights, and 3) that habeas action should be considered as a "collateral consequence of conviction" and thus inside the scope of trial counsel's representation.

## VI.

Having been denied his defense, and found guilty as charged, he was then *denied mitigating evidence* which would have lessened his punishment. (This denial is made clear by the record.) There was no anecdotal evidence regarding Applicant's good qualities, no showing of anything in his life which might have caused his behavior, no attempt to humanize him, no showing of his long list of accomplishments. *Art. 37.07, Sec. 3, Tex. Code Crim. Proc.* is not that difficult to understand.

## VII.

Further, Applicant's effort to kill himself the night before his punishment hearing together with its obvious effects on his body, did not go unnoticed by the trial court, as the judge remarked, "Mr. Sixta, I'm not – what ever happened last night, obviously, I'm glad you're alive and all that stuff..." The judge then admonished Applicant not to mention the incident before the jury. Then, remarkably, Applicant was pressed on to testify. (This is all supported by the record and the application.)

## VIII.

While the record shows that Applicant worked hard all his life, receiving many recognitions, both as a civilian and in the military (the jury heard none of it) the fact remains that he was unskilled in the law, and his first two applications, both *pro se*, failed. He was unable even to get his "FACTS" in the correct place on the writ-form. Now we are

asked to find that his lack of legal training, his indigency, have doomed him, and that his receiving a fair trial and due process of law is a chancy endeavor.

### IX.

The State raises questions which have been answered in the application. For example, Applicant has explained that the *newly discovered evidence*, although discoverable by his trial counsel, was left to be discovered by Applicant, *himself.* Applicant also has urged that this failure to present his defense violated his right to due process of law.

### X.

For these reasons, and all the reasons before the Court in the application, the Court should consider the merits and grant relief based on the instant application for writ of habeas corpus.

### XI.

Service has been accomplished by sending a copy of this instrument to the following person at the following address:

ANA M. BENAVIDES

Assistant District Attorney

Harris County, Texas

1201 Franklin, Suite 600

Houston, Texas 77002

SIGNED this _____ day of May, 2014.

Respectfully submitted:

_____
ARDON MOORE
Attorney and Counselor at Law
P.O. Box 133183
Tyler, TX 75713
Texas Bar I.D. No. 14390000
903-593-1116

Cause No. 923949-C

FILED
Chris Daniel
District Clerk

MAY 02 2014

Time: _____
Harris County, Texas
By _____
Deputy

| | | |
|---|---|---|
| EX PARTE | § | IN THE 351st DISTRICT COURT |
| | § | OF |
| DANIEL JAMES SIXTA, Applicant | § | HARRIS COUNTY, T E X A S |

## STATE'S PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

The Court has considered the application for writ of habeas corpus, the State's answer, and official court records in the above-captioned cause. The Court finds that the applicant has failed to include sufficient specific facts establishing that the current claims could not have been presented previously because the factual or legal basis for the claim was unavailable; or that, by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt. TEX. CODE CRIM. PROC. ANN. art. 11.07 § 4 (a) (West 2013).

## ORDER

THE CLERK IS ORDERED to prepare a transcript of all papers in cause number 923949-C and transmit same to the Court of Criminal Appeals as provided by TEX. CODE CRIM. PROC. ANN. art. 11.07 § 3 (West 2013).



The transcript shall include certified copies of the following documents:

A.    the applicant's Application for a Writ of Habeas Corpus;

B.    the State's answer;

C.    the Court's order;

D.    the indictment, judgment and sentence, and docket sheets in cause number 923949 (unless they have been sent to the Texas court of criminal appeals pursuant to a post-conviction writ of habeas corpus order);

E.    the State's Proposed Findings of Fact, Conclusion of Law and Order; and

F.    the applicant's Proposed Findings of Fact, Conclusions of Law, and Order (if any).

THE CLERK is further ORDERED to send a copy of this order to the applicant's habeas attorney, Ardon "Ace" Moore, P.O. Box 133183, Tyler, TX 75713; and a copy to the counsel for the State, Ana M. Benavides, 1201 Franklin, Suite 600, Houston, Texas 77002.

**By the following signature, the Court adopts the State's Proposed Findings of Fact, Conclusions of Law and Order in cause number 923949-C.**

Signed on this ___1___ day of ___July___, 2014.

_____
JUDGE PRESIDING

2

FILED
Chris Danie
District Clerk

MAY 02 2014

Time: _____
Harris County, Texas
By _____
Deputy

Cause No. 923949-C

EX PARTE

§   IN THE 351ˢᵗ DISTRICT COURT

§   OF

DANIEL JAMES SIXTA,
Applicant

§   HARRIS COUNTY, T E X A S

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that I have served a copy of the *State's Proposed Findings of Fact, Conclusion of Law, and Order* in cause number 923949-C to the applicant's habeas attorney on May 2, 2014, by mail to the listed address:

Ardon "Ace" Moore,
Attorney at Law
P.O. Box 133183
Tyler, TX 75713

Ana M. Benavides
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 755-6657
Texas Bar ID #24057467

3

## HENDERSON v.
## Ex Parte Cathy Lynn HENDERSON.

### No. AP–76925.

### -- December 05, 2012

Jani J. Maselli, Houston, for Appellant.Carl Bryan Case, Jr., Asst. District Atty., Austin, for State.

OPINION

This is a subsequent application for writ of habeas corpus in a capital case, in which applicant asserted that she has newly available evidence that: (1) shows that she is innocent of capital murder; and (2) but for constitutional errors, she would not have been found guilty. On June 11, 2007, we found that the application satisfied the requirements for a subsequent writ under Article 11.071, Section 5, and remanded the application to the trial court for further proceedings. We will grant relief and remand the cause for a new trial.

In accordance with our remand order, the trial court held an evidentiary hearing. Applicant presented the testimony of six expert witnesses. Relying on new developments in the science of biomechanics, these witnesses testified that the type of injuries that Brandon Baugh suffered could have been caused by an accidental short fall onto concrete. Dr. Roberto Bayardo, the medical examiner who testified at trial that applicant's position that Brandon's injuries resulted from an accidental fall was false and impossible, testified at the evidentiary hearing that he now believes that there is no way to determine with a reasonable degree of medical certainty whether Brandon's injuries resulted from an intentional act of abuse or an accidental fall. The State presented five expert witnesses who testified that, notwithstanding the studies cited by applicant's experts, it was very unlikely that Brandon's injuries were caused by an accidental short fall onto concrete.

Following the evidentiary hearing, the trial court recommended granting a new trial. The court found that all of the expert witnesses were truthful and credible. The court further found that Dr. Bayardo's re-evaluation of his 1995 opinion is based on credible, new scientific evidence and constitutes a material exculpatory fact. The trial court concluded that applicant has proven by clear and convincing evidence that no reasonable juror would have convicted her of capital murder in light of her new evidence.

In post-conviction habeas corpus review, this Court is the ultimate fact finder, but the trial judge is the original fact finder. As a matter of course this Court will defer to and accept the convicting court's findings of fact and conclusions of law, as long as they are supported by the record. This is particularly true in matters concerning the weight and credibility of the witnesses and, in the case of expert witnesses, the level and scope of their expertise.

1

In this case, the trial court's findings of fact are supported by the record. Although we need not accept the trial court's conclusions concerning actual innocence, we accept the court's recommendation to grant relief and remand for a new trial.

CONCURRING OPINION

Back in 2007, I voted to allow the applicant in this cause to proceed on the merits of a subsequent writ application because I believed that her application contained previously unavailable specific facts sufficient to make out a prima facie case for a constitutional claim of actual innocence.[1] Now that the applicant has had a chance to develop a record in support of her claim of actual innocence, I agree with both Judge Keasler (and, implicitly, Judge Cochran) that her evidence falls short of satisfying the "Herculean" burden imposed on applicants making a bare claim of actual innocence under the standard we laid out in Ex parte Elizondo.[2] And yet, the convicting court has recommended that we grant the applicant a new trial, and the State has declared itself content to go along with that ultimate recommendation. I write separately to explain why, particularly in light of my concurring opinion last year in Ex parte Robbins,[3] I, too, am content to grant the applicant a new trial in this case—but on the basis of the inadvertent use of false evidence rather than actual innocence.

A bare claim of actual innocence and a claim that false evidence was inadvertently used to obtain a conviction both fall along a continuum of due process violations. At one end of the continuum is a claim that the State has knowingly used false or perjured testimony. Here, due process is primarily concerned with the fairness of the trial.[4] Because of the State's complicity in undermining the integrity of the process, the standard for materiality is comparatively low: a reasonable possibility that the false or perjured testimony contributed to the conviction.[5] At the other end of the continuum is a bare claim of actual innocence. An actual innocence claim does not depend upon a showing of misconduct of any kind on the part of the State. The due process concern is with the accuracy of the result.[6] For that reason, an actual innocence claim will result in habeas corpus relief only upon a showing of extreme materiality: the applicant must be able to show by clear and convincing evidence that, given the newly available evidence of innocence in addition to the inculpatory evidence presented at trial, no reasonable juror would have convicted him.[7] And, as Presiding Judge Keller has advocated, and I agree, "[t]he unknowing use of perjured or false testimony falls [or at least should fall] in between these endpoints, with a mid-level standard (or standards) of materiality."[8] Thus, as the particular due process claim moves from the fairness end of the continuum toward the accuracy end, the standard for materiality should rise concomitantly, culminating in the Herculean burden associated with a bare claim of actual innocence.

Though I do not think that the applicant has proven actual innocence in this case, I do believe that she has established that her conviction violated her right to due process. She has proven to my satisfaction that her conviction was based in critical part upon an opinion from the medical examiner that he has now disowned because it has been shown by subsequent scientific developments to be highly questionable. In Robbins, a non-death-penalty capital murder case, the applicant raised claims of actual innocence and the inadvertent use of false evidence. I joined the majority opinion denying relief on both claims, but wrote separately to express my view that, "when it comes to claims of the inadvertent use of false evidence, we must not be overly liberal in how we characterize 'false' evidence."[9] One immediately obvious difference between Robbins and the instant case is that Robbins did not involve intervening scientific

2

developments—the medical examiner in Robbins simply changed her mind between the time of her trial testimony and the post-conviction writ proceedings.[10] Here, the medical examiner currently believes that intervening research in the science of biomechanics has undercut his trial testimony, and the convicting court has accepted that as a sufficiently accurate statement of the condition of current scientific/medical knowledge to justify the conclusion that the applicant's trial was rendered unfair—and quite possibly inaccurate—by the medical examiner's now-disowned trial testimony. Under these circumstances, I am far less hesitant to characterize the trial testimony as "false."

Nor does it trouble me that, when the applicant filed her subsequent writ application in 2007, she did not include a false-evidence claim, per se. Having filed her subsequent writ application two-and-a-half years before we issued our opinion in Ex parte Chabot,[11] she could not have known that we would come to entertain claims of the inadvertent use of false evidence.[12] Even so, embedded within her claim of actual innocence are facts sufficient to allege such a claim,[13] and in pursuing her actual innocence claim, she has ultimately developed facts sufficient to prove it.

My concurring opinion in Robbins was fueled by a concern that the materiality standard we have applied to claims of the inadvertent use of false or perjured evidence since Chabot may not be sufficiently stout. To my way of thinking, such claims fall closer to the accuracy-of-the-result actual-innocence end of the continuum than the fairness-of-the-process State-complicity end. Accordingly, while a claim that the State inadvertently used false or perjured testimony should not be subject to quite the same Herculean standard of materiality as an actual innocence claim, still, if we are to recognize it as a valid due process claim at all, we should subject it to a materiality standard that is relatively high. I did not think that Robbins could meet such a high standard of materiality and believed that to grant him relief under the circumstances of that case would effectively undermine our actual innocence jurisprudence. I therefore voted to deny relief in Robbins.

By contrast, on the facts of this case, as detailed in Judge Cochran's concurring opinion, it is evident to me that the applicant can meet practically any standard of materiality less than that applicable to a bare actual innocence claim. In Ex parte Chavez, I recently took the position that a subsequent post-conviction habeas applicant should not be permitted to proceed to the merits of his inadvertent-use-of-false-evidence claim because, regardless of whatever standard of materiality we might apply, the subsequent applicant could not possibly meet it.[14] In this case, my view is just the opposite. While she cannot satisfy the Herculean materiality standard to satisfy a claim of actual innocence, the present applicant has demonstrated materiality under whatever marginally lesser standard we may care to carve out to govern a claim that due process has been violated by the inadvertent use of false evidence. That is enough to convince me that the Court appropriately adopts the convicting court's ultimate recommendation—acceded to by the State—to grant the applicant a new capital murder trial.

CONCURRING OPINION

This case raises the same novel and difficult issue for the criminal-justice system that this Court faced, and, I maintain, fumbled in Ex parte Robbins:[1] Changing science has cast doubt on the accuracy of the original jury verdict.[2] Dr. Roberto Bayardo, who performed the autopsy of the victim in this case, testified unequivocally at trial that three-and-a-half-month-old Brandon Baugh "came to his death as a result of a

3

severe closed head injury . characteristic of abuse, homicide." He concluded, without a scintilla of doubt, that the cause of Brandon's death was a severe closed-head injury and the manner of death was homicide. Dr. Bayardo was the State's star witness at trial on the cause and manner of Brandon's death. But, based on advances in the science of pediatric head trauma, he has since changed his mind: "Based on the physical evidence in the case, I cannot determine with a reasonable degree of medical certainty whether Brandon Baugh's injuries resulted from an intentional act or an accidental fall." This scientific uncertainty about Brandon's manner of death raises an extremely serious concern about the accuracy of the original jury verdict.[3] I write separately to provide some factual context for the habeas judge's recommendation to grant a new trial, the State's decision to agree with that recommendation, and this Court's adoption of the habeas judge's findings of fact and ultimate recommendation.

I.

On the morning of January 21, 1994, Eryn and Melissa Baugh left their infant son, Brandon, with applicant, their regular babysitter.[4] That day, both applicant and Brandon disappeared. A kidnapping investigation began the next day. On February 1, applicant was arrested by the FBI in Kansas City. At first, applicant denied any knowledge of Brandon's location or well-being. Later, she stated that Brandon's grandmother, driving a car with Oklahoma license plates, picked him up during the afternoon of January 21. Eventually, applicant admitted that Brandon was dead, but claimed that his death was an accident. She also said that she had buried his body in a wooded area near Waco, that she had used a spade to dig the grave, and that she could take officers to his grave.

The single contested issue in the 1995 capital-murder trial was whether applicant intended to kill Brandon or whether she recklessly, negligently, or accidentally caused his death. In her statement, applicant contended that Brandon's death was an accident-he accidentally fell from her arms onto a linoleum-covered concrete floor.[5] The State's primary evidence to prove that applicant intended to kill Brandon consisted of the circumstantial evidence produced by the autopsy.[6] At trial, Dr. Roberto Bayardo, the long-time and highly experienced medical examiner for Travis County, testified that it was "impossible" for Brandon's extensive brain injuries to have occurred in the way that applicant stated. He said that her story was false and "incredible." In his opinion (and that of Dr. Sparks Veasey, the Deputy Chief Medical Examiner of Lubbock County), Brandon's injuries must have resulted from an intentional blow.[7] He concluded, "I would say the baby was caught up with the hands by the arms along the body and then swung and slammed very hard against a surface." In Dr. Bayardo's opinion, Brandon's death was the result of child abuse: "this is the worst case of head injury [at the hands of a person] I [have] ever seen." The jury agreed and convicted applicant of capital murder in May 1995.

This Court affirmed applicant's conviction and death sentence on direct appeal[8] and denied relief on her initial writ application in 2002.[9] The federal district judge denied her federal habeas petition in 2004,[10] and the Fifth Circuit affirmed that denial in 2006.[11]

The Honorable Jon Wisser presided over applicant's 1995 trial and is currently presiding over her subsequent writ application. Judge Wisser was sufficiently troubled by the preliminary scientific evidence initially presented to him that, on April 4, 2007, he recalled applicant's original death warrant and

4

rescheduled her execution to give her sufficient time to gather additional material for this subsequent writ application.

On May 23, 2007, three weeks before her re-scheduled execution date of June 13, 2007, applicant filed this subsequent application for habeas relief based on recent scientific advances in the area of biomechanics and physics-advances that led Dr. Bayardo to recant his conclusive opinion that Brandon's head injuries could not have been caused by an accidental, short-distance fall. Dr. Bayardo's 2007 affidavit stated,

Since 1995, when I testified at Cathy Henderson's trial, the medical profession has gained a greater understanding of pediatric head trauma and the extent of injuries that can occur in infants as a result of relatively short distance falls, based in part on the application of principles of physics and biomechanics. Specifically, and as shown in the reports that I have read, even a fall of a relatively short distance onto a hard surface can cause the degree of injury that Brandon Baugh experienced. If this new scientific information had been available to me in 1995, I would have taken it into account before attempting to formulate an opinion about the circumstances leading to the injury.

I have reviewed the affidavit of John Plunkett dated May 18, 2007,12 and I agree with his opinion. Based on the physical evidence in the case, I cannot determine with a reasonable degree of medical certainty whether Brandon Baugh's injuries resulted from an intentional act or an accidental fall. In fact, had the new scientific information been available to me in 1995, I would not have been able to testify the way I did about the degree of force needed to cause Brandon Baugh's head injury.

Faced with this recantation, we held that applicant's first two claims-(1) she is innocent of capital murder, and (2) but for constitutional errors she would not have been found guilty of capital murder—satisfied the requirements of article 11.071, § 5(a). We then remanded her application to the trial court for consideration of the merits. Judge Wisser held hearings between November 17, 2008, and March 5, 2009, and listened to the testimony of twelve witnesses. Seven of these witnesses were medical doctors and four were scientists with Ph.Ds. The twelfth witness was Linda Icenhauer–Ramirez, one of applicant's trial attorneys.

At the habeas hearing, Dr. Bayardo testified that, because of recent scientific knowledge about how head injuries occur, he would no longer use words like "impossible" or "incredible" to describe applicant's version of the events. Also, he would no longer assert that Brandon's injuries, if they were caused by an accidental fall, would have to be the result of a fall from a height of over two stories. He stood by the cause of death: a heavy blow to the head. But he would change the manner of death from "homicide" to "undetermined." He stood by his trial testimony that the comminuted depressed fracture of the back of the skull, which caused radiating fractures, was the result of a single blow. Dr. Bayardo said that, because Brandon sustained just one injury and that was to the back of his head, he doubted his prior finding of "homicide." In other child homicides, the infants had multiple injuries to the side or front, rather than the back, of the head.13 Dr. Bayardo flatly contradicted his trial testimony when he concluded, "I don't believe it's a case of child abuse."

5

Applicant also called Dr. Monson, an assistant professor of biomechanics at the University of Utah, who studies traumatic brain injury in children; Dr. Plunkett, a forensic pathologist who studies pediatric head trauma; and Dr. Van Ee, who has a Ph.D. in biomedical engineering and studies impact and orthopedic biomechanics. They testified that the application of biomechanics to the study of pediatric head trauma and the medical community's recognition of the role of biomechanics in determining causes of injury are recent and still developing. The medical community did not recognize a role for biomechanics in cases such as this one in 1998, when applicant filed her first habeas application.

These experts testified about "drop" experiments conducted with crash-test dummies and infant cadavers that measured the impact and injuries involved in short-distance falls, and how those experiments show the potential for head injury and death when babies fall short distances. Dr. Monson testified that he calculated the g-force involved in the fall (as described by applicant) to be 120 to 163g. Dr. Monson could not rule out the possibility that Brandon's death resulted from a short-distance fall: "So recognizing that the calculated values are well above when simple skull fracture may occur and also recognizing that there aren't data defining exactly when a fracture of this severity may occur, I have to conclude that you simply cannot rule out that possibility."

Dr. Plunkett testified about his playground-equipment study that included cases in which small children who fell short distances suffered complex skull fractures, brain injury, and death. He also could not rule out the possibility of an accident.

Q. As a pathologist who has done intensive work in this area and now is an author and speaker and expert in the field, do you think it's scientifically plausible to offer an opinion on the cause of an infant's death in a case like this without any review or application of biomechanics?

A. Not today, that's not acceptable.

Q. Why not?

A. Unless your experience is in the area of bioengineering, very few physicians have the necessary knowledge to evaluate, to rigorously evaluate, Brandon's injury. It's got to go beyond medicine.

Q. Based on your studies and your work, Dr. Van Ee's work, the CRABI 14 dummy tests that you've seen, all of your review of the medical reports, and a portion of Brandon Baugh's skull this morning, in your opinion, can any person conclude rationally and with certainty that the death of Brandon Baugh resulted from an intentional murderous act?

A. No.

Q. Could Brandon, in your opinion, have suffered a complex comminuted skull fracture from a drop of four feet—four and a half feet landing on the back of his head on a hard floor?

A. Yes.

6

Dr. Van Ee performed an accident reconstruction using the CRABI–6 infant dummy. He testified that Brandon was probably traveling 11 miles per hour when he hit the concrete floor. "Severe injury is certainly a possibility and may even be likely for this type of impact." He testified that Brandon's skull fracture could have resulted from a fall of about four feet onto a carpeted or linoleum-covered concrete surface. He said there was now no "correct scientific support" for Dr. Bayardo's trial testimony.

Applicant's experts generally concluded that it was possible that a short-distance fall, like the one that applicant reported, could have caused Brandon's injuries. The State's experts then testified about the limitations and shortcomings of the studies and experiments described by applicant's experts and the rarity of head injuries with diffuse brain injury and complex skull fractures such as those Brandon suffered.

The State called Dr. Rangarajan, who has a Ph.D. in biomedical engineering and engineering mechanics. He designs crash-test dummies for government and industry use. Dr. Rangarajan designed a newborn-infant dummy for car-seat tests in Japan, and he testified about the limitations of using a dummy's response to predict injury. He noted that "dummies are calibrated to perform well in automotive seated posture." And, the dummies are only biofidelic (able to produce true human-like responses) within calibration limits. He said that there are not enough biomechanics data to assess the probability of injury, but he did not know whether the tests conducted by the defense experts were an accepted way of predicting severe head injury: "I don't know how to answer the question because I cannot say. I'm not like—I'm not the general secretary of the scientific community."

Dr. Case, a medical examiner, neuropathologist, and forensic pathologist who has published articles on short-distance falls and pediatric head injuries, also testified for the State. She has written on how to distinguish between accidental head injuries and inflicted or abusive head injuries. A marker, "the presence of the diffuse distribution of subdural blood over the cerebral convexities," signals brain injury produced by a blow to the head. Short falls, on the other hand, cause focal injuries, not diffuse ones.[15] Only "one to two to three percent of all short falls will result in a simple linear skull fracture." Brandon's injury, "a depressed comminuted skull fracture," signaled that he had suffered a blunt impact blow. "In my opinion, this is not going to result from a short fall [of] less than six feet. This fracture is not a fracture that I have ever seen in a short fall or that I have ever seen described in a short fall." Brandon had a "diffuse subdural hemorrhage," but Dr. Case could not tell whether it was the result of a single impact or multiple impacts.

Dr. Case disagreed with Dr. Bayardo about the significance of the fact that there were no other injuries on Brandon's body. In her experience, 25 to 50 percent of children who died from abusive head injury had no other marks on their body. Dr. Case specifically criticized Dr. Plunkett's work and testified that it was "on the fringe" and not widely accepted in the professional-medical community. Dr. Case thought the defense's focus on the fracture was misguided because "You have to focus on the entirety of the head injury."

Dr. Pustilnik, the Chief Medical Examiner for Galveston County and an assistant professor in pathology at UTMB, testified for the State and said that biomechanical engineering "looks at the body in what they call finite-point analysis. In certain instances it falls apart when you have to look at differential . mechanisms

7

when you have both rigid structures in the body interacting with liquid or gelatinous structures in the body." He said that there was "absolutely" a danger in taking readings from accelerometers in the crash-test dummies and making assumptions about how an infant of those dimensions would behave:

[I]t's not any good to use the CRABI for head injury in these young infants because no one has studies on head injuries on infants the way they have studies on CRABI models. They don't have-you know, three-month-olds don't have accelerometers behind their ears, so you can never know.

Dr. Pustilnik also criticized the cadaver studies because there were too many unknowns: Were the children stored cold, room temperature, or frozen? Were they dried out? Were they dropped with the scalp intact? "You just don't know. It's not in the papers." It was Dr. Pustilnik's opinion that Brandon suffered "multiple impacts to the back and left or perhaps even right left-side back area" of his head.

Dr. Jenny, a professor of pediatrics and the director of the child protection program at a hospital in Providence, Rhode Island, has studied child abuse and car safety and has specialized in treating babies with head injuries. She also questioned the usefulness of the defense studies and testified that, based on the severity of Brandon's fractures, it was "highly likely" that he had been a victim of multiple impacts or crush injuries to his head. The fracture pattern was not consistent with a short fall from a care-giver's arms. Dr. Jenny characterized Dr. Plunkett's testimony about playground falls as disingenuous, and Dr. Van Ee's accident reconstruction "drop" tests with the CRABI–6 as lacking a proper protocol. She said it was "impossible" for Brandon to have suffered his injuries in a short fall. She disagreed with the other State's experts that such injuries were possible, though improbable, from a short fall. Those falls create "linear parietal" fractures, rather than complex fractures.

Dr. Gill–King, the director of the Laboratory of Forensic Anthropology and Human Identification, and a professor of forensic anthropology and pathology, who focuses on the material properties of bone, testified for the State. He likened the radiating fractures found on Brandon's skull to those created from shooting a BB-gun multiple times at a window: "A fracture stops another fracture." He disagreed with Dr. Bayardo that there was one blow to Brandon's head because the injuries were distinct outside-to-inside injuries: "I concluded there were at least three separate applications of force. There may have been more, but there were at least three." He also stated that the CRABI–6 dummy's head does not in any way accurately portray the properties of a human infant head.

In rebuttal, applicant called Dr. Ophoven, a pediatric forensic pathologist and medical examiner, and Dr. Stephens, a forensic pathologist and former medical examiner.

Dr. Ophoven described the "pendulum swing" in the medical community with respect to pediatric injuries: before the 1980's, a doctor would generally accept a family member's report that a child's head injury occurred accidentally. In the late 1980's, doctors began to routinely disbelieve family members' reports of children's accidental head injuries and to assume abuse. Now, with studies applying biomechanics to the field of pediatric head injuries, doctors are more cautious about "ruling out" the possibility that a child's head injury occurred accidently. After reviewing the materials in this case, including the State's experts' testimony, Dr. Ophoven stated that short falls like that described here "rarely cause fatal injuries, but have the potential to kill." She stated that biomedical analysis is important

8

in cases like this one, where there is no evidence of pre-existing or fresh abuse or assault and where the history comes in as a possible accidental fall. She said that Dr. Van Ee's and Dr. Monson's reports support their opinions that fatal injuries can occur from a fall of 46 inches onto the concrete surface described here. She also said that Brandon's injuries were consistent with a single blow; she did not see evidence of multiple impacts. She based this on "confluence bleeding from a single area of impact," and the "clear continuity between the fractures in the back with the fractures on the side[.]" She said that she would not rely on a forensic anthropologist, like Dr. Gill–King, to help her with the cause of death or nature of injuries or number of impacts because "theirs is the area of bones and their training is not in making a determination and rendering it."

Recent studies have clearly said, very clearly, you can not tell the difference between an accidental fracture and an inflicted fracture by how bad it is, how complicated it is, whether or not it crosses the suture line, whether or not it comes apart on the sides, that you cannot look at the fracture and say, I see abuse.

Dr. Ophoven summarized her testimony as follows:

So this issue here is, is it my opinion that there is science to study the force that could be generated in a fall? Yes. Do we have reasonable expectations of what's the amount of force it takes for those falls to cause a fatal injury or death? Yes. Could those forces have been generated in this case? Yes. Do I have an opinion about what happened to Brandon? I can't answer the question, but what I can say is he sure could have fallen and died.

The defense also called Dr. Stephens, who said that a medical examiner's change of the manner of death from "homicide" to "undetermined" represents a paradigm shift. He did not regard Dr. Plunkett's work as marginal but instead opined that some professionals in the medical community would not let go of old beliefs when faced with studies that challenged them. He personally had seen cases in which short-distance falls had killed children. He did not agree with much of what Dr. Pustilnik had to say, and discounted the significance of fracture lines hitting one another. He also agreed with Dr. Bayardo that the injuries Brandon sustained were the product of a single blow or impact.

Applicant also called her trial attorney to testify that she filed a pre-trial motion for funds to employ a biomechanical expert, but her motion was denied.

In sum, all but one of these ten medical and scientific experts agreed that Dr. Bayardo's trial testimony was now known to be scientifically inaccurate: Brandon's autopsy results did not establish that his death was the product of an intentional homicide. Indeed, all but one of these experts basically admitted that science cannot answer the question of whether Brandon's death was the result of an intentional homicide. It could have been an intentional homicide; it could have been an accident. Based upon the totality of the evidence, Judge Wisser recommended that this Court

vacate the judgment of conviction in this cause, and . order that Applicant be returned forthwith from her present place of confinement to the custody of the Sheriff of Travis County Texas, where she may

9

thereafter be held to answer any indictment or other charges made against her arising out of the death of Brandon Baugh.

II.

Dr. Bayardo's change in opinion on the manner of death from "homicide" to "undetermined" does not mean applicant is actually innocent of homicide. Nor does it mean that his trial testimony was "false" at the time it was given, based upon the state of scientific knowledge that he relied upon at that time. Due process was not violated at the time of trial, but nevertheless, the scientific testimony that supported a finding of "homicide" in the original trial has been retracted. Dr. Bayardo's current scientific uncertainty, as well as the uncertainty of all but one of the experts at the habeas evidentiary hearing, casts a pall upon the basis for the jury's verdict and upon its accuracy. At worst, the result of a change in the manner of Brandon's death to "undetermined" is only an admission that science cannot resolve the issue of whether Brandon's death was the result of a homicidal act. The jurors would have to decide that crucial question based upon the rest of the evidence.

The problem is that we do not know whether the jury would have found that applicant intentionally (as opposed to recklessly, negligently, or accidentally) caused Brandon's death absent Dr. Bayardo's expert scientific opinion.[16] I recognize that this case does not fit neatly into our habeas statute or our actual-innocence jurisprudence.[17] But until the Supreme Court (or this Court) holds that a conviction later found to be based upon unreliable scientific evidence violates the Due Process Clause,[18] I will stick by what I said in my Robbins dissent.

Who should decide whether the newly discovered unreliability of the expert scientific testimony was so crucial to the original jury's verdict that the accuracy of that verdict can no longer be relied upon?

I fall back upon the wisdom and experience of the habeas judge—the "Johnny—on—the—Spot" factfinder to whom we will defer whenever the record supports his essential factual findings.[19]

Judge Wisser held a series of live hearings so that he could hear, first-hand, from all the experts. And he has concluded that the accuracy of the verdict can no longer be relied upon. The following findings—all supported by the record—are especially important to Judge Wisser's recommendation of a new trial:

7. Dr. Roberto Bayardo served as the Chief Medical Examiner of Travis County for twenty-eight years, and personally conducted the autopsy of Brandon Baugh in February 1994.

8. [Applicant] claims that the infant died when he accidently fell from her arms to the concrete floor of her home, a distance of approximately four-and-one-half feet. At the trial, however, Dr. Bayardo strenuously disagreed that the infant's death could have been accidental. Dr. Bayardo told the jury in no uncertain terms that "it would have been impossible" for an accidental fall to have produced the injuries sustained by the infant; that the claim of an accidental fall therefore was "incredible" and that to have sustained these injuries from a fall, the infant "would have to fall from the height higher than a two story building." For these reasons, Dr. Bayardo opined in his autopsy report that the manner of death was "homicide," meaning that the only way the infant could have sustained his fatal injuries was by means of a deliberate and murderous blow struck by Applicant.

10

9. Dr. Sparks Veasey, then the Deputy Chief Medical Examiner of Lubbock County, also testified for the State at the trial. He reviewed Dr. Bayardo's autopsy report and photographs, and testified that the death resulted from blunt force trauma, probably resulting from "slamming into a wall or floor." As Dr. Plunkett has pointed out, however, Dr. Veasey's essentially repetitive testimony was uninformed by modern scientific learning and suffered the same vices as did the testimony of Dr. Bayardo. The State did not call Dr. Veasey as a witness at the evidentiary hearing. The Court does find that, if the jurors had heard Dr. Bayardo's re-evaluation, they would not have credited the then-conflicting testimony of Dr. Veasey.

10. Based on the trial court record and the Court's personal recollection of the trial, the Court finds that the trial testimony of Dr. Bayardo was the critical evidence upon which the conviction of Applicant rested, and was the evidence upon which the essential element of culpable mental state hinged. The "impossible," "incredible," "two story building" and "slamming" testimony of the State's chief expert medical witness ruled out accidental cause. On that basis, the State persuaded the jurors that Applicant was guilty of murder beyond a reasonable doubt.

13. Dr. Bayardo and Dr. Plunkett both testified at the evidentiary hearing. Based upon the content of their written submissions, the testimony of each witness during direct and cross-examination, and the demeanor of each witness, the Court finds the Affidavit and testimony of Dr. Bayardo, and the Affidavit, report and testimony of Dr. Plunkett, are true, and that each of these witnesses is credible.

17. Dr. Bayardo testified at the evidentiary hearing that he continues to hold the opinions that he expressed in his Affidavit, and that [he] continues to share the views expressed by Dr. Plunkett in the latter's evaluation. Addressing the words he used in his testimony to the jury in 1995, Dr. Bayardo testified at the evidentiary hearing that he would not use "impossible" or "incredible" were he to testify to the jury today, "because of the new knowledge about how these types of injuries occur."

18. Dr. Bayardo also explained that he used the "two-story fall" analogy in his 1995 testimony because "that's what I was taught during my residency and during my training that that's the way that these types of injuries happen," and "at that time, we didn't have any information about the biomechanical way of explaining these injuries." The two-story analogy "would have been my usual answer in cases like this" in 1995, but he would not say so today, because the new scientific developments in biomechanical investigations "put a doubt in my mind."

19. In his 1995 Medical Examiner's Report Dr. Bayardo states that, in his professional opinion, the manner of the infant's death was "homicide." At the evidentiary hearing, however, Dr. Bayardo explained that he wrote "homicide" in 1994 because "at that time we didn't have any information about the biomechanical way of explaining these injuries[.]" He then testified that if he were preparing his report today, he would not have opined that the manner of death was homicide, but instead, "I would leave it undetermined,".

11

20. Applicant's witness, Dr. Peter J. [Stephens], is also a former Medical Examiner. He testified that this re-evaluation of the manner of death by Dr. Bayardo—from "homicide" to "undetermined"—was a significant "paradigm shift" representing a very fundamental re-evaluation.

21. In addition, Dr. Bayardo explained that there were other circumstances that now cause him to doubt that Brandon Baugh's death was a homicide. He testified that

All the previous cases I've seen that were the result of a homicide injury had the multiple, recent, and other injuries and also had multiple fractures of ribs and extremities, and they also had multiple bruises or scrapes of similar ages. And this baby did not have any of those injuries, and that the location [of the injury] was also different from the other cases I've seen.

22. Because Dr. Bayardo's testimony at trial was the critical evidence upon which the conviction of Applicant rested, and was the testimony upon which the essential element of culpable mental state hinged, the Court finds that if Dr. Bayardo's re-evaluation had been presented to the jury in 1995, no rational juror could have or would have convicted Applicant of capital murder beyond a reasonable doubt in light of this new evidence.

In his Finding of Fact Number 23, Judge Wisser explicitly addressed the "guilty conscience" evidence detailed by Judge Keasler:

23. In making its Finding No. 22, the Court has not overlooked the State's evidence at trial concerning Applicant's flight after the death of the infant. While flight might be some evidence of a guilty conscience, it is equivocal evidence at best, and on the basis of personal recollection, the Court finds that the evidence of flight did not have the capacity to prove the mens rea of capital murder beyond a reasonable doubt.

24. In making its Findings, the Court has also considered the Applicant's evidence of the new scientific analysis, unavailable at the trial, upon which Dr. Bayardo based his re-evaluation. The Court has done so in order to assure itself that Dr. Bayardo's re-evaluation is based upon a solid scientific foundation, and therefore supports the Court of Criminal Appeals' statement that the re-evaluation is a "material exculpatory fact."

25. In this regard, the Court has read, heard, considered, and evaluated the reports and materials of Drs. Plunkett, Stephens, and Monson upon which Dr. Bayardo relied in his Affidavit, the trial testimony of these three experts, and the corroborating reports and evidentiary hearing testimony of Drs. Janice Ophoven and Chris Van Ee.

26. The Court finds that Dr. Plunkett's Affidavit, his own report and materials, as well as the report of Dr. Peter Stephens, and the report of Dr. Kenneth Monson and the observed testimony of each of these witnesses at the evidentiary hearing, are truthful and credible.

27. Dr. Plunkett's report in the present case, and those of the other experts, show that the 1995 testimony of the State's chief experts was, at bottom, scientifically flawed and grounded upon the belief that "short-distance falls" can never case fatal infant head trauma. This belief no longer enjoys acceptance in today's scientific community.

12

28. Dr. Monson made and explained a number of biomechanical calculations that he performed as an expert witness for Applicant, and concluded that the infant's assumed fall from Applicant's arms "had the potential to produce a serious injury," and that "the possibility [of accidental death] cannot be ruled out given the current state of knowledge." The Court finds that Dr. Monson's Report and testimony are truthful and credible.

29. Dr. Monson testified that, from an assumed fall height of 46 inches from Ms. Henderson's arms, the head of the infant would have been traveling at a speed of almost 11 miles an hour when it struck the floor, and that because the floor was a concrete, unyielding surface, the deceleration from 11 miles per hour to zero was virtually "instantaneous."

30. Applicant's witness Dr. Kenneth Monson, and State's witness Dr. Nagaranjan Rangarajan, largely agree that scientific evidence available today cannot rule out the possibility of accidental death.

31. At trial, Dr. Bayardo testified that the fatal trauma sustained by Brandon Baugh was the product of a single blow to the infant's head. This, of course, is consistent with the infant having fallen from Applicant's arms, and reaching a speed of eleven miles per hour when the back of his head struck the concrete floor, and thereby absorbed all the energy (G force) of the fall "virtually instantaneously." No evidence was introduced by the State that would have permitted the jury to find, much less beyond a reasonable doubt, that the infant sustained fatal trauma by reason of multiple blows to the head.

32. At the evidentiary hearing, Dr. Bayardo provided a detailed explanation of his conclusion that the infant died as a result of a single blow to the head. He used his autopsy photos for this purpose, as well as explaining the "soft tissue" and other analyses that he observed or performed during the autopsy. Based both upon its assessment of Dr. Bayardo's testimony at the evidentiary hearing, and upon its personal recollection of Dr. Bayardo's testimony at the trial of this case in 1995, and at many other criminal trials at which this Court served as trial judge, this Court finds that Dr. Bayardo's "single blow" analysis is truthful and credible.

33. Drs. John Plunkett, Janice Ophoven, and Peter Stephens each testified at the evidentiary hearing that they agreed with Dr. Bayardo's single blow analysis. The Court finds that all this testimony is truthful and credible.

34. The reports of Drs. Plunkett, Stephens, Ophoven, and Monson, and these witnesses' corresponding testimony at the evidentiary hearing, support a finding that the biomechanical analysis that has been presented and used in this case was not available to Applicant in November 1998. Although biomechanical studies and analyses had been used theretofore for accident prevention research and application—helmets, airbags, seatbelts, child restraint seats, etc .—it was not until the early 2000's that research began to focus for the first time on short distance falls and other traumatic events involving head injuries to infants and young children.

35. The Court also heard the testimony of the State's experts, Drs. Mary Case, M.D., Carole Jenny, M.D., N. Rangarajan, Ph.D., Stephen Pustilnik, M.D., and Harrell Gill–King, Ph.D. The Court finds that their testimony is truthful and credible.

13

36. However, despite finding that both Applicant's and State's expert witnesses were truthful and credible, the Court finds that Dr. Bayardo's re-evaluation is based upon credible, new scientific evidence, and that the re-evaluation is, as the Court of Criminal Appeals stated, a "material exculpatory fact."

37. Accordingly, the Court finds that Applicant has met her burden of proof under Sections, 5(a)(1) and 5(e) of Article 11.071, namely, that the factual basis of her claim was unavailable to her at the time she filed her prior application on November 17, 1998, and that the basis of her claim was not ascertainable through the exercise of reasonable diligence on or before that date.

Judge Wisser's single Conclusion of Law is: "Applicant Cathy Lynn Henderson has proved by clear and convincing evidence that no reasonable juror would have convicted her of the capital murder of Brandon Baugh in light of the new evidence presented in her Application." Judge Wisser signed his findings and conclusions on May 14, 2012. On June 13, 2012, the State filed its response:

The State has reviewed the habeas court's findings and conclusions on the first subsequent writ application. Given that Dr. Roberto Bayardo, one of the State's major witnesses, has changed his opinion concerning the cause and manner of death of the infant Brandon Baugh, and in light of the court's findings that this new medical testimony would have impacted the jury's decision, the State does not oppose the habeas court's recommendation that the applicant's cause be remanded for a new trial.

The State's position is not based on the belief that the applicant is not guilty. Nor do we agree with the theory of biomechanics as presented by defense experts and relied upon by Dr. Bayardo. But we do believe that the community must have confidence in a fair process and accurate outcome. To this end, we believe Dr. Bayardo's reevaluation and the habeas court's recommendation are important enough to merit a reconsideration of all the evidence, including the new scientific theories, by a jury.

Our decision not to file objections to the habeas court's findings, nor to oppose the court's recommendation for a new trial, is done so that this matter can be fully and fairly litigated.[20]

Under the standard for determining a bare claim of actual innocence announced in Ex parte Elizondo, an applicant must show "by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence."[21] This is what applicant claims; this is what the trial court concluded—that no reasonable juror would have found applicant guilty of the capital murder of Brandon Baugh—at least not to a level of confidence beyond a reasonable doubt.

Judge Wisser did not have to find that Brandon's death was an accident to conclude that applicant was entitled to a new trial based on Dr. Bayardo's changed testimony and the new expert testimony concerning scientific advances in biomechanics and forensic pathology. Judge Wisser's factual finding that "if Dr. Bayardo's re-evaluation had been presented to the jury in 1995, no rational juror could have or would have convicted Applicant of capital murder beyond a reasonable doubt in light of this new evidence" is entitled to deference because it is supported by the record.[22] That does not mean that applicant is actually innocent of capital murder. It simply means that the crucial evidence that had supported both the cause of Brandon's death and applicant's intent to cause his death has been retracted. The present guilty verdict is based on scientifically unreliable evidence, but, after another capital murder

14



trial, a guilty verdict could be based on scientifically reliable evidence or evidence that forthrightly admits that science cannot resolve the question of either causation or intent.

Given Judge Wisser's profound concerns about the impact of Dr. Bayardo's expert testimony at trial on the critical, disputed issue of applicant's intent, I agree that applicant did not receive a fundamentally fair trial based upon reliable scientific evidence.[23] Despite every participant's honesty and good faith, this-as the District Attorney of Travis County forthrightly recognizes—is a case that should be retried to ensure the accuracy of our verdicts and the integrity of our system. With these comments, I join the Court's order.

CONCURRING OPINION

Like the majority of the Court, I conclude that the death sentence imposed against Cathy Lynn Henderson, applicant, must be vacated and that she must receive a new trial for the charge of capital murder of Brandon Baugh. In reaching this conclusion, I follow the recommendation of the trial court and the State's attorney and join the Court's majority opinion granting relief. I also join the concurring opinion by the Honorable Judge Cochran with two exceptions. I disagree with her conclusions that (1) this case is the same as Ex parte Robbins, 360 S.W.3d 446 (Tex.Crim.App.2011), and (2) this case permits us to decide whether there is a due-process violation outside the context of a death-penalty case. I write separately to explain why I conclude that this case presents more compelling reasons for granting relief than those presented in Robbins. See id.

In Robbins, this Court denied the applicant relief. Id. at 448. If this case was factually identical to Robbins, the same precedent that was used to deny relief in Robbins would compel denying relief in this case. See id. Instead, the Court grants relief in this case. I conclude that, although they share many factual similarities, Robbins and this case differ as to the findings of fact rendered by the respective trial courts: This trial court finds that new scientific evidence is the basis for ordering a new trial, whereas the Robbins trial court found that use of false evidence was the basis for ordering a new trial. Id. at 457.

The Robbins trial court's findings stated that medical examiner "Dr. Moore's trial opinions were not true. They were based on false pretenses of competence, objectivity, and underlying pathological reasoning, and were not given in good faith." Id. at 477 (Alcala, J., dissenting). The trial court characterized Dr. Moore's testimony as "expert fiction calculated to attain a criminal conviction." Id. Furthermore, the trial court found that Dr. Moore was "biased toward the State" at the time she testified. Id. at 474 (Cochran, J., dissenting). In my dissenting opinion in Robbins, I concluded that the record supported the trial court's characterization concerning the falseness of the testimony and that the use of that testimony violated the Due Process Clause of the Fourteenth Amendment. Id. at 476–77 (Alcala, J., dissenting); see also Ex parte Chabot, 300 S.W.3d 768, 770–71 (Tex.Crim.App.2009); Ex parte Napper, 322 S.W.3d 202, 242 (Tex.Crim.App.2010).

Here, the trial court has not made any factual findings to suggest that, at the time that it was introduced, the medical evidence underlying applicant's conviction was known to have been false. More specifically, nothing in the trial court's findings suggests that Dr. Bayardo based his testimony on false pretenses of competence, a lack of objectivity, prosecutorial bias, or expert fiction calculated to attain a criminal conviction. The absence of these types of findings distinguishes this case from Robbins and renders it a

new-science case rather than a false-testimony case. Compare id. at 457. As Judge Cochran accurately observes in her concurring opinion today, Dr. Bayardo's testimony was "based upon the state of the scientific knowledge" and was not known to have been false at the time it was given. For this reason, I join Judge Cochran's opinion today, although I did not in Robbins. See id. at 476 n. 1 (Alcala, J., dissenting).

In Robbins, I explained that I did not join Judge Cochran's dissenting opinion "because the change in Dr. Moore's testimony is not due to new scientific principles but is instead, according to her, due to her having more experience as a medical examiner, and according to the trial court's findings, due to her trial testimony being the result of prosecutorial bias." Id. Today, I join Judge Cochran's concurring opinion because this case falls squarely within her assertion that executing a defendant whose conviction is premised on now-discredited scientific theories violates due process, even though those scientific theories were once considered valid and true at the time they were applied.

Furthermore, although I disagree with the Honorable Judge Price's analysis of Robbins, I agree with his conclusion that this case presents a stronger reason to grant relief than that presented in Robbins: Without relief, applicant will be executed for a conviction that we now know was premised largely on faulty science.

The Supreme Court has succinctly observed that "the penalty of death is qualitatively different from any other sentence." Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (internal quotations omitted). Among these differences is that a death sentence "is unique in its total irrevocability." Furman v. Georgia, 408 U.S. 238, 306, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring). The Court has held that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." Lockett, 438 U.S. at 604. This heightened need for reliability requires a mechanism that enables judicial enforcement of that sentence to evolve with the science that serves as the basis for imposition of that sentence.

Whether we ultimately apply the faulty-science theory to due-process complaints beyond the death-penalty context is a question for another day. The holding of this case is quite narrow: Due process prohibits the execution of a person when faulty science was essential to the State's establishment of an element necessary for conviction—here, that the cause of death of the complainant was intentional—and the habeas record shows that today's scientific community reaches a different consensus—here, that the cause of death is undetermined.

In accordance with the trial court's recommendation, I join in the Court's judgment granting relief and remanding for a new trial.

DISSENTING OPINION

Like this Court's order remanding the matter to the trial court for findings of fact and conclusions of law, the Court's opinion today grants Cathy Henderson relief without one word of analysis why she is entitled to it. In fact, the Court does not even identify the legal basis for granting Henderson relief. Instead it issues a legally hollow opinion with a staggering result. Readers of both our remand order in this matter and today's opinion will undoubtedly and justifiably be both baffled and appalled by the Court's opinion. I

16

count myself among them. The unmistakable message of the Court's per curiam opinion is this: despite applicable legal precedent to the contrary and overwhelming inculpatory facts, we grant Henderson relief solely because we want to. And to future applicants, this message's implication is clear: with luck, your writ application may also be viewed with such grace.

In her subsequent application for a writ of habeas corpus, Henderson asserts she is entitled to relief for three reasons: (1) she is actually innocent of capital murder because no reasonable juror would convict her of capital murder in light of new scientific evidence (Herrera[1] -type claim); (2) but for constitutional errors—namely a violation of Ake v. Oklahoma[2] and a Fifth Amendment claim previously raised and rejected on direct appeal[3] —no rational juror could have found her guilty beyond a reasonable doubt in light of the new evidence (Schlup[4] -type claim); and (3) she is no longer death eligible. The Court came to the breathtaking conclusion that Henderson satisfied Texas Code of Criminal Procedure article 11.07, § 5(a) with her allegation that then Travis County Medical Examiner Dr. Roberto Bayardo's reevaluation of his opinion at trial was newly discovered evidence that established her innocence. The Court remanded the matter to the trial court for further proceedings on Henderson's first two claims and dismissed her third.[5]

After several evidentiary hearings, this matter now returns to us with the trial judge's findings of fact and conclusions of law recommending that we grant relief on Henderson's first actual-innocence claim. Dr. Bayardo's reevaluation of whether the injuries suffered by Brandon Baugh, the three-and-half-month-old victim of this capital murder, were intentionally inflicted is the crux of Henderson's actual-innocence claim and the foundation of the trial judge's recommendation to grant relief. Despite our instructions in the remand order, the trial judge did not enter findings of fact or conclusions of law on Henderson's Schlup claim, which if the Court were to expressly reject Henderson's actual-innocence claim, as it should, would require remanding to the trial judge to address this issue.

By explicitly stating that the trial judge's findings of fact are supported by the record, the Court, by implication, reaches the opposite conclusion as to the trial judge's conclusions of law—that they do not share the same record support. But it nonetheless "accepts" the trial judge's recommendation to grant relief and give Henderson a new trial on an unknown basis. Surely, it cannot be actual innocence otherwise the Court would have found the trial judge's conclusions are supported by the record or would have expressly found Henderson proved her actual innocence. In its zeal to grant Henderson relief, the Court is forced to look elsewhere to accomplish its goal, and left without a clear legal path, the Court takes the indefensible position to grant relief without justification or explanation. The facts adduced at trial and in the subsequent evidentiary hearings in light of our actual-innocence case law make it clear why the majority could not adopt the trial judge's conclusions and grant Henderson relief on actual-innocence grounds; the burden is too high, the inculpatory facts are too great, and the "new evidence" is too weak.

To put the issue of Dr. Bayardo's reevaluation in perspective, it is appropriate to start with his testimony at Henderson's 1995 capital murder trial. At the time, Dr. Bayardo had been Travis County's Chief Medical Examiner for eighteen years and throughout his career he had performed approximately 15,000 autopsies. He personally performed Brandon Baugh's autopsy and testified to the extent of Brandon's injuries at trial. Dr. Bayardo concluded, "It is my opinion, based upon the autopsy findings, that the decedent, Brandon Baugh, came to his death as a result of a severe closed head injury. There was

17

comminuted fracturing of the back of the skull and subdural and subarachnoid hemorrhages implying that a severe force had been given to the head and characteristic of abuse, homicide."[6] Dr. Bayardo also concluded that it would have been "impossible" and "incredible" for a fall from four to four-and-a-half feet to have caused Brandon's injuries. He also testified that Brandon's injuries were not accidental because the fractures crossed the suture lines found in an infant's not-fully formed skull which would require a severe degree of force. Further, the injury's location—the back of the head—was a characteristic of an abused child because most accidents occur on the sides of the head. Dr. Bayardo explained that "[t]his is an injury that you see when a baby's head is slammed or thrown very forceable against a flat surface" and in order for Brandon's injury to result from a fall, "he would have to fall from a height higher than a two-story building."[7] On cross-examination, Dr. Bayardo conceded that his testimony was limited to the cause of death and he was unable to tell the jury the exact nature of the severe force or how that force was inflicted.

At the habeas hearing and in his affidavit, Dr. Bayardo testified that after reviewing reports from Drs. John Plunkett, Peter Stephens, and Kenneth Monsoon—Henderson's proffered experts who discussed how biomechanics could explain that Brandon's injuries were accidental—he would no longer testify that the manner of Brandon's death was homicide; instead he would now conclude that it was "undetermined," as opposed to accidental. According to his affidavit, Dr. Bayardo also claims that he would not be able to testify about the degree of force needed to cause Brandon's head injury and would not conclude that an accidental fall was "impossible" or "incredible" in explaining the cause of Brandon's injuries.

Even after the benefit of multiple evidentiary hearings where the trial judge took testimony from expert after expert, Henderson is no closer to establishing her innocence than she was in her claims she asserted in her subsequent application.[8] Henderson presents a bare innocence claim. We have labeled the burden of establishing a bare claim of actual innocence a Herculean task.[9] In satisfying this heavy burden, Henderson's newly discovered evidence must constitute affirmative evidence of her innocence.[10] Henderson must show by clear and convincing evidence that no reasonable juror would have convicted her in light of the new evidence.[11] Whether an applicant satisfies this burden requires the evaluation of "the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole, so we must necessarily weigh such exculpatory evidence against the evidence of guilt adduced at trial."[12]

The trial judge concluded that Henderson "has proved by clear and convincing evidence that no reasonable juror would have convicted her of the capital murder of Brandon Baugh in light of the new evidence presented in her Application."[13] The Court's opinion acknowledges that in most circumstances we appropriately defer to and accept the trial judge's findings of fact and conclusions of law when they are supported by the record. However, we may make contrary findings and conclusion when our independent review of the record reveals the findings and conclusions are not supported by the record.[14] Here, the trial judge's conclusion is not supported by the record and is demonstrably wrong because it implicitly mischaracterizes Dr. Bayardo's new opinion, improperly focuses on Dr. Bayardo's reevaluation in isolation, and fails to weigh such exculpatory evidence against all of the evidence of guilt adduced at trial.

Dr. Bayardo's testimony was merely one piece of evidence that established Henderson's guilt at trial and shed light on her intent that fateful day. Henderson was the last one to have seen Brandon the day he

18

went missing after he was dropped off at Henderson's home where she cared for Brandon and Megan Baugh. There were no calls to 911 that day from Henderson's home or from her neighborhood. There were no other pleas for help. She had the Baughs' emergency contact numbers. But they were not called. After Brandon died, she wrapped his body in a blanket and put his body in a Bartles & Jaymes wine cooler box and secured it with tape later matched up to tape found in her home. With Brandon's body in the trunk of her car, Henderson put her daughter Jennifer and Megan, Brandon's older sister, in the car with a spade and her neatly packed suitcase and drove to Round Rock to get her car's oil changed.

On her way out of town and with the two girls in tow, she drove to the bank to withdraw $2200 through a cash advance on her credit card. After repeated attempts proved unsuccessful, she was finally able to withdraw $1000. Henderson told the bank employee that she needed the money because her father just died and she needed to be with her family. At some point in the afternoon, she stopped at McDonald's to get the girls something to eat. She then drove to Holland, Texas where her husband's relatives lived. She arrived unexpectedly. They had not seen Henderson in five or six months. Once there, she told her husband's relatives that she needed to go to the store and would be back soon. She asked her eleven-year-old niece to babysit Jennifer and Megan. She never returned. Instead, she continued north where outside Waco, just off a country road near a stand of trees, she buried Brandon in the box, using the spade she packed. Investigators would later find Brandon's diaper bag in a ditch in the vicinity where they found Brandon's buried body.

Later that night she checked into a motel in Blackwell, Oklahoma under the name Tracy Simms and listed a Missouri address. The next day, Henderson arrived in Trenton, Missouri and dropped in on a longtime friend Linda Brewer. It too was an unexpected visit. The two discussed Henderson's troubling custody issues and how she was ordered to have only supervised visitation with her other daughter. Henderson told Brewer that the children she watched were picked up by their grandparents who would take care of them for a week so she decided to visit her in Missouri. Only three days after Brandon was killed and while having a few margaritas with a friend, Henderson admitted that she had "killed somebody or murdered somebody."[15]

Henderson and Brewer then drove to Independence, Missouri to see other friends. After her arrival in Independence, Henderson told Brewer that she had a new identity, was getting new licence plates for her car, and wondered how she would look with red hair. Brewer began to realize Henderson's trip was no longer just an opportunity to come back and visit. When asked why she needed to change her identity, she responded, "I can't do life. I don't want to talk about it anymore." With the use of a Social Security card another friend found, she assumed the identity of Patricia Keith. Reluctant to drive her vehicle because she was afraid the police would be looking for it, she got some old Missouri license plates and put them on her car. She dyed her hair red. With her new identity, she rented an apartment under her assumed name. She also began a sexual relationship with the male friend who gave her the Social Security card and new license plates and wanted him to move in with her. She attempted to find a job in Independence. She did all of this within three or four days after Brandon's death.

When a police officer knocked at the door of her apartment looking for information on Henderson and Brandon, she claimed that she had never seen the person (Henderson) in the pictures. At first, the officer did not recognize her from the pictures. But the officer returned, and Henderson gave a false name. After

19

Henderson consented to a search of the apartment, the officer discovered the Social Security card Patricia Keith's name along with the receipt for the oil change and apartment rental receipt. She was subsequently arrested and claimed that she did not know what this was about, threatened the officers with a false imprisonment suit, and complained that she was going to miss a hair appointment.

She was then interviewed by an FBI agent to whom she gave conflicting stories. Her first story was that she did not have any information about Brandon. In her second story, she claimed that the Baughs' grandmother came to pick Brandon up. She then claimed she packed up the girls and brought them to the bank, McDonald's, and the relatives' home in Holland and drove to Blackwell, Oklahoma, checking into the motel under Tracy Simms and finally arriving in Trenton and Independence, Missouri. But when the agent suggested that Brandon was dead, and perhaps it was an accident, Henderson said "yes." When asked "Did you bury him?" she responded "Of course, I did. He's just a baby." Henderson's final version was that around 10:30 in the morning, Brandon fell from her arms and hit the tile floor. She stated she attempted CPR for about an hour, but she knew he was dead. She admitted to burying Brandon near Waco with a spade she brought from home.

Dr. Bayardo was not the only witness who gave expert testimony concerning the manner of Brandon's death. The jury heard from Lubbock County Deputy Chief Medical Examiner Dr. Sparks Veasey III. Like Dr. Bayardo, Dr. Veasey concluded that Brandon's injuries were "consistent with a baby's head [being] slammed into a blunt object, a baby being held by the legs and slammed into a wall or a floor. They are consistent with a baby being forcefully—extremely forcefully thrown into a blunt—into a blunt object."[16] He further concluded that Brandon's injuries were inconsistent with an accidental drop from a distance of four to five feet and was certain that Brandon's injuries were not the result of an accident. In addition to Dr. Veasey, Henderson's own expert corroborated Dr. Bayardo's and Dr. Veasey's conclusions. After reviewing the autopsy report, photographs, and videotape, Dr. Kris Sperry, the Fulton County Deputy Chief Medical Examiner in Atlanta, Georgia, opined that Brandon's crushing skull fractures were not accidental.

The trial judge's conclusion that Henderson proved by clear and convincing evidence that no reasonable juror would have convicted her of capital murder simply failed to weigh Dr. Bayardo's reevaluation against the evidence of guilt adduced at trial. The trial judge came to the remarkable and unsupported mixed finding and conclusion that

Because Dr. Bayardo's testimony at trial was the critical evidence upon which the conviction of Applicant rested, and was the testimony upon which the essential element of culpable mental state hinged, the Court finds that if Dr. Bayardo's re-evaluation had been presented to the jury in 1995, no rational juror could have or would have convicted Applicant of capital murder beyond a reasonable doubt in light of this new evidence.[17]

Contrary to Judge Cochran's belief, the trial judge's opinion that "no rational juror could have or would have convicted Applicant of capital murder beyond a reasonable doubt in light of this evidence" is a conclusion of law, and therefore not entitled to deference.

20

The trial judge claimed to be mindful of Henderson's flight, only to "find [ ] that the evidence of flight did not have the capacity to prove the mens rea of capital murder beyond a reasonable doubt." But "[w]e have repeatedly held that flight is evidence of a circumstance from which an inference of guilt may be drawn."[18] Notably, the trial judge did not hear from Dr. Veasey or Dr. Sperry in connection with Henderson's application and Henderson does not directly challenge their conclusions. We do not know if their conclusions would change like Dr. Bayardo's when presented with Henderson's experts' affidavits and reports. On this record, we cannot assume they would. However, the trial judge cavalierly found that "if the jurors had heard Dr. Bayardo's re-evaluation, they would not have credited the then-conflicting testimony of Dr. Veasey ."[19] Such idle speculation is certainly not a finding that this Court should adopt. Even if true, what about Dr. Sperry's testimony offered by Henderson herself? The findings and conclusions are silent about the potential impact of Dr. Sperry's corroborative testimony of both Dr. Veasey's and Dr. Bayardo's opinions at trial.

More importantly, it is the trial judge's failure to consider all of Henderson's actions after Brandon's death that is the most troubling. After Brandon's death, there was no attempt to call for help. She attempted to hide the evidence of Brandon's death by burying him near Waco with the spade she brought from home. While having drinks with friends she admitted to killing or murdering someone. Further, Henderson did not merely engage in a very deliberate plan to flee. She actively attempted to evade law enforcement through assuming a new identity, changing her appearance, changing her licence plates, and starting a new life in Missouri while leaving her family behind. And when the jig was up, she first claimed not to know what happened to Brandon before finally admitting to burying him and changing her version of events to describe an accidental death. These are not the acts of an innocent person. In the face of common sense and our case law, it would be preposterous to conclude that Dr. Bayardo's new opinion that the manner of death should be undetermined, as opposed to accidental, would undermine all of the incriminating evidence establishing Henderson's guilt.

By leaving its rationale unstated, the Court avoids confronting our holding in Ex parte Robbins,[20] our recent opinion addressing a factually similar actual-innocence claim and precedent determinative of Henderson's actual-innocence claim. In Ex parte Robbins, Dr. Patricia Moore, an assistant medical examiner, testified at Robbins's capital murder trial that the child victim's death was caused by "asphyxia due to compression of the chest and abdomen and that the manner of death was homicide."[21] Many years after the jury found Robbins guilty of capital murder, Dr. Moore's report and conclusions were reexamined by several other medical examiners who disagreed with her conclusions. Dr. Moore herself also reevaluated her report and came to the conclusion that her opinion had changed and the cause and the manner of the victim's death should be listed as undetermined.[22] Like Henderson, Robbins claimed this reevaluation was newly discovered evidence that demonstrated his actual innocence.[23] In denying Robbin's actual-innocence claim, we held that

[Robbins] failed to prove that the new evidence unquestionably establishes his innocence. Moore can no longer stand by her trial testimony, but rather than completely retracting her trial opinion, she is of the current opinion that the cause and manner of death of [the victim's] death are 'undetermined.' Moore cannot rule out her trial opinion as a possibility of how [the victim] died. Hence, Moore's reevaluation

21

falls short of the requisite showing for actual innocence because it does not affirmatively disprove that [Robbins] intentionally asphyxiated [the victim].24

Like Dr. Moore's reevaluation in Ex parte Robbins, Dr. Bayardo's reevaluation did not render void his trial testimony.25 The jury could have considered Dr. Bayardo's testimony that the manner of death was "undetermined" and still have found Henderson guilty based on all of the evidence presented at her trial, including Dr. Veasey's and Dr. Sperry's expert conclusions.26 Henderson's reliance on Dr. Bayardo's reevaluation merely serves to retroactively impugn the State's case at trial and does not affirmatively demonstrate her innocence.27 On this record and particular claim of actual innocence, we are compelled to follow Ex parte Robbins and conclude that Henderson failed to satisfy her Herculean burden—to show by clear and convincing evidence that no reasonable juror would have convicted her in light of Dr. Bayardo's reevaluation.

In its response, the State does not contest the trial judge's findings and conclusions, and does not oppose granting Henderson relief. The State takes this position while simultaneously making it clear that it does not believe that Henderson is not guilty and disagrees with the biomechanical theory presented by Henderson's experts and relied upon by Dr. Bayardo in his reevaluation. The State's concern for the community's confidence in the criminal justice system expressed in its response is laudable. But it is neither legally controlling, nor a particularly persuasive argument for granting Henderson relief when the State still contests Henderson's underlying factual contentions. The State's acquiescence cannot not bridge the gulf between Henderson's asserted claims and the burden she must satisfy to be legally entitled to relief.

Today, the Court's decision casts aside its established legal principles and grants relief to an applicant not entitled to it. The Court accomplishes this feat by abandoning all standards necessary for an applicant to obtain relief, only to replace them with an unexplained, ad hoc determination. "Because we want to" is not a substitute for legal reasoning. And any suggestion to the contrary is untenable. Further, we have denied past applicants similarly requested relief on similar evidence. We owe a duty to all applicants that we will measure the merits of their claims equally.

Henderson's Herrera-type claim of actual innocence should be denied and her pending Schlup-type actual-innocence claim should be remanded to the trial court for findings of fact and conclusions of law. It is a travesty to grant this child killer relief on some unknown legal principle while her tiny, defenseless victim lies dead and reburied. Therefore I dissent with all the vigor at my command.

DISSENTING OPINION

Something is missing here. While the Court states that it accepts the trial court's recommendation granting relief, it does so without providing any legal basis for that ruling, and I cannot find a ground upon which relief should be granted. And to justify its decision, the Court makes a quantum leap from "advances in science" to granting relief, which presents a whole new dilemma for the criminal justice system and this case in particular.

22

The real issue in this case is whether the admission of potentially unreliable evidence requires this Court to grant relief regardless of the state of the remaining record. Eleven expert witnesses testified at Applicant's writ hearing, some for both sides. The trial court found all of the experts credible but focused on a change in the testimony of expert Dr. Bayardo to conclude that Applicant had proven by clear and convincing evidence that no reasonable juror would have convicted her in light of the "new evidence." This Court now defers to that conclusion. However, nowhere in Dr. Bayardo's altered testimony does he state or indicate that his original opinion was false, nor does he refute the medical science relied upon by the other State experts. Instead, Dr. Bayardo changed his opinion on the manner of death from "homicide" to "undetermined" based upon changes in the science upon which he relied. While a change in Dr. Bayardo's testimony could render his opinion unreliable, "unreliable" testimony does not equate with "false testimony" or "innocence," nor does it automatically require a new trial.

The admission of expert testimony is governed by Texas Rule of Evidence 702, and to be admissible under this rule, the party offering the scientific expert testimony must demonstrate by clear and convincing evidence that such testimony is both relevant and reliable. Kelly v. State, 824 S.W.2d 568, 572 (Tex.Crim.App.1992). The focus of the reliability analysis is to determine whether the evidence has its basis in sound scientific methodology such that testimony about "junk science" is weeded out. Jordan v. State, 928 S.W.2d 550, 555 (Tex.Crim.App.1996).

Whether the science at issue is a "hard" science[1] or a "soft" science,[2] "reliability should be evaluated by reference to the standards applicable to the particular professional field in question." Coble v. State, 330 S.W.3d 253, 274 (Tex.Crim.App.2010); see Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (holding that when the subject of the expert's testimony is scientific knowledge, the basis of his or her testimony must be grounded in the accepted methods and procedures of science). Therefore, a change in the science upon which an expert relied in providing his trial testimony might indeed undermine the reliability of his testimony. But it does not necessarily follow that the testimony was "false" or that the existence of new science necessarily implicates innocence. For example, in this Court's unanimous opinion in Ex parte Miles, 359 S.W.3d 647 (Tex.Crim.App.2012), we adopted the trial court's conclusion that the "gunshot-residue standards, as testified to at trial, are no longer reliable." Id. at 663. However, we did not adopt the trial court's conclusion that "Applicant should also be granted relief, independently, on the ground of flawed forensic testimony." Id. Instead, we looked to all of the evidence presented and only then determined that actual-innocence relief was warranted. Other decisions from this Court recognize both the advancement in science and the legislative directive to apply that science to our caselaw through Chapter 64 of the Texas Code of Criminal Procedure. While further testing may prove to be inconclusive or even exculpatory, relief may nonetheless be denied based on the volume of other evidence. See Gutierrez v. State, 337 S.W.3d 883 (Tex.Crim.App.2011); Prible v. State, 245 S.W.3d 466 (Tex.Crim.App.2008).

Furthermore, even if a change in the underlying science means that the expert testimony was unreliable, it does not automatically result in a due process violation (and thus a new trial). An additional analytical step is required. Only when the admission of unreliable testimony was harmful is due process implicated and a new trial appropriate. See Coble, 330 S.W.3d at 280. Accordingly, relief should only be granted if the applicant demonstrates the error affected his or her substantial right to a fair trial. See Tex.R.App.

23

Proc. 44.2(b); Coble, 330 S.W.3d at 280 (explaining that harm occurs when the error had a substantial and injurious effect or influence in determining the jury's verdict). A criminal conviction should not be overturned by the erroneous admission of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." Johnson v. State, 967 S.W.2d 410, 417 (Tex.Crim.App.1998).

This reliability analysis is consistent with our policy interest in the finality of convictions. The Supreme Court has emphasized its enduring respect for "the State's interest in the finality of convictions that have survived direct review within the state court system." Calderon v. Thompson, 523 U.S. 538, 555, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). "Without finality, the criminal law is deprived of much of its deterrent effect." Teague v. Lane, 489 U.S. 288, 309, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality op.). To abide by Judge Cochran's suggestion that any intervening scientific development should result in a new trial would seriously undermine the stability of our criminal justice system. Most convictions involve some type of scientific evidence, whether hard (e.g., DNA or urinalysis) or soft (e.g., eyewitness identification or forensic psychiatrists testifying about future dangerousness). Rarely is a case wholly dependent on science alone. Thus, if we were to grant a new trial with every scientific advancement, without proof that the original science was indeed faulty, the finality of convictions would be illusory. While the evolution of science is important to the improvement of our system, each case must be decided individually, taking into account all of the evidence.

In summary, intervening scientific developments might result in unreliable expert testimony, and the admission of this unreliable evidence might rise to the level of a due process violation. But this case does not present us with such a scenario. Dr. Bayardo changed his opinion on the manner of death from "homicide" to "undetermined" based upon changes in the science upon which he relied. Perhaps this makes Dr. Bayardo's trial testimony unreliable, but as Judge Cochran acknowledges in her concurring opinion, this "does not mean applicant is actually innocent of homicide" or that "[Dr. Bayardo's] trial testimony was 'false' at the time it was given, based upon the state of scientific knowledge that he relied upon at that time." The "new evidence," even if based on "new science," must still affirmatively establish that the applicant is entitled to relief. See Ex parte Spencer, 337 S.W.3d 869, 879 (Tex.Crim.App.2011).

Additionally, when the entire record is considered, it is clear that Appellant's substantial rights to a fair trial were not affected by the admission of Dr. Bayardo's testimony. See Coble, 330 S.W.3d at 280 ("In making a harm analysis, we examine the entire trial record and calculate, as much as possible, the probably impact of the error upon the rest of the evidence."). As Judge Keasler competently outlines in his dissenting opinion, there is ample evidence to support that Appellant intentionally caused Brandon's death. See Tex. Penal Code § 19.03(a)(8). Certainly, in this context, Dr. Bayardo's unreliable testimony could not have a substantial and injurious effect or influence in determining the jury's verdict. See Coble, 330 S.W.3d at 280. The record provides fair assurance that the error would not influence a jury, or would have but a slight effect. See Johnson, 967 S.W.2d at 417.

For these reasons, I respectfully dissent.

PER CURIAM.

24

PRICE, J., filed a concurring opinion.COCHRAN, J., filed a concurring opinion in which WOMACK, JOHNSON, and ALCALA, JJ., joined.ALCALA, J., filed a concurring opinion.KEASLER, J., filed a dissenting opinion, in which KELLER, P.J., and HERVEY, J., joined.HERVEY, J., filed a dissenting opinion in which KELLER, P.J., and KEASLER, J., joined.MEYERS, J., not participating.